## ORAL ARGUMENT NOT YET SCHEDULED

No. 20-1161 (consolidated with Nos. 20-1171, 20-1172, 20-1180, 20-1198)

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

DEBORAH EVANS, *et al.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,
*Respondent*,

JORDAN COVE ENERGY PROJECT L.P., *et al.*,
*Respondent-Intervenors*.

On Petition for Review of Orders of the Federal Energy Regulatory Commission

## STATUTORY AND REGULATORY ADDENDUM

David Bookbinder
Megan C. Gibson
Niskanen Center
820 First Street, NE, Suite 675
Washington, DC 20002
(202) 810-9260
dbookbinder@niskanencenter.org
mgibson@niskanencenter.org

*Attorneys for Landowner Petitioners*

**Additional counsel listed inside front brief cover.**

Nathan Matthews.
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5695
Nathan.Matthews@sierraclub.org

*Attorney for Rogue Riverkeeper, Rogue Climate, Cascadia Wildlands, Ctr. for Biological Diversity, Citizens for Renewables, Friends of Living Or. Waters, Or. Physicians for Social Responsibility, Or. Wild, Or. Women's Land Trust, Sierra Club, and Waterkeeper Alliance*

Gillian Giannetti
Natural Resources Defense
Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 717-8350
ggiannetti@nrdc.org

Ann Alexander
Natural Resources Defense
Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6190
aalexander@nrdc.org

*Attorneys for Natural Resources
Defense Council, Inc.*

Susan Jane M. Brown
Western Environmental Law
Center
4107 NE Couch Street Portland,
OR. 97232
(503) 914-1323
brown@westernlaw.org

*Attorney for Cascadia
Wildlands, Center for Biological
Diversity, Citizens for
Renewables, Friends of Living
Oregon Waters, Oregon
Physicians for Social
Responsibility, Oregon Wild,
Oregon Women's Land Trust,
Rogue Climate, Rogue
Riverkeeper, and Waterkeeper
Alliance*

# STATUTORY AND REGULATORY ADDENDUM
# TABLE OF CONTENTS

**Statutes**

5 U.S.C. § 706 ……………………………………………………….……..1

15 U.S.C. § 717a …………………………………….………………….…..3

15 U.S.C. § 717b ………….…..……………………………………….…..5

15 U.S.C. § 717c …………….…………………………………………….9

15 U.S.C. § 717f …………………………………………………………12

15 U.S.C. § 717r …………………….……………………………………15

42 U.S.C. § 4332 …………………………………………….…..………18

Or. Rev. Stat. § 468A.205………………………………..….………22

**Regulations**

40 C.F.R. § 1502.14 (2019) …………………………………………….23

40 C.F.R. § 1502.16 (2019) …………………………………………….25

40 C.F.R. § 1502.22 (2019) …………………………………………….27

40 C.F.R. § 1506.2 (2019) ……………..……………………………………29

40 C.F.R. § 1508.8 (2019) ……………..……………………………………31

**Rules**

Fed. R. Evid. 201 ………………………………………………………………32

**Standing Declarations**

Standing Declaration of Lesley Adams …………..……………………………38

Standing Declaration of Martin Albert …………………………………....46

Standing Declaration of Michael Daole ……………………………….....51

Standing Declaration of Lucy DeFranco …………………..………....…55

Standing Declaration of Delos Galen Lee Devine ……………………….60

Standing Declaration of Kathleen Dodds …………………………………67

Standing Declaration of Rosemary Francis Eatherington ……………....70

Standing Declaration of Daniel E. Estrin …………………………….....76

Standing Declaration of Ka'ila Farrell-Smith ……………………………83

Standing Declaration of Doug Heiken …………….………...............89

Standing Declaration of Robyn Jannsen …………..……………….........94

Standing Declaration of Josh Laughlin ……………..…….…………...103

Standing Declaration of Sylvia Mangan ……………..…………………108

Standing Declaration of Robert Pollock ……………….……............118

Standing Declaration of Natalie Ranker ……………..………….……..123

Standing Declaration of Darlyne Reising ……………….…………….130

Standing Declaration of Joe Serres ……………………….…………...135

Standing Declaration of Douglas Smith ………………….…………...139

Standing Declaration of Barbara Taylor ……………….……………...146

Standing Declaration of Hillary Tiefer ……………….…………….....152

**Documents of which Petitioners Seek Judicial Notice** (excerpts)**:**

Pembina Pipeline Corporation, DOE/FE Docket Nos. 12-32-LNG, 11-127-LNG, Semi-Annual Report for *Jordan Cove Energy Project, L.P.* (Oct. 1, 2020), https://www.energy.gov/sites/prod/files/2020/11/f80/Jordan Cove Energy Project LP Semi-Annual Report 3413.pdf ……………….……………………………….……….…...155

FERC Ltr. to Nat'l Oceanic and Atmospheric Admin. (Aug. 12, 2020), https://elibrary.ferc.gov/eLibrary/filelist?accession_num= 20200812-3024……………………………………… ..……………….156

Department of Energy, DOE/FE Order No. 3413-A, Final Authorization,
    *Jordan Cove Energy Project, L.P.*, (July 6, 2020),
    https://www.energy.gov/sites/prod/files/2020/07/f76/3143a.pdf...161

Pembina Response to Nat'l Oceanic and Atmospheric Admin. (Aug. 12,
    2020), https://beta.regulations.gov/document/NOAA-HQ-2020-
    0058-0049....………………………………………....……..163

USCA Case #20-1161    Document #1881462    Filed: 01/22/2021    Page 7 of 173

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by  Krafsur v. Davenport,   6th Cir.(Tenn.),   Dec. 04, 2013

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

---

United States Code Annotated
   Title 5. Government Organization and Employees (Refs & Annos)
     Part I. The Agencies Generally
       Chapter 7. Judicial Review (Refs & Annos)

---

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

  **(1)** compel agency action unlawfully withheld or unreasonably delayed; and

  **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)** contrary to constitutional right, power, privilege, or immunity;

    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    **(D)** without observance of procedure required by law;

    **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**001**

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

Notes of Decisions (4865)

5 U.S.C.A. § 706, 5 USCA § 706
Current through P.L. 116-259. Some statute sections may be more current, see credits for details.

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**002**

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717a

§ 717a. Definitions

Effective: August 8, 2005
Currentness

When used in this chapter, unless the context otherwise requires--

**(1)** "Person" includes an individual or a corporation.

**(2)** "Corporation" includes any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, receiver or receivers, trustee or trustees of any of the foregoing, but shall not include municipalities as hereinafter defined.

**(3)** "Municipality" means a city, county, or other political subdivision or agency of a State.

**(4)** "State" means a State admitted to the Union, the District of Columbia, and any organized Territory of the United States.

**(5)** "Natural gas" means either natural gas unmixed, or any mixture of natural and artificial gas.

**(6)** "Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

**(7)** "Interstate commerce" means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States.

**(8)** "State commission" means the regulatory body of the State or municipality having jurisdiction to regulate rates and charges for the sale of natural gas to consumers within the State or municipality.

**(9)** "Commission" and "Commissioner" means the Federal Power Commission, and a member thereof, respectively.

**(10)** "Vehicular natural gas" means natural gas that is ultimately used as a fuel in a self-propelled vehicle.

**003**

**(11)** "LNG terminal" includes all natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel, but does not include--

**(A)** waterborne vessels used to deliver natural gas to or from any such facility; or

**(B)** any pipeline or storage facility subject to the jurisdiction of the Commission under section 717f of this title.

## CREDIT(S)

(June 21, 1938, c. 556, § 2, 52 Stat. 821; Pub.L. 102-486, Title IV, § 404(a)(2), Oct. 24, 1992, 106 Stat. 2879; Pub.L. 109-58, Title III, § 311(b), Aug. 8, 2005, 119 Stat. 685.)

Notes of Decisions (48)

15 U.S.C.A. § 717a, 15 USCA § 717a
Current through P.L. 116-259. Some statute sections may be more current, see credits for details.

---

End of Document     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**004**

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717b

§ 717b. Exportation or importation of natural gas; LNG terminals

Effective: August 8, 2005
Currentness

**(a) Mandatory authorization order**

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

**(b) Free trade agreements**

With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas--

  **(1)** the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and

  **(2)** the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

**(c) Expedited application and approval process**

For purposes of subsection (a), the importation of the natural gas referred to in subsection (b), or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

**(d) Construction with other laws**

Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under--

**005**

**(1)** the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

**(2)** the Clean Air Act (42 U.S.C. 7401 et seq.); or

**(3)** the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

**(e) LNG terminals**

**(1)** The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

**(2)** Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall--

**(A)** set the matter for hearing;

**(B)** give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b-1 of this title;

**(C)** decide the matter in accordance with this subsection; and

**(D)** issue or deny the appropriate order accordingly.

**(3)(A)** Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find [1] necessary or appropriate.

**(B)** Before January 1, 2015, the Commission shall not--

**(i)** deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

**(ii)** condition an order on--

**(I)** a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

**006**

**(II)** any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

**(III)** a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

**(C)** Subparagraph (B) shall cease to have effect on January 1, 2030.

**(4)** An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

**(f) Military installations**

**(1)** In this subsection, the term "military installation"--

**(A)** means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

**(B)** does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

**(2)** The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult [2] with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

**(3)** The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

### CREDIT(S)

(June 21, 1938, c. 556, § 3, 52 Stat. 822; Pub.L. 102-486, Title II, § 201, Oct. 24, 1992, 106 Stat. 2866; Pub.L. 109-58, Title III, § 311(c), Aug. 8, 2005, 119 Stat. 685.)

### EXECUTIVE ORDERS

**EXECUTIVE ORDER NO. 10485**

<Sept. 3, 1953, 18 F.R. 5397, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957.>

**007**

**Performance of Functions Respecting Electric Power and Natural Gas Facilities Located on United States Borders**

**Section 1. (a)** The Secretary of Energy is hereby designated and empowered to perform the following-described functions:

**(1)** To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and a foreign country.

**(2)** To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the exportation or importation of natural gas to or from a foreign country.

**(3)** Upon finding the issuance of the permit to be consistent with the public interest, and, after obtaining the favorable recommendations of the Secretary of State and the Secretary of Defense thereon, to issue to the applicant, as appropriate, a permit for such construction, operation, maintenance, or connection. The Secretary of Energy shall have the power to attach to the issuance of the permit and to the exercise of the rights granted thereunder such conditions as the public interest may in its judgment require.

**(b)** In any case wherein the Secretary of Energy, the Secretary of State, and the Secretary of Defense cannot agree as to whether or not a permit should be issued, the Secretary of Energy shall submit to the President for approval or disapproval the application for a permit with the respective views of the Secretary of Energy, the Secretary of State and the Secretary of Defense.

**Sec. 2.** [Deleted].

**Sec. 3.** The Secretary of Energy is authorized to issue such rules and regulations, and to prescribe such procedures, as it may from time to time deem necessary or desirable for the exercise of the authority delegated to it by this order.

**Sec. 4.** All Presidential Permits heretofore issued pursuant to Executive Order No. 8202 of July 13, 1939, and in force at the time of the issuance of this order, and all permits issued hereunder, shall remain in full force and effect until modified or revoked by the President or by the Secretary of Energy.

**Sec. 5.** Executive Order No. 8202 of July 13, 1939, is hereby revoked.

Notes of Decisions (43)

**Footnotes**

| | |
|---|---|
| 1 | So in original. Probably should be "finds". |
| 2 | So in original. Probably should be "coordinates and consults". |

15 U.S.C.A. § 717b, 15 USCA § 717b
Current through P.L. 116-259. Some statute sections may be more current, see credits for details.

**End of Document**                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**008**

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
   Title 15. Commerce and Trade
      Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717c

§ 717c. Rates and charges

Effective: August 8, 2005
Currentness

**(a) Just and reasonable rates and charges**

All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

**(b) Undue preferences and unreasonable rates and charges prohibited**

No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Filing of rates and charges with Commission; public inspection of schedules**

Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from June 21, 1938) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Changes in rates and charges; notice to Commission**

Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**009**

**(e) Authority of Commission to hold hearings concerning new schedule of rates**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission, or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Storage services**

**(1)** In exercising its authority under this chapter or the Natural Gas Policy Act of 1978 (15 U.S.C. 3301 et seq.), the Commission may authorize a natural gas company (or any person that will be a natural gas company on completion of any proposed construction) to provide storage and storage-related services at market-based rates for new storage capacity related to a specific facility placed in service after August 8, 2005, notwithstanding the fact that the company is unable to demonstrate that the company lacks market power, if the Commission determines that--

**(A)** market-based rates are in the public interest and necessary to encourage the construction of the storage capacity in the area needing storage services; and

**(B)** customers are adequately protected.

**(2)** The Commission shall ensure that reasonable terms and conditions are in place to protect consumers.

**(3)** If the Commission authorizes a natural gas company to charge market-based rates under this subsection, the Commission shall review periodically whether the market-based rate is just, reasonable, and not unduly discriminatory or preferential.

**CREDIT(S)**

(June 21, 1938, c. 556, § 4, 52 Stat. 822; Pub.L. 87-454, May 21, 1962, 76 Stat. 72; Pub.L. 109-58, Title III, § 312, Aug. 8, 2005, 119 Stat. 688.)

**010**

Notes of Decisions (865)

15 U.S.C.A. § 717c, 15 USCA § 717c
Current through P.L. 116-259. Some statute sections may be more current, see credits for details.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**011**

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Validity Called into Doubt by   Transcontinental Gas Pipe Line Company, LLC v. Permanent Easements for 2.14 Acres and Temporary Easements for 3.59 Acres in Conestoga Township, Lancaster County, Pennsylvania, Tax Parcel Number 1201606900000,   3rd Cir.(Pa.),   Oct. 30, 2018

🚩 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

> United States Code Annotated
>   Title 15. Commerce and Trade
>     Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717f

§ 717f. Construction, extension, or abandonment of facilities

Currentness

### (a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

### (b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

### (c) Certificate of public convenience and necessity

**(1)(A)** No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall

**012**

issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

**(B)** In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

**(2)** The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of--

**(A)** natural gas sold by the producer to such person; and

**(B)** natural gas produced by such person.

**(d) Application for certificate of public convenience and necessity**

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

**(e) Granting of certificate of public convenience and necessity**

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

**(f) Determination of service area; jurisdiction of transportation to ultimate consumers**

**(1)** The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

**013**

**(2)** If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

**(g) Certificate of public convenience and necessity for service of area already being served**

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

**(h) Right of eminent domain for construction of pipelines, etc.**

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

## CREDIT(S)

(June 21, 1938, c. 556, § 7, 52 Stat. 824; Feb. 7, 1942, c. 49, 56 Stat. 83; July 25, 1947, c. 333, 61 Stat. 459; Pub.L. 95-617, Title VI, § 608, Nov. 9, 1978, 92 Stat. 3173; Pub.L. 100-474, § 2, Oct. 6, 1988, 102 Stat. 2302.)

Notes of Decisions (839)

15 U.S.C.A. § 717f, 15 USCA § 717f
Current through P.L. 116-259. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**014**

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.    3

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717r

§ 717r. Rehearing and review

Effective: August 8, 2005
Currentness

**(a) Application for rehearing; time**

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Review of Commission order**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation,

**015**

if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**(2) Agency delay**

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**016**

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

**CREDIT(S)**

(June 21, 1938, c. 556, § 19, 52 Stat. 831; June 25, 1948, c. 646, § 32(a), 62 Stat. 991; May 24, 1949, c. 139, § 127, 63 Stat. 107; Pub.L. 85-791, § 19, Aug. 28, 1958, 72 Stat. 947; Pub.L. 109-58, Title III, § 313(b), Aug. 8, 2005, 119 Stat. 689.)

Notes of Decisions (777)

15 U.S.C.A. § 717r, 15 USCA § 717r
Current through P.L. 116-259. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**017**

⚑ KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by   Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Engineers,   11th Cir.(Fla.),   Sep. 15, 2010

⚑ KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 55. National Environmental Policy (Refs & Annos)
      Subchapter I. Policies and Goals (Refs & Annos)

42 U.S.C.A. § 4332

§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

Currentness

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--

**(A)** utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

**(B)** identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

**(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

**(i)** the environmental impact of the proposed action,

**(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,

**(iii)** alternatives to the proposed action,

**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

**018**

USCA Case #20-1161      Document #1881462      Filed: 01/22/2021      Page 25 of 173

**(v)** any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

**(D)** Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

**(i)** the State agency or official has statewide jurisdiction and has the responsibility for such action,

**(ii)** the responsible Federal official furnishes guidance and participates in such preparation,

**(iii)** the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

**(iv)** after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

**(E)** study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

**(F)** recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

**(G)** make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

**(H)** initiate and utilize ecological information in the planning and development of resource-oriented projects; and

**019**

**(I)** assist the Council on Environmental Quality established by subchapter II of this chapter.

**CREDIT(S)**

(Pub.L. 91-190, Title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub.L. 94-83, Aug. 9, 1975, 89 Stat. 424.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 13352**

<Aug. 26, 2004, 69 F.R. 52989>

**Facilitation of Cooperative Conservation**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Purpose.** The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

**Sec. 2. Definition.** As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

**Sec. 3. Federal Activities.** To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

**(a)** carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

**(i)** facilitates cooperative conservation;

**(ii)** takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

**(iii)** properly accommodates local participation in Federal decisionmaking; and

**(iv)** provides that the programs, projects, and activities are consistent with protecting public health and safety;

**(b)** report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

**(c)** provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

**020**

**Sec. 4. White House Conference on Cooperative Conservation.** The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

**(a)** convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

**(b)** ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

**Sec. 5. General Provision.** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH

Notes of Decisions (5011)

## Footnotes

1    So in original. The period probably should be a semicolon.

42 U.S.C.A. § 4332, 42 USCA § 4332

Current through P.L. 116-259. Some statute sections may be more current, see credits for details.

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**021**

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Oregon Revised Statutes Annotated
Title 36a. Housing; Lottery and Games; Environment
Chapter 468A. Air Quality (Refs & Annos)
Climate Change (Refs & Annos)
(Oregon Global Warming Commission) (Refs & Annos)

O.R.S. § 468A.205

468A.205. Reduction goals

Currentness

(1) The Legislative Assembly declares that it is the policy of this state to reduce greenhouse gas emissions in Oregon pursuant to the following greenhouse gas emissions reduction goals:

(a) By 2010, arrest the growth of Oregon's greenhouse gas emissions and begin to reduce greenhouse gas emissions.

(b) By 2020, achieve greenhouse gas levels that are 10 percent below 1990 levels.

(c) By 2050, achieve greenhouse gas levels that are at least 75 percent below 1990 levels.

(2) The Legislative Assembly declares that it is the policy of this state for state and local governments, businesses, nonprofit organizations and individual residents to prepare for the effects of global warming and by doing so, prevent and reduce the social, economic and environmental effects of global warming.

(3) This section does not create any additional regulatory authority for an agency of the executive department as defined in ORS 174.112.

**Credits**
Added by Laws 2007, c. 907, § 2, eff. Aug. 7, 2007.

O. R. S. § 468A.205, OR ST § 468A.205
Current through laws enacted in the 2020 Regular Session of the 80th Legislative Assembly, which adjourned sine die March 3, 2020; laws enacted in the First Special Session of the 80th Legislative Assembly, which adjourned sine die June 26, 2020; and laws enacted during the Second Special Session of the 80th Legislative Assembly, which adjourned sine die August 10, 2020, pending classification of undesignated material and text revision by the Oregon Reviser. See ORS 173.160.

End of Document                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**022**

# Code of Federal Regulations - 2019

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter V. Council on Environmental Quality
            Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.14

§ 1502.14 Alternatives including the proposed action.

Currentness

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Current through July 5, 2019; 84 FR 32098.
© 2019 Thomson Reuters.

**023**

USCA Case #20-1161     Document #1881462          Filed: 01/22/2021        Page 30 of 173

40 C. F. R. § 1502.14, 40 CFR § 1502.14

**024**

# Code of Federal Regulations - 2019

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.16

§ 1502.16 Environmental consequences.

Currentness

This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in § 1502.14. It shall include discussions of:

(a) Direct effects and their significance (§ 1508.8).

(b) Indirect effects and their significance (§ 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

**025**

USCA Case #20-1161    Document #1881462    Filed: 01/22/2021    Page 32 of 173

**Credits**

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Current through July 5, 2019; 84 FR 32098.
© 2019 Thomson Reuters.

40 C. F. R. § 1502.16, 40 CFR § 1502.16

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**026**

# Code of Federal Regulations - 2019

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.22

§ 1502.22 Incomplete or unavailable information.

Currentness

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the Federal Register on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

**Credits**
[51 FR 15625, April 25, 1986]

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

**027**

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Current through July 5, 2019; 84 FR 32098.
© 2019 Thomson Reuters.

40 C. F. R. § 1502.22, 40 CFR § 1502.22

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**028**

# Code of Federal Regulations - 2019

Code of Federal Regulations
> Title 40. Protection of Environment
>> Chapter V. Council on Environmental Quality
>>> Part 1506. Other Requirements of NEPA (Refs & Annos)

40 C.F.R. § 1506.2

§ 1506.2 Elimination of duplication with State and local procedures.

Currentness

(a) Agencies authorized by law to cooperate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

# 029

SOURCE: 43 FR 56000, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Current through July 5, 2019; 84 FR 32098.
© 2019 Thomson Reuters.

40 C. F. R. § 1506.2, 40 CFR § 1506.2

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**030**

# Code of Federal Regulations - 2019

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter V. Council on Environmental Quality
            Part 1508. Terminology and Index (Refs & Annos)

40 C.F.R. § 1508.8

§ 1508.8 Effects.

Currency

Effects include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Current through July 5, 2019; 84 FR 32098.
© 2019 Thomson Reuters.

40 C. F. R. § 1508.8, 40 CFR § 1508.8

End of Document                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**031**

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article II. Judicial Notice

Federal Rules of Evidence Rule 201, 28 U.S.C.A.

Rule 201. Judicial Notice of Adjudicative Facts

Currentness

**(a) Scope.** This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

**(b) Kinds of Facts That May Be Judicially Noticed.** The court may judicially notice a fact that is not subject to reasonable dispute because it:

   **(1)** is generally known within the trial court's territorial jurisdiction; or

   **(2)** can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

**(c) Taking Notice.** The court:

   **(1)** may take judicial notice on its own; or

   **(2)** must take judicial notice if a party requests it and the court is supplied with the necessary information.

**(d) Timing.** The court may take judicial notice at any stage of the proceeding.

**(e) Opportunity to Be Heard.** On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.

**(f) Instructing the Jury.** In a civil case, the court must instruct the jury to accept the noticed fact as conclusive. In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive.

**CREDIT(S)**
(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1930; Apr. 26, 2011, eff. Dec. 1, 2011.)

**ADVISORY COMMITTEE NOTES**
**1972 Proposed Rules**

**032**

**Note to Subdivision (a).** This is the only evidence rule on the subject of judicial notice. It deals only with judicial notice of "adjudicative" facts. No rule deals with judicial notice of "legislative" facts. Judicial notice of matters of foreign law is treated in Rule 44.1 of the Federal Rules of Civil Procedure and Rule 26.1 of the Federal Rules of Criminal Procedure.

The omission of any treatment of legislative facts results from fundamental differences between adjudicative facts and legislative facts. Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body. The terminology was coined by Professor Kenneth Davis in his article An Approach to Problems of Evidence in the Administrative Process, 55 Harv.L.Rev. 364, 404-407 (1942). The following discussion draws extensively upon his writings. In addition, see the same author's Judicial Notice, 55 Colum.L.Rev. 945 (1955); Administrative Law Treatise, ch. 15 (1958); A System of Judicial Notice Based on Fairness and Convenience, in Perspectives of Law 69 (1964).

The usual method of establishing adjudicative facts is through the introduction of evidence, ordinarily consisting of the testimony of witnesses. If particular facts are outside the area of reasonable controversy, this process is dispensed with as unnecessary. A high degree of indisputability is the essential prerequisite.

Legislative facts are quite different. As Professor Davis says:

"My opinion is that judge-made law would stop growing if judges, in thinking about questions of law and policy, were forbidden to take into account the facts they believe, as distinguished from facts which are 'clearly * * * within the domain of the indisputable.' Facts most needed in thinking about difficult problems of law and policy have a way of being outside the domain of the clearly indisputable." A System of Judicial Notice Based on Fairness and Convenience, *supra*, at 82.

An illustration is *Hawkins v. United States,* 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958), in which the Court refused to discard the common law rule that one spouse could not testify against the other, saying, "Adverse testimony given in criminal proceedings would, we think, be likely to destroy almost any marriage." This conclusion has a large intermixture of fact, but the factual aspect is scarcely "indisputable." See Hutchins and Slesinger, Some Observations on the Law of Evidence--Family Relations, 13 Minn.L.Rev. 675 (1929). If the destructive effect of the giving of adverse testimony by a spouse is not indisputable, should the Court have refrained from considering it in the absence of supporting evidence?

"If the Model Code or the Uniform Rules had been applicable, the Court would have been barred from thinking about the essential factual ingredient of the problems before it, and such a result would be obviously intolerable. What the law needs at its growing points is more, not less, judicial thinking about the factual ingredients of problems of what the law ought to be, and the needed facts are seldom 'clearly' indisputable." Davis, *supra,* at 83.

Professor Morgan gave the following description of the methodology of determining domestic law:

"In determining the content or applicability of a rule of domestic law, the judge is unrestricted in his investigation and conclusion. He may reject the propositions of either party or of both parties. He may consult the sources of pertinent data to which they refer, or he may refuse to do so. He may make an independent search for persuasive data or rest content with what he has or what the parties present. * * * [T]he parties do no more than to assist; they control no part of the process." Morgan, Judicial Notice, 57 Harv.L.Rev. 269, 270-271 (1944).

This is the view which should govern judicial access to legislative facts. It renders inappropriate any limitation in the form of indisputability, any formal requirements of notice other than those already inherent in affording opportunity to hear and be heard and exchanging briefs, and any requirement of formal findings at any level. It should, however leave open the possibility of introducing evidence through regular channels in appropriate situations. See *Borden's Farm Products Co. v. Baldwin,* 293 U.S.

**033**

194, 55 S.Ct. 187, 79 L.Ed. 281 (1934), where the cause was remanded for the taking of evidence as to the economic conditions and trade practices underlying the New York Milk Control Law.

Similar considerations govern the judicial use of non-adjudicative facts in ways other than formulating laws and rules. Thayer described them as a part of the judicial reasoning process.

"In conducting a process of judicial reasoning, as of other reasoning, not a step can be taken without assuming something which has not been proved; and the capacity to do this with competent judgment and efficiency, is imputed to judges and juries as part of their necessary mental outfit." Thayer, Preliminary Treatise on Evidence 279-280 (1898).

As Professor Davis points out, A System of Judicial Notice Based on Fairness and Convenience, in Perspectives of Law 69, 73 (1964), every case involves the use of hundreds or thousands of non-evidence facts. When a witness in an automobile accident case says "car," everyone, judge and jury included, furnishes, from non-evidence sources within himself, the supplementing information that the "car" is an automobile, not a railroad car, that it is self-propelled, probably by an internal combustion engine, that it may be assumed to have four wheels with pneumatic rubber tires, and so on. The judicial process cannot construct every case from scratch, like Descartes creating a world based on the postulate *Cogito, ergo sum*. These items could not possibly be introduced into evidence, and no one suggests that they be. Nor are they appropriate subjects for any formalized treatment of judicial notice of facts. See Levin and Levy, Persuading the Jury with Facts Not in Evidence: The Fiction-Science Spectrum, 105 U.Pa.L.Rev. 139 (1956).

Another aspect of what Thayer had in mind is the use of non-evidence facts to appraise or assess the adjudicative facts of the case. Pairs of cases from two jurisdictions illustrate this use and also the difference between non-evidence facts thus used and adjudicative facts. In People v. Strook, 347 Ill. 460, 179 N.E. 821 (1932), venue in Cook County had been held not established by testimony that the crime was committed at 7956 South Chicago Avenue, since judicial notice would not be taken that the address was in Chicago. However, the same court subsequently ruled that venue in Cook County was established by testimony that a crime occurred at 8900 South Anthony Avenue, since notice would be taken of the common practice of omitting the name of the city when speaking of local addresses, and the witness was testifying in Chicago. *People v. Pride,* 16 Ill.2d 82, 156 N.E.2d 551 (1951). And in *Hughes v. Vestal,* 264 N.C. 500, 142 S.E.2d 361 (1965), the Supreme Court of North Carolina disapproved the trial judge's admission in evidence of a state-published table of automobile stopping distances on the basis of judicial notice, though the court itself had referred to the same table in an earlier case in a "rhetorical and illustrative" way in determining that the defendant could not have stopped her car in time to avoid striking a child who suddenly appeared in the highway and that a nonsuit was properly granted. *Ennis v. Dupree,* 262 N.C. 224, 136 S.E.2d 702 (1964). See also *Brown v. Hale,* 263 N.C. 176, 139 S.E.2d 210 (1964); *Clayton v. Rimmer,* 262 N.C. 302, 136 S.E.2d 562 (1964). It is apparent that this use of non-evidence facts in evaluating the adjudicative facts of the case is not an appropriate subject for a formalized judicial notice treatment.

In view of these considerations, the regulation of judicial notice of facts by the present rule extends only to adjudicative facts.

What, then, are "adjudicative" facts? Davis refers to them as those "which relate to the parties," or more fully:

"When a court or an agency finds facts concerning the immediate parties--who did what, where, when, how, and with what motive or intent--the court or agency is performing an adjudicative function, and the facts are conveniently called adjudicative facts. * * *

"Stated in other terms, the adjudicative facts are those to which the law is applied in the process of adjudication. They are the facts that normally go to the jury in a jury case. They relate to the parties, their activities, their properties, their businesses." 2 Administrative Law Treatise 353.

**034**

**Note to Subdivision (b).** With respect to judicial notice of adjudicative facts, the tradition has been one of caution in requiring that the matter be beyond reasonable controversy. This tradition of circumspection appears to be soundly based, and no reason to depart from it is apparent. As Professor Davis says:

"The reason we use trial-type procedure, I think, is that we make the practical judgment, on the basis of experience, that taking evidence, subject to cross-examination and rebuttal, is the best way to resolve controversies involving disputes of adjudicative facts, that is, facts pertaining to the parties. The reason we require a determination on the record is that we think fair procedure in resolving disputes of adjudicative facts calls for giving each party a chance to meet in the appropriate fashion the facts that come to the tribunal's attention, and the appropriate fashion for meeting disputed adjudicative facts includes rebuttal evidence, cross-examination, usually confrontation, and argument (either written or oral or both). The key to a fair trial is opportunity to use the appropriate weapons (rebuttal evidence, cross-examination, and argument) to meet adverse materials that come to the tribunal's attention." A System of Judicial Notice Based on Fairness and Convenience, in Perspectives of Law 69, 93 (1964).

The rule proceeds upon the theory that these considerations call for dispensing with traditional methods of proof only in clear cases. Compare Professor Davis' conclusion that judicial notice should be a matter of convenience, subject to requirements of procedural fairness. *Id.,* 94.

This rule is consistent with Uniform Rule 9(1) and (2) which limit judicial notice of facts to those "so universally known that they cannot reasonably be the subject of dispute," those "so generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute," and those "capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." The traditional textbook treatment has included these general categories (matters of common knowledge, facts capable of verification), McCormick §§ 324, 325, and then has passed on into detailed treatment of such specific topics as facts relating to the personnel and records of the court, *Id.* § 327, and other governmental facts, *Id.* § 328. The California draftsmen, with a background of detailed statutory regulation of judicial notice, followed a somewhat similar pattern. California Evidence Code §§ 451, 452. The Uniform Rules, however, were drafted on the theory that these particular matters are included within the general categories and need no specific mention. This approach is followed in the present rule.

The phrase "propositions of generalized knowledge," found in Uniform Rule 9(1) and (2) is not included in the present rule. It was, it is believed, originally included in Model Code Rules 801 and 802 primarily in order to afford some minimum recognition to the right of the judge in his "legislative" capacity (not acting as the trier of fact) to take judicial notice of very limited categories of generalized knowledge. The limitations thus imposed have been discarded herein as undesirable, unworkable, and contrary to existing practice. What is left, then, to be considered, is the status of a "proposition of generalized knowledge" as an "adjudicative" fact to be noticed judicially and communicated by the judge to the jury. Thus viewed, it is considered to be lacking practical significance. While judges use judicial notice of "propositions of generalized knowledge" in a variety of situations: determining the validity and meaning of statutes, formulating common law rules, deciding whether evidence should be admitted, assessing the sufficiency and effect of evidence, all are essentially nonadjudicative in nature. When judicial notice is seen as a significant vehicle for progress in the law, these are the areas involved, particularly in developing fields of scientific knowledge. See McCormick 712. It is not believed that judges now instruct juries as to "propositions of generalized knowledge" derived from encyclopedias or other sources, or that they are likely to do so, or, indeed, that it is desirable that they do so. There is a vast difference between ruling on the basis of judicial notice that radar evidence of speed is admissible and explaining to the jury its principles and degree of accuracy, or between using a table of stopping distances of automobiles at various speeds in a judicial evaluation of testimony and telling the jury its precise application in the case. For cases raising doubt as to the propriety of the use of medical texts by lay triers of fact in passing on disability claims in administrative proceedings, see *Sayers v. Gardner,* 380 F.2d 940 (6th Cir.1967); *Ross v. Gardner,* 365 F.2d 554 (6th Cir.1966); *Sosna v. Celebrezze,* 234 F.Supp. 289 (E.D.Pa.1964); *Glendenning v. Ribicoff,* 213 F.Supp. 301 (W.D.Mo.1962).

**Notes to Subdivisions (c) and (d).** Under subdivision (c) the judge has a discretionary authority to take judicial notice, regardless of whether he is so requested by a party. The taking of judicial notice is mandatory, under subdivision (d), only when

**035**

a party requests it and the necessary information is supplied. This scheme is believed to reflect existing practice. It is simple and workable. It avoids troublesome distinctions in the many situations in which the process of taking judicial notice is not recognized as such.

Compare Uniform Rule 9 making judicial notice of facts universally known mandatory without request, and making judicial notice of facts generally known in the jurisdiction or capable of determination by resort to accurate sources discretionary in the absence of request but mandatory if request is made and the information furnished. But see Uniform Rule 10(3), which directs the judge to decline to take judicial notice if available information fails to convince him that the matter falls clearly within Uniform Rule 9 or is insufficient to enable him to notice it judicially. Substantially the same approach is found in California Evidence Code §§ 451-453 and in New Jersey Evidence Rule 9. In contrast, the present rule treats alike all adjudicative facts which are subject to judicial notice.

**Note to Subdivision (e).** Basic considerations of procedural fairness demand an opportunity to be heard on the propriety of taking judicial notice and the tenor of the matter noticed. The rule requires the granting of that opportunity upon request. No formal scheme of giving notice is provided. An adversely affected party may learn in advance that judicial notice is in contemplation, either by virtue of being served with a copy of a request by another party under subdivision (d) that judicial notice be taken, or through an advance indication by the judge. Or he may have no advance notice at all. The likelihood of the latter is enhanced by the frequent failure to recognize judicial notice as such. And in the absence of advance notice, a request made after the fact could not in fairness be considered untimely. See the provision for hearing on timely request in the Administrative Procedure Act, 5 U.S.C. § 556(e). See also Revised Model State Administrative Procedure Act (1961), 9C U.L.A. § 10(4) (Supp.1967).

**Note to Subdivision (f).** In accord with the usual view, judicial notice may be taken at any stage of the proceedings, whether in the trial court or on appeal. Uniform Rule 12; California Evidence Code § 459; Kansas Rules of Evidence § 60-412; New Jersey Evidence Rule 12; McCormick § 330, p. 712.

**Note to Subdivision (g).** Much of the controversy about judicial notice has centered upon the question whether evidence should be admitted in disproof of facts of which judicial notice is taken.

The writers have been divided. Favoring admissibility are Thayer, Preliminary Treatise on Evidence 308 (1898); 9 Wigmore § 2567; Davis, A System of Judicial Notice Based on Fairness and Convenience, in Perspectives of Law, 69, 76-77 (1964). Opposing admissibility are Keeffe, Landis and Shaad, Sense and Nonsense about Judicial Notice, 2 Stan.L.Rev. 664, 668 (1950); McNaughton, Judicial Notice--Excerpts Relating to the Morgan-Whitmore Controversy, 14 Vand.L.Rev. 779 (1961); Morgan, Judicial Notice, 57 Harv.L.Rev. 269, 279 (1944); McCormick 710-711. The Model Code and the Uniform Rules are predicated upon indisputability of judicially noticed facts.

The proponents of admitting evidence in disproof have concentrated largely upon legislative facts. Since the present rule deals only with judicial notice of adjudicative facts, arguments directed to legislative facts lose their relevancy.

Within its relatively narrow area of adjudicative facts, the rule contemplates there is to be no evidence before the jury in disproof. The judge instructs the jury to take judicially noticed facts as established. This position is justified by the undesirable effects of the opposite rule in limiting the rebutting party, though not his opponent, to admissible evidence, in defeating the reasons for judicial notice, and in affecting the substantive law to an extent and in ways largely unforeseeable. Ample protection and flexibility are afforded by the broad provision for opportunity to be heard on request, set forth in subdivision (e).

Authority upon the propriety of taking judicial notice against an accused in a criminal case with respect to matters other than venue is relatively meager. Proceeding upon the theory that the right of jury trial does not extend to matters which are beyond reasonable dispute, the rule does not distinguish between criminal and civil cases. *People v. Mayes,* 113 Cal. 618, 45 P. 860

**036**

(1896); *Ross v. United States,* 374 F.2d 97 (8th Cir.1967). Cf. *State v. Main,* 94 R.I. 338, 180 A.2d 814 (1962); *State v. Lawrence,* 120 Utah 323, 234 P.2d 600 (1951).

**Note on Judicial Notice of Law.** By rules effective July 1, 1966, the method of invoking the law of a foreign country is covered elsewhere. Rule 44.1 of the Federal Rules of Civil Procedure; Rule 26.1 of the Federal Rules of Criminal Procedure. These two new admirably designed rules are founded upon the assumption that the manner in which law is fed into the judicial process is never a proper concern of the rules of evidence but rather of the rules of procedure. The Advisory Committee on Evidence, believing that this assumption is entirely correct, proposes no evidence rule with respect to judicial notice of law, and suggests that those matters of law which, in addition to foreign-country law, have traditionally been treated as requiring pleading and proof and more recently as the subject of judicial notice be left to the Rules of Civil and Criminal Procedure.

**1974 Enactment**

Rule 201(g) as received from the Supreme Court provided that when judicial notice of a fact is taken, the court shall instruct the jury to accept that fact as established. Being of the view that mandatory instruction to a jury in a criminal case to accept as conclusive any fact judicially noticed is inappropriate because contrary to the spirit of the Sixth Amendment right to a jury trial, the Committee adopted the 1969 Advisory Committee draft of this subsection, allowing a mandatory instruction in civil actions and proceedings and a discretionary instruction in criminal cases. House Report No. 93-650.

**2011 Amendments**

The language of Rule 201 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

Notes of Decisions (694)

Fed. Rules Evid. Rule 201, 28 U.S.C.A., FRE Rule 201
Including Amendments Received Through 1-1-21

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**037**

## DECLARATION OF LESLEY ADAMS

1.      My name is Lesley Adams, and I have lived in Jackson County,

Oregon for 22 years. I have worked for and volunteered my time with organizations

working to protect our air, water, land, fish and wildlife. I am a financial supporter

and member of such organizations, including Sierra Club.

2.      The Sierra Club is a nationwide non-profit environmental membership

organization whose purpose is to explore, enjoy, and protect the wild places of the

earth; to practice and promote the responsible use of the earth's ecosystems

and resources; to educate and enlist humanity to protect and restore the quality of

the natural and human environment; and to use all lawful means to carry out these

objectives. This includes things like land, air, and the protection of threatened and

endangered species and their habitat.

3.      Starting in 2003, I was a staff member at the Klamath-Siskiyou

Wildlands Center (KS Wild) and spent considerable time studying, hiking and

advocating for public lands in the Upper Rogue Basin. In 2008, I founded Rogue

Riverkeeper as a program at KS Wild to focus advocacy on the aquatic values and

resources of the Rogue River Basin.

4.      After extensive interviews with local experts, we determined that the

Jordan Cove LNG project was one of the most significant threats to the Rogue

River and its native salmon populations due to the direct impacts of pipeline

**038**

construction, and exacerbating carbon impacts on our climate. Jordan Cove LNG was a founding priority of Rogue Riverkeeper.

5.    In my years of Rogue River advocacy, I have floated the Rogue with elected officials to discuss management and restoration of this regional ecological and economic treasure; I have participated in restoration efforts along the Rogue; and I have spent many hours with landowners who felt scared and bullied by Pembina because the company wanted to take their property through eminent domain to build the Pacific Connector Pipeline.

6.    I have been opposing the Jordan Cove LNG project for twelve years through public comment, oral testimony, community organizing, and education. I believe that this project, if constructed, would have long-term damage to public waters, lands and fish that our community relies on for our regional identity and economy.

7.    As a river user and public lands advocate, I frequently camp, hike, kayak, fish, raft, study ornithology, botanize, and explore the forests, rivers, and streams in the Upper Rogue Basin. I plan to spend time in these areas in Spring 2021 to enjoy the Upper Rogue River and its surrounding public lands.

8.    The Upper Rogue River is one of my favorite places to visit with my son who is learning to fish. The Upper Rogue River is known for its abundant fishing opportunities due to the cold, clear water and prime fish habitat. The section

2

**039**

of river where the Pacific Connector pipeline is proposed to cross under the Rogue River is one of the last chinook spawning sites in the Upper Rogue River. The existence of clean, cold water and iconic fish species like the Rogue River chinook salmon bring me, and my seven year-old son, great joy and comfort. I learned to fly-fish on the Upper Rogue, and teaching my seven year-old son to fish is a highlight of my life. I plan to continue fishing with him in the Upper Rogue for years to come.

9.      I have visited the river for professional and recreational purposes for two decades. The proposed Pacific Connector gas pipeline, associated with the Jordan Cove Liquified Natural Gas (LNG) export project, would negatively impact the river's character that I rely upon for education and spiritual renewal. If built, the Pacific Connector natural gas pipeline would negatively impact the Upper Rogue River and its tributaries due to significant construction in, through, and under the Rogue River and various tributaries. Construction activities would directly impact my use and enjoyment of the river, because I do not believe that a river corridor is any place for a natural gas pipeline.

10.      I regularly hike, backpack and camp public lands in southern Oregon. Over the past 12 years, I estimate that I have hiked along the Pacific Crest Trail six times where the Pacific Connector pipeline is proposed to cross it. The logging required for pipeline construction would harm the aesthetic value of this area, and

**040**

increase fire hazard in a region that is already a tinderbox. Current closed-canopy

forests would be clearcut for pipeline construction and the trees would be replaced

by grasses, shrubs, and invasive weeds that ignite easier and spread fire faster than

forests. The clearcut corridor would allow winds to blow at greater speeds,

increasing fire intensity and rate of spread. In effect, the pipeline pathway would

function like a quick-burning fuse in a wind tunnel, allowing flames to race across

the landscape. Local firefighting services are already stretched thin and may not be

able to respond to a wildfire in this rugged terrain.

11.     On September 8, 2020, I was settling my son into his first day of first

grade (virtually through Zoom) when out of my bedroom window I noticed a

massive plume of smoke rising two blocks away.  Within the next hours, we

evacuated our home in dramatic fashion and significant portions of Talent, Oregon

and Phoenix, Oregon had burned on the ground in what would be named the

Almeda Fire, which was part of what became known as the 2020 "Labor Day

Firestorms" of western Oregon. Oregon Department of Forestry firefighters told me

they had never seen fire behavior like they did in those days in September 2020.

Yet, that type of fast, hot, erratic, wind-driven fire event is what is projected to

occur with more frequency in the years ahead due to the local impacts of climate

change. I am extremely concerned that this project will increase fire hazard directly

through logging activities, and indirectly by further facilitating carbon dioxide into

4

**041**

our atmosphere through the combustion of natural gas, which will exacerbate the harmful trends in my community, as well as communities across our country, and the world. I am extremely concerned about how this project would exacerbate an already dangerous fire trend in southern Oregon.

12.     The Rogue River Basin consists of a diverse array of communities, economies, and ecological systems. The Basin's rich history, beautiful setting, and recreational and employment opportunities attract visitors and residents to the region year-round. Climate change is likely to produce significant new stresses and alterations to water quantity and quality, fish, wildlife, plant life, forests, and fire regimes of the Rogue Basin. These changes will produce considerable modifications in the way the local economy functions, in infrastructure and buildings, in human health, and in the quality of life of the people who live in and enjoy the Rogue River Basin.

13.     Scientific experts anticipate that local impacts of climate change include increased storm and fire frequency that will increase sediment and nutrient loads as well as persistent organic pollutants and other contaminants entering the Rogue River and its tributaries. Along with higher water temperatures these factors will reduce water quality, threatening the recruitment and survival of young native fish. Furthermore, shifts in the timing of stream flows could trigger earlier emergences of aquatic insects and shifts in the timing of adult salmon and steelhead

5

**042**

spawning migration, egg incubation and hatch, and smolt outmigration. Warmer water temperatures and extended low summer base flows will extend well past the summer months and are likely to decrease dissolved oxygen, produce more disease, and create a greater frequency of conditions lethal to native fish. More storms and flooding likely will increase streambank erosion and increase channel downcutting resulting in degraded stream habitat and habitat fragmentation precipitating a reduction in biotic carrying capacity, heightened susceptibility to flood and drought, and a contraction of the stream network.

14.    Climate impacts will also directly stress our human communities. Demands for emergency services are likely to increase as storm events, flooding and wildfires increase, but the funding needed to support them may be difficult to obtain. Rising summer temperatures will likely increase the incidence and intensity of heat-related illnesses and vector- and water-borne diseases such as Lyme disease and West Nile virus. Rising temperatures and increased smoke from wildfires are likely to increase the incidence of asthma. Agriculture will face increased competition between in-stream and municipal users for available water supplies while rising temperatures are likely to require the use of more water.

15.    Climate impacts will likely increase disruption and direct damage to transportation systems, buildings, and real estate from more flooding and wildfires. Many roads will likely to be impacted by more frequent storm events, flooding and

**043**

wildfires, impairing the movement of people during emergencies. Increasingly drought stressed vegetation will lead to increases in insect outbreaks and disease. Stressed and dying vegetation will produce larger and more frequent wildfires. As a community member and mother, this project would harm my ability to live, enjoy and thrive in southern Oregon.

16.    Pursuant to my previous job as Rogue Riverkeeper, I have been party to various comment submissions on permit applications for the Jordan Cove LNG export project. As an Oregonian, I expect the federal government to adhere to state authority. For example, the Section 401 Clean Water Act permit required by the State of Oregon was denied because the Department of Environmental Quality determined that the proposed Jordan Cove LNG export project could not demonstrate that it would meet Oregon's clean water standards, which protect the Rogue River and its fish.

17.    I have a personal interest in protecting and restoring clean water, fish habitat, and the overall health of the Upper Rogue River, and public forests throughout the Rogue Basin, including helping my region minimize climate chaos. I intend to continue to spend as much time as possible on and around the Upper Rogue River and surrounding public lands. I intend to spend at least one day each month in 2021 on or adjacent to some stretch of the Rogue River.

**044**

18.    I am deeply troubled by the decline of sensitive salmon species on the west coast, and I fear that the continued and increased impacts to their habitat, including projected climate stressors, may soon lead to their drastic decline and extinction.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Dated: January 17, 2021. Respectfully submitted,

_____

Lesley Adams

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATURAL RESOURCES DEFENSE          )
COUNCIL, INC.,                      )
                                    )
    *Petitioner,*              )          Case No. 20-1180
                                    )          Consolidated with
    v.                         )          Nos. 20-1161, 20-1170
                                    )          20-1171, 20-1172,
FEDERAL ENERGY REGULATORY           )          20-1198
COMMISSION,                         )
                                    )          **DECLARATION OF**
    *Respondent.*              )          **MARTIN ALBERT**
_____ )

**MARTIN ALBERT** states as follows:

1.     I have personal knowledge of each of the facts set forth below, and if called upon to do so, could and would testify regarding the following. This declaration is filed in support of the Petition filed in the captioned matter, concerning the proposed Jordan Cove Energy Project.

2.     I live at 2040 Ashland Mine Road in Ashland, Oregon, with my wife, Peggy. I am 77 years old, and I am a physician with Rogue Community Health. Peggy Wright is 66 years old and is a nutritionist, also with Rogue Community Health. I first donated to NRDC in 1982, and have donated to NRDC every year between 1985 and 2019. I have additionally been a member of the Sierra Club for about 30 years.

**046**

3.    I am deeply concerned about the Jordan Cove project and the impact it would have on me. I am an avid kayaker, and the pipeline will cut through one of my favorite kayaking spots on the Rogue River. The Jordan Cove project would also contribute to climate change and hence to the increasingly bad wildfires we've been seeing in Oregon.

4.    My wife and I love to go kayaking and hiking. We go out just about every weekend. One of our favorite kayaking spots is on the Rogue River just north of Shady Cove. It's only thirty-five minutes from our house, and there is a beautiful bucolic stretch of river there, where it's a little bit challenging, but very safe. It's a uniquely ideal location compared to a lot of the other rafting areas nearby - more remote and a beautiful scenic area, but also convenient to get to and with easier Class I and II rapids. We've been on that section of the River four times so far this summer. We also launch on other access points on the Rogue River.

5.    I understand that the Pacific Connector pipeline, if built, would cut right through our kayaking spot on the Rogue River, between two of the parks I use as my put-in points (Elk Creek Park and Shady Cove Park). I am very worried about this, as it would destroy our ability to enjoy that beautiful place, and make access difficult during construction. I understand that if the pipeline is built there, they will have to clear-cut the forest, which would change the whole aesthetic of the place. There would be trucks and construction equipment coming in. They'd

**047**

have to build an industrial station. This area is unique, and the pipeline would permanently damage it. I greatly enjoy looking out at the rural landscape while rafting there, but with the pipeline being built, I could no longer enjoy that as I do now. It's very likely that my wife and I would stop kayaking in that **area if** the pipeline is built.

6.    The pipeline would also disrupt my enjoyment of the Brown Mountain area, just north of the proposed pipeline route, which is one of my favorite hiking destinations. The trail system in this area, which includes Lake of the Woods and Fish Lake, is notable because of its recent lava flows, which I enjoy looking at. To hike into this area, I start at the point where the Pacific Crest Trail crosses Dead Indian Memorial Highway and go north, which means I would have to pass right over the pipeline route to get to the Brown Mountain area. Particularly since trees in the pipeline right of way will be clear cut, the pipeline would destroy the scenic beauty and wilderness feel of this area, and greatly diminish my enjoyment of it. It is likely that if the pipeline were constructed, I would hike this section of the Pacific Crest Trail to the Brown Mountain area less frequently, if at all.

7.    Additionally, I am concerned about the contribution the Jordan Cove project would make to climate change. I understand that the construction and operation of the terminal and the pipeline will result in about two million metric tons of carbon dioxide emissions. Those emissions would contribute to global

**048**

climate change, which in turn has been linked to increased frequency and intensity of wildfires. That worries me a lot. Wildfires are a serious risk in our area of Oregon. The past few summers have gotten pretty bad; the entire area where we live has suffered from the smoke and wildfire damage. When the fires get dense, the smoke covers the whole area, and we don't go outside.

8.     Besides the smoke problem, my wife and I are directly at risk from fire damage, a risk that is only going to get worse with more climate change. We've been trying to take proactive steps to mitigate fire risk at our five-acre property by clearing some of the trees and removing the brush, but it may not be sufficient in intensified fire seasons as climate change worsens – in part due to emissions from Jordan Cove. Our community is in real danger of getting a fire like the High Cascades fire that burned through the Rogue River and the Umpqua National Forest back in 2017. If the Jordan Cove project is built, the additional greenhouse gas emissions due to the project would increase the fire risk to me and my wife and to our property. There is also a risk of an accident on the pipeline that could cause an explosion that would trigger wildfires.

9.     I DECLARE, under penalty of perjury, that the foregoing is true and correct.

August 18, 2020

**049**

Martin Albert

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NATURAL RESOURCES DEFENSE )
COUNCIL, INC., )
)
  *Petitioner*, )          Case No. 20-1180
)          **Consolidated with**
  v. )          Nos. 20-1161, 20-1170
)          20-1171, 20-1172,
FEDERAL ENERGY REGULATORY )          20-1198
COMMISSION, )
)          **DECLARATION OF**
  *Respondent*. )          **MICHAEL DAOLE**
_____ )

**MICHAEL DAOLE** states as follows:

1.     I have personal knowledge of each of the facts set forth below, and if

called upon to do so, could and would testify regarding the following. This

declaration is filed in support of the Petition filed in the captioned matter,

concerning the proposed Jordan Cove Energy Project.

2.     I live with at 247 N Laurel Street in Ashland, Oregon. I have lived in

Oregon for 15 years.

3.     I am a member of NRDC, and have been a member since 2007.

4.     I value wild spaces, and enjoy spending time in the outdoors in places

that have not been manipulated and disfigured by human activity. Since learning

that the Pacific Connector pipeline would be built through areas where I bike, hike,

1

**051**

and raft, I have become very concerned about its effects. I have followed news developments about the pipeline, and attended three public meetings about the project in Medford and White City over the last couple of years.

5.     I enjoy cycling and take trips on my road bike about twice each week, usually about 30 miles; and I go mountain biking about once a month. One of the places I go regularly on my bike is Lake of the Woods in the Fremont–Winema National Forest. The scenery there and on the way to the lake is beautiful, with great views of the mountains and forests. The Pacific Connector pipeline will cross the road between my house and Lake of the Woods. Seeing the pipeline and its associated construction during the middle of a ride through the woods would reduce my enjoyment of the trip. I don't enjoy seeing habitat destruction and wild places that have been altered by industrial development, so I would avoid any area along the pipeline. If the pipeline were built, I probably wouldn't go to Lake of the Woods at all anymore.

6.     I also enjoy rafting. One of the best rivers for rafting in Oregon is the Rogue River, which I enjoy rafting each year. The Pacific Connector pipeline will cross the upper part of the Rogue River on a section near my house, between Shady Grove and Rogue Elk, which is one of the stretches I like to raft. It would be distressing to see the damage done by the construction of the pipeline crossing, and the construction and its aftermath would diminish the scenic quality of that stretch

2

**052**

of the river. If the pipeline were built, I would avoid that section of the river and would have to travel further from home to go rafting.

7.     I am also worried about the effects of climate change, which the Jordan Cove LNG terminal and Pacific Connector pipeline would make worse due to their methane emissions. The climate has already changed since I moved to Oregon 15 years ago, with noticeably hotter weather in the summer and shorter winters.

8.     In the winter I love to ski, and climate change is already diminishing the quality of skiing conditions in Oregon. I go backcountry skiing about three times a week in our local mountains. I have noticed how the snow conditions have gotten worse in recent years, both in terms of the amount of snowfall and the quality of the snow for skiing. This spring was particularly bad: normally one can summit Mt. Shasta to ski down it as late as June, but this year the season was over in April. The mountain lost snow so fast during the spring that I had to hike areas that would normally be covered in snow in order to reach higher elevations that were still covered. The Jordan Cove project's greenhouse gas emissions threaten to exacerbate these problems of poor-quality snow for skiing by making climate change worse, and hence reduce the number and quality of the opportunities that I have to go skiing.

3

**053**

9.      Climate change negatively affects my cycling activities as well, as heat makes cycling unpleasant to impossible. For road cycling in the summer months, you have to get up early in the morning if you want to go for a long ride and avoid the heat during the middle of the day. With the warmer climate in the last few years, especially the increasing number of 100-degree days, there are fewer opportunities to ride when it's not too hot. If the Jordan Cove project is built and makes climate change worse, I will be able to go on long rides on fewer days each summer and will need to get up earlier in the morning to do so.

10.     Climate change also increases the risk of forest fires. I am very sensitive to air quality, which is one reason I live in Ashland away from the big cities. I check the air quality when there are fires, and don't go on bike rides when the air quality is bad. If the Jordan Cove project is built and contributes to forest fires getting worse, it will negatively affect my health and reduce the number of days I can exercise outside.

I DECLARE, under penalty of perjury, that the foregoing is true and correct.

August 20, 2020

Michael Daole

4

**054**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., | ) ) ) | |
| *Petitioner*, | ) ) | Case No. 20-1180 Consolidated with |
| v. | ) ) | Nos. 20-1161, 20-1170 20-1171, 20-1172, |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | 20-1198 |
| | ) | **DECLARATION OF** |
| *Respondent*. | ) ) | **LUCY DeFRANCO** |

**LUCY DeFRANCO** states as follows:

1.    I have personal knowledge of each of the facts set forth below, and if called upon to do so, could and would testify regarding the following. This declaration is filed in support of the Petition filed in the captioned matter, concerning the proposed Jordan Cove Energy Project.

2.    I live at 183 East Ashland Lane in Ashland, Oregon, and have lived there for roughly 40 years. I am 64 years old and am a retired teacher. I currently live with my husband and daughter. I am a member of NRDC, having first donated in 2001 and most recently donated in February 2020.

3.    I have known about the Jordan Cove project for years. I feel strongly that the developers are building Jordan Cove simply because there's a glut of gas in the United States and they need to find somewhere else to sell it, no matter the

1

**055**

economic or environmental costs to our community. Due to these concerns, I filed a comment in June 2019 with the Federal Energy Regulatory Commission outlining my opposition to the project, which I am attaching to this declaration. I stated my concerns about the project's fire and geological risks, as well as its impact on waterways and irrigation water.

4.      The Jordan Cove project will, if built, have serious impacts on my leisure activities, my health, and my financial outlook. My husband and I go rafting about once a year along the Rogue River right by Shady Cove – the proposed site of the pipeline crossing. It's simply beautiful there – a pretty and peaceful wilderness site where I like to look out at the trees and birds along the water. I am very concerned that, with the pipeline coming in and the necessary cutting of trees that will happen around the pipeline site, the area will lose that special feel. I'm also concerned about potential leaks from the pipeline into the Rogue River or other waterways, which would affect all life downstream. If the pipeline comes through, my husband and I would probably not want to raft there anymore.

5.      When we're rafting, one of our great joys is looking at all the birds that populate the River. I fear that the use of herbicides to clear the pipeline right of way may harm those bird populations, so we wouldn't be able to enjoy seeing as many of them.

**056**

6.    Additionally, I am very worried about the effect of climate change on my health and financial security, and the Jordan Cove project threatens to make climate change worse due to its anticipated methane emissions. In particular, I am concerned about the relationship between increased greenhouse gas emissions and forest fires, as smoke is uniquely hard for me to handle. The emissions caused by the construction and operation of the Jordan Cove project will only increase these risks by worsening climate change, threatening my safety and ability to breathe.

7.    I have lung issues, heart palpitations, and allergies. I cough a lot. I've had allergies since I was a child when my stepfather was a chain smoker. This year, the air has been pretty clear because driving and industrial activity has slowed with the pandemic, but there have been serious forest fires all around us several times over the past few years, and we'll get the smoke from these forest fires at our house. To deal with this problem, we installed an air purifier – which helped some, but I could still smell the smoke in my house. Because of my issues, I review the air quality data before going out. When these fires happened, I didn't go anywhere. This was deeply upsetting, because I like to walk daily and attend to my garden, but couldn't do any of that with the smoke around. If the fires become worse due to worsening climate change, my activities will be curtailed further and my health will be increasingly at risk.

**057**

8.    Climate change risks not only worsened smoke conditions, but also direct threats to my neighborhood.  There was a grass fire about half a mile south of us a few years ago, and we were without electricity on a very hot, very smoky day for 6 or so hours, which was deeply uncomfortable for me.

9.    These air quality issues also impact my ability to make a living.  In the world before COVID, I worked as a vendor at the Lithia Artisan Market of Ashland, or LAMA for short.  I typically work there every weekend, which involves being outside all day long.  I spin my own wool and sell yarn and textiles, and have been featured on LAMA's website as a resident artist.  When the forest fires hit, I couldn't work as often because the air quality was awful, so I couldn't breathe. Also, tourism to the area plummeted, meaning that my income from the days I could work was very low. I am concerned that, if there are more forest fires due to worsening climate change (contributed to by the Jordan Cove project), people will not frequent the market as often, and I will not be able to work as often, causing me to lose income.

10.    Finally, Jordan Cove threatens the small "u-pick" Christmas tree farm that my husband runs, whose proceeds we use to pay our property taxes.  We use irrigation water to water the farm, but drought threatens our farm's stability.  It seems like every third or fourth year we're dealing with water shortages, and it's only getting worse.  I learned from our local USDA farm representative that, in

4

**058**

November 2018, we only had 12 percent of our normal water stored in the mountain lakes. Even though it rained a lot after November, we still did not catch up. This year, due to water shortages, my husband lost half of the new trees he planted last fall.

11. Jordan Cove threatens to make the water shortage problem worse, thus threatening the Christmas tree farm that both my husband and I depend upon. I learned from the local county commissioners that Jordan Cove wants to use our limited irrigation water to test for leaks in the pipeline. I am concerned that Jordan Cove's use of the water will make an already limited resource more limited, so that it will be even more difficult for us to maintain our trees. I am additionally concerned that the project's climate change impacts will only increase the risk of fire and drought, both of which threaten the farm, particularly the young trees that are already prone to catch fire.

12. I DECLARE, under penalty of perjury, that the foregoing is true and correct.

August 20, 2020

*Lucy DeFranco*

Lucy DeFranco

5

**059**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATURAL RESOURCES DEFENSE )
COUNCIL, INC.,                              )
                                                      )
        *Petitioner*,                       )              Case No. 20-1180
                                                      )              Consolidated with
        v.                                         )              Nos. 20-1161, 20-1170
                                                      )              20-1171, 20-1172,
FEDERAL ENERGY REGULATORY    )              20-1198
COMMISSION,                              )
                                                      )
        *Respondent*.                     )              **DECLARATION OF**
_____)              **DELOS GALEN**
                                                                   **LEE DEVINE**

**DELOS GALEN LEE DEVINE** states as follows:

1.      I have personal knowledge of each of the facts set forth below, and if

called upon to do so, could and would testify regarding the following. This

declaration is filed in support of the Petition filed in the captioned matter,

concerning the proposed Jordan Cove Energy Project.

2.      I live with my wife at 65755 North Bay Road in North Bend, Oregon.

3.      I have been an NRDC member since 2015, with my most recent

donations made in April and June 2020.

4.      My wife and I moved to Oregon in 1980 from Southern California in

order to escape the air pollution there. We chose to live on the Oregon coast for the

1

**060**

quality of the air and the natural beauty of the scenery. We also purchased a separate house in Coos Bay for my mother to join us.

5.      I am a retired forester, having worked for the Oregon Department of Forestry for most of my career. In the ten years leading up to my retirement in 2017, I was a Stewardship Forester, and oversaw the protection of natural resources in relation to forestry projects. As part of that job I surveyed for eagles and other wildlife, and worked on forest lands about 50 percent of the time. I worked with other state officials and landowners on assessing the impact of construction projects and timber harvesting on the forest and the wildlife that lives there, and on water quality.

6.      I first heard of the Jordan Cove project about 10 years ago. I have followed news about the project through my local newspaper and in media on the internet.

7.      I am very concerned about the possibility that the Jordan Cove project will be built. My wife and I have already decided that if that happens, we will move away from the area, and relocate my mother, as the project will destroy the peace, quiet, beauty, and clean air that made us want to live here to begin with. The project would greatly diminish our enjoyment of our home next to the Bay, and would negatively impact many of the activities I enjoy in my retirement.  We

2

**061**

have already begun planning where we would move if Jordan Cove is built, as we would want to leave well before the project is completed.

8.    Our home in North Bend sits on a hill overlooking Coos Bay, directly across from Jordan Point. Our property is just across a road from the Bay, and is less than 300 feet from the shore. The proposed Jordan Cove LNG export facility is less than two miles from us as the crow flies; and some parts of the project site are only about one mile away, including the end of the new pipeline.

9.    We bought our home specifically because of its beautiful natural location, shrouded by old growth trees and with views of the Bay. Unlike many of our neighbors, we have not cut the trees on our property, but we can still see the Bay from our house through a pruned area, and from other locations on our property.

10.    Putting a giant industrial facility right across from us on the Bay would deeply cut into our enjoyment of all we love about our home. Instead of quiet and a view of a mostly peaceful Bay, we would have to see the ship traffic going back and forth to the terminal and hear its considerable noise; and would also likely have at least the taller structures of the facility in our line of sight through the pruned area.

11.    The Jordan Cove terminal would also subject us to increased air pollution at our home and in the surrounding area. The whole reason we moved to

3

**062**

Oregon from Southern California back in 1980 was the clean air – we were tired of the pollution in California, and chose the Oregon coast because of its good air and water quality. The project's air pollution—and any air pollution generated by passing ships—would directly undercut our whole reason for having moved here, and would drive us to sell and move elsewhere if it comes to pass.  I am particularly worried that since the area of Coos Bay between our property and the Jordan Cove project site is essentially unobstructed, air pollution from the site would blow onto our property when winds are out of the west. In addition to my own dislike of breathing dirty air, I worry about its effect on my wife, who is disabled and is very sensitive to things in the air. I have been so concerned about this that I have written two letters to the editor of our local paper, *The World*, (attached to this Declaration) opposing the project for this specific reason.

12.    In addition to its impact on my home directly, the Jordan Cove project would also undercut my enjoyment of natural areas near my home and beyond. I enjoy walking on the trails and beaches on the stretch of land north of the entrance to Coos Bay, known locally as the North Spit. I usually go out there about every 2 to 3 weeks. While there, I like to hike, relax, read, take photos, and walk my dogs (although I don't let them go onto the beach during snowy plover nesting season). I usually hike between one and five miles, sometimes going all the way down the

4

**063**

spit to the breakwater at the entrance to the Bay. I hike along both sides of the spit, the ocean side and the side bordering the Bay. It's one of my favorite places to go.

13.    The Jordan Cove project is being built on the North Spit, and would be visible from some of the places where I hike. The tankers going to and from the terminal would also be visible—and probably audible—from the trails on both sides of the spit. I enjoy the natural beauty and quiet of the Bay and the Pacific Ocean, which is why I do these walks. Having to look at all that industrial activity, and hear the noisy tankers, would greatly undercut my enjoyment of all that. If the project is built, and in the event I had not succeeded in moving out of the area, I would go to the North Spit less often, or not at all.

14.    I also enjoy seeing whales when hiking on the ocean side of the North Spit, and bring binoculars to try to see them when it's the right season. Having grown up in Santa Barbara and having lived near the coast much of my life, the ocean is dear to me. Seeing whales is an important part of my enjoyment of the ocean, especially knowing that they are threatened by human activities. It would be deeply upsetting to me if tankers traveling to and from the terminal were to hit and kill a whale, which I understand to be a distinct possibility with the stepped-up ship traffic.

15.    I also worry that one of the tankers could shipwreck along the coast—which threatens to impact me directly, since I live practically on the Bay

5

**064**

and like to look out over it. In 1999, the ship New Carissa ran aground on the
North Spit and then split in half, so it's clearly a real risk.

16.    In addition to my concerns with the Jordan Cove LNG facility on
Coos Bay, I am also worried about impacts of the Pacific Connector pipeline on
my activities and environment. In particular, it threatens my enjoyment of angling.
I love to fish, and go every year during the fall salmon season and the winter
steelhead season. For salmon, I fish the Coos River and the Millicoma River
(which flows into the Coos River); and for steelhead, I fish the Coos River. I
usually go 1 to 3 times a year for salmon, and about the same frequency for
steelhead. I am concerned that both construction of the pipeline and the tree-
clearing for the right of way will harm and diminish fish populations, so that I will
no longer be able to fish successfully in the places I go now.

17.    I am also concerned about the impacts of the pipeline on water
quality. During my career in forestry, I saw the havoc that can be created by
drilling underneath rivers to build a pipeline, and am concerned that the
construction of the Pacific Connector pipeline could impact my local water supply.

18.    Finally, I am very concerned about the effects of climate change,
which Jordan Cove's emissions threaten to make worse. In recent years, I have
noticed how the climate is already changing, and as a former forester, I am
particularly aware of and worried about the increased droughts and worse forest

6

**065**

fires that result from climate change. The fire seasons in the last five years have been extraordinary, with conditions that were unheard of during most of my career as a forester – and now Jordan Cove's emissions threaten to make that worse. At my home, even though we are near the ocean, I keep the area near our house trimmed to cut down on the amount of dry fuel available to try to prevent a forest fire from destroying our house. If there is a greater risk of fires in the future, it will increase the risk to our house and property.

I DECLARE, under penalty of perjury, that the foregoing is true and correct.

August 21, 2020

Delos Galen Lee Devine

7

**066**

## DECLARATION OF KATHLEEN DODDS

1.    I, Kathleen Dodds, set forth that I am over the age of 18 years and am competent to attest to the facts contained in this declaration.

2.    I am a member in good standing and a Board Member of the non-profit organization, Citizens For Renewables (CFR), dedicated to using renewable energy and educating the public about the benefits of renewable energy and the detriments of fossil fuel infrastructure development.

3.    I moved to Coos Bay, Oregon, ten years ago to be close to family and because of the Oregon Coast's beauty and an optimal environment.

4.    When I learned about the Cascadia Subduction Zone and the possibility of a significant earthquake and tsunami, I was concerned, researched, and implemented safety measures for myself and my family.

5.    I looked for a local organization that shared my concerns and found Citizens Against LNG ("CALNG"). This organization was formed at the very beginning when the proposal becomes public in Coos County. I have attended their monthly meeting and appreciate the in-depth legal and scientific information shared at each meeting. The organization helps me fight this project effectively. In 2017, other members of CALNG and I formed Citizens for Renewables ("CFR"), a 501)c)(3) corporation with the intent that CALNG would become a project of CFR. CALNG agreed and in an agreement signed in December 2107 that happened. I

1

**067**

was elected Treasurer of CFR in 2018. I am currently the Treasurer of CFR.

6.    The more I have learned about the Jordan Cove Energy Project and the Pacific Connector Gas Pipeline, the more I have become alarmed and fearful. This project endangers me and my family's health and safety.

7.    I suffer from COPD, lung disease. The toxins from the liquified natural gas (LNG) plant will exacerbate my health to the point that I may need to move away.

8.    A source of even greater anxiety and fear is the explosive power of a liquid gas project.   The LNG plant will chill the gas to -260F. The terminal where the tankers will load up is as close as 1/3 mile to 1 mile from population areas. LNG industry experts would mandate a minimum safety distance of 2.2 miles from local populations. But many of us live inside "burn zones," which, with the power of a predicted 8-9.5 magnitude earthquake/tsunami, natural gas (carried in pipes throughout the bay breaking open), and liquified gas (in a tank or tanker breached by the impacts), would be spilled on the water. Gas on water heats up and with a small spark will explode, igniting the gas, killing and burning people, school kids, and animals.

9.    Another issue that concerns me is the North Bend Airport, which we are fortunate to have in this community. During the summer, there are direct flights to Denver, Colorado, and San Francisco, California. I have often flown to Denver

2

**068**

to visit relatives and friends in the Rocky Mountains. Many golfers are on these flights, on their way to and from our local world-famous Bandon Dunes Golf Resort. The LNG plant will send up plumes of gaseous waste, which is directly in the path of air flights. Consequently, airplanes will not be able to land or take off consistently. This area's revenue loss would be tremendous if those golfers cannot easily access the golf course. I have been on a flight re-routed to land in Eugene, Oregon, because of a small amount of fog. It was a two-hour car ride after landing and waiting, creating a three-hour delay to get home.

10.    Jordan Cove Energy Project is too dangerous, too toxic, and too close to population areas to be allowed to exist. This project will interfere with the health and safety, even life, of my family and me. My 11 years old granddaughter says she thinks about the earthquake/tsunami every day (all school kids are trained in safety measures for the predicted event). What happens to her childhood when she learns she may receive 2nd or 3rd-degree burns or instant annihilation from this project?

I declare under penalty of perjury that the preceding is true and correct. Executed on August 13, 2020.

Kathleen Dodds
Kathleen Dodds

**069**

## DECLARATION OF ROSEMARY FRANCIS EATHERINGTON

1.     My name is Rosemary Francis Eatherington, and I am the President of Oregon Women's Land Trust (OWLT).  I make this declaration based on my own knowledge.

2.     OWLT is a federal 501(c)(3) nonprofit corporation representing over 300 members throughout the United States.

3.     Our articles of incorporation include protecting ecosystems and promoting sustainable living on the earth.  We are an organization that manages our forests "to preserve land and … to foster the recognition of land as a sacred heritage…"

4.     Our articles also include to: "hold in perpetuity land and other assets in trust for the benefit of women, particularly for women who would otherwise be denied such access…. to encourage, thereby, a development of harmonious and ecologically sound land-based communities… to preserve land and protect it from speculation and overdevelopment and to foster the recognition of land as a sacred heritage and resource belonging to all."

5.     OWLT owns 147 acres of forests, meadows, and wetlands in T29S, R4W, Section 25, Tax Lot No 500, known as Owl Farm. The center of the Pacific Connector Pipeline right-of-way would pass within 300' of the southern boundary

**070**

of our property. It would also be within about 900' of the house and 1,200 feet of our water well.

6.    The section of the pipeline near us is between MP 85 and 86.

7.    Between 2006 and 2017 and the various iterations of this project, Pacific Connector proposed two routes directly through our property. In 2017, Pacific Connector identified an alternative that put the route on our southern boundary, but very close to our living area. This alternative was ultimately chosen as the preferred route by Pacific Connector and the Federal Energy Regulatory Commission (FERC).

8.    The route goes over our only ingress and egress to our property. In the event of a pipeline accident near us, we would have no vehicular opportunity to escape.

9.    The pipeline would cause any resident of, or visitor to, Owl Farm to lose privacy. Company inspectors in a plane doing air inspection will be able to observe us in the garden or elsewhere on the farm. During construction, workers near our property will be able to view residents and visitors, depriving us of the privacy for which we value Owl Farm. Privacy is especially important at Owl Farm, which for decades has been a place of safety and sanctuary for women and children. This sense of safety will be undermined by the regular and ongoing presence of workers whose criminal or domestic abuse histories we do not know.

2

**071**

10.     Visitors and residents of Owl Farm are rightfully concerned with wildland fire during fire season. The presence of a pipeline with high pressure flammable gas so close to our living area will significantly increase our fears. Any accident on the section of the pipe nearest to us, that causes the pipe to rupture and ignite, would be catastrophic. In such an event, anyone at Owl Farm would have to drive across the pipeline right-of-way, through flames, to escape, as the pipeline crosses our only egress route. Likewise, emergency personnel would have to drive across a burning right-of-way to rescue anyone. This, or a forest fire cause by the pipeline near us, could threaten our property. The damage from a fire could destroy our forests and buildings, including a historic farm house. It could even threaten human lives. Losing Owl Farm to a wildland fire would fundamentally change our conservation role and our ability to host women and events at the farm.

11.     Our organization has held this land for over forty years. It is internationally recognized as a place where women can cultivate a deeper understanding of nature while gaining hands-on experience in sustainability and land stewardship.

12.     A fossil fuel infrastructure project that we would cross every time we drive in or out of the property that contributes to climate change would violate our commitment to preserving the natural environment. Simply knowing the

3

**072**

infrastructure is so close to Owl Farm would disrupt our activities and the intention with which we carry them out.

13.     The extreme steepness of the land on our southern border will cause the pipeline right-of-way to severely erode soils. Blasting is likely needed to open the pipeline trench. FERC's 2009 final environmental impact statement (FEIS) claims that "Unstable rock and soil slopes could locally fail as a result of blasting vibrations…. Identified slope areas that could be impacted by blasting would be monitored and evaluated for hazards to people and property during the blasting operations."  This statement was repeated in the 2019 FEIS as well, and the steep hill above our house and the steep hill 300 feet to our south fall into this category. The "local failure" blithely referenced by FERC could be quite catastrophic for Owl Farm should it occur, because it would result in a substantial landslide. I have no confidence that any measures proposed by Pacific Connector are sufficient to prevent this from occurring.

14.     FERC never evaluated how safe it would be driving under a failing slope during heavy rain storms. During very heavy rain events, which happen regularly in southern Oregon in the fall, winter, and spring, it might not be safe for us to drive in or out of our property. Even if a landslide occurred while we were not driving, it would block our egress and ingress.

**073**

15.    We would receive no compensation for any of the impacts to our property because the right-of-way is on the other side of the property line, but those adjacent effects absolutely would affect and harm our property.

16.    FERC's 2019 FEIS says that when blasting near wells, "Pacific Connector would request authorization from landowners to test and document the baseline condition, yield, and water quality of any private wells or springs being used as permitted water supplies within 200 feet of the pipeline construction right-of-way." Our well is over 200 feet distance from the right-of-way, but could still be impacted by blasting. Pacific Connector is unaware that the well exists near, but more than 200 feet from the right-of-way, and I am very concerned that our water source will be disrupted and maybe permanently harmed by the blasting. But because our well is outside of Pacific Connector's "danger zone," any damage to it will not be addressed by the company.

17.    I and OWLT have been fighting this proposal since its inception. This has been an incredibly stressful and intrusive process for us. In 2016 when FERC denied the application for a Certificate of Public Convenience and Necessity, we thought that this project was dead and that our property was safe. But Jordan Cove and Pacific Connector reapplied, and FERC disregarded the adverse effects to private landowners like us and the environment that it previously stated were so great that the project should not move forward. It is time for a court to evaluate the

5

**074**

legality of this project, and I am confident that when it does, it will find that this project does not comply with the National Environmental Policy Act, Natural Gas Act, and other laws. A court order making that determination, and enjoining any pipeline construction or ground-disturbing activities, would address my concerns with this project, as I believe the company would not attempt for a fourth time to build this boondoggle.

I declare under penalty of perjury that the foregoing is true and correct. Dated this 16th day of December, 2020.

_Rosemary Eatherington_

_____

Rosemary Francis Eatherington

6

**075**

## DECLARATION OF DANIEL E. ESTRIN

1.      I, Daniel E. Estrin, declare that if called as a witness in this action, I would competently testify, of my own personal knowledge, as follows:

2.      I am the General Counsel and Advocacy Director of Waterkeeper Alliance (Waterkeeper). I have worked with the Waterkeeper movement in various capacities for more than 29 years. As Waterkeeper's General Counsel and Advocacy Director, I am responsible for supervising all Waterkeeper legal advocacy work, including all litigation to which Waterkeeper is a party.

3.      Waterkeeper is a not-for-profit corporation organized under the laws of the State of New York and a charitable corporation under section 501(c)(3) of the Internal Revenue Code. Waterkeeper maintains its headquarters at 180 Maiden Lane, Suite 603, New York, New York 10038.

4.      The Waterkeeper movement is a global movement of on-the-water advocates who patrol and protect over 2.75 million square miles of rivers, streams, watersheds, and coastlines in North and South America, Europe, Australia, Asia, and Africa. We seek to protect water quality in every major watershed around the world, and to restore and maintain all waterways as drinkable, fishable, and swimmable consistent with the goals of the federal Clean Water Act (CWA) and other laws. Waterkeeper works toward this vision through direct advocacy and

1

**076**

through the grassroots advocacy of its Waterkeeper member and affiliate

organizations, which Waterkeeper connects and supports to provide a voice for

waterways and their communities worldwide.

5.     Waterkeeper is a membership organization with two classes of

members: licensed organizational members and individual supporting members.

6.     Waterkeeper's Board of Directors must approve all licensed member

organizations. Once approved, member organizations are entitled to vote, through a

designated representative, on matters at member organization meetings. Among

other requirements, member organizations must conform to Waterkeeper quality

standards, participate in membership meetings, elect the President of Waterkeeper,

and elect the Waterkeeper Council, which is composed of 25 member organization

representatives. Waterkeeper Council members, in turn, elect a total of six Council

members to serve on Waterkeeper's Board of Directors.

7.     Waterkeeper currently connects more than 350 Waterkeeper member

and affiliate organizations in 47 countries on six continents, including

approximately 160 Basinkeepers, Baykeepers, Bayoukeepers, Canalkeepers,

Channelkeepers, Coastkeepers, Creekkeepers, Inletkeepers, Lakekeepers,

Riverkeepers, Shorekeepers, Soundkeepers, and Waterkeepers (U.S. Member

Organizations), and 20 affiliate organizations licensed by Waterkeeper (U.S.

**077**

Affiliate Organizations) in the United States. Our U.S. Member Organizations and U.S. Affiliate Organizations cumulatively have tens of thousands of individual members who live, work, and recreate on waterways and in watersheds across the United States and whose interests are injured by regulatory actions that result in increased pollution and otherwise cause injury to watersheds and the communities and ecosystems that rely on them.

8.    Waterkeeper supports its U.S. Member and U.S. Affiliate Organizations, and their respective individual members, through coordinated litigation and other advocacy, as well as by providing a centralized hub for sharing scientific, legal, and administrative resources with these organizations across the country; by expanding local Waterkeepers' abilities to affect environmental compliance and policy on a national level; by sponsoring educational and capacity-building programs for U.S. Member and Affiliate Organizations; by providing legal support to these organizations; and by registering, protecting, and administering the trademarks covering "Waterkeeper" and the other registered "-keeper" trademarks listed above.

9.    The second class of Waterkeeper members comprises more than 15,000 individual supporting members who enable Waterkeeper to accomplish its mission through their financial, volunteer, and other vital contributions.

**078**

Waterkeeper supports these individual members by advocating on behalf of their clean water interests in local and national fora, including before legislative bodies, government agencies, and courts of law, and by keeping them informed about environmental issues that impact their communities and others around the world.

10.    Waterkeeper has three primary advocacy campaigns, one of which is "Clean and Safe Energy," under which we advocate for controlling pollution and other adverse environmental impacts from the fossil fuel industry and transitioning to a clean and sustainable energy future. Waterkeeper Alliance regularly organizes training courses and informational panels at member summits, regional meetings, and at Waterkeeper annual meetings and conferences that include workshops addressing water and climate pollution associated with the fossil fuel industry and how such pollution affects neighboring waterbodies and communities. Additionally, Waterkeeper Alliance maintains information on a webpage devoted to environmental impacts from the fossil fuel industry, including information on impacts and legislative and regulatory measures to prevent or reduce such impacts.

11.    Many of Waterkeeper Alliance's U.S. Member and Affiliate Organizations are actively involved in our Clean and Safe Energy campaign and actively work to protect their watersheds from pollution caused by the extraction, transportation, and combustion of fossil fuels, such as leasing of federal public

**079**

lands for coal, oil and gas extraction, licensing of interstate pipelines and export facilities, and permitting of antiquated power plants. Additionally, these U.S. Member and Affiliate Organizations have individual members who live, work, and recreate in areas and watersheds that are adversely affected by fossil fuel pollution. Through our Clean and Safe Energy campaign we seek to protect all of our respective environmental interests.

12.    Waterkeeper Alliance has participated in myriad major litigations on behalf of itself, its organizational members, and all of our respective individual members, many of which involve regulation of the fossil fuel industry under environmental laws such as the National Environmental Policy Act and the Clean Water Act. *See, e.g.*, *Southwestern Elec. Power Co. v. EPA*, 920 F.3d 999 (5th Cir. 2019); *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414 (D.C. Cir. 2018); *Riverkeeper v. Taylor Energy Co., LLC*, 309 F.R.D. 381 (E.D. La. 2015); *Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.*, 25 F. Supp. 3d 798 (E.D.N.C. 2014); *Commonwealth v. Shepherd*, 366 S.W.3d 1 (Ky. 2012). Waterkeeper also advocates for more stringent regulation of the fossil fuel industry before state and national officials, and for implementation and enforcement of existing laws through litigation.

**080**

13.     With respect to Jordan Cove and the Pacific Connector Pipeline that are the subject of the petition for review, Waterkeeper has been actively involved in opposing this application, as well as an earlier iteration of this project, on behalf of its organizational and individual members for almost a decade. Waterkeeper intervened and participated for years in an earlier FERC proceeding before the Commission denied a certificate of public convenience and necessity in late 2016. Waterkeeper also timely intervened and actively participated in the underlying FERC proceeding.

14.     Rogue Riverkeeper, a Co-Petitioner in this proceeding, is one of Waterkeeper's licensed U.S. Member Organizations. Other U.S. Member Organizations – most notably Columbia Riverkeeper and Klamath Riverkeeper – have also been involved in opposing the Jordan Cove LNG Export Terminal and Pacific Connector Pipeline, but are not parties to this proceeding.

15.     Waterkeeper seeks in this proceeding to protect and represent the interests of all of these organizational members whose interests will be injured if this project is constructed and operated, as well as the interests of all of our respective individual members who stand to be injured by the decisions challenged herein. *See, e.g.*, Declarations of Douglas Smith and Robyn Janssen filed contemporaneously.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Respectfully executed this 14th day of January, 2021, in Norwalk, Connecticut.

Daniel E. Estrin

**082**

## DECLARATION OF KA'ILA FARRELL-SMITH

1.      I, Ka'ila Farrell-Smith, set forth that I am over the age of 18 years and am competent to attest to the facts contained in this declaration.

2.      I am a Board Member of Rogue Climate, a non-profit organization with the mission to empower Southern Oregon communities most impacted by climate change, including low-income, rural, youth, seniors, and communities of color, to win climate justice by organizing for clean energy, sustainable jobs, and a healthy environment.

3.      Rogue Climate organizes community members in Oregon's Klamath, Jackson, Douglas, and Coos Counties, many of whom are directly affected by the Jordan Cove LNG export terminal and Pacific Connector pipeline. Rogue Climate has approximately 7,000 active supporters.

4.      Rogue Climate active supporters have a direct connection to the watersheds that would be affected by the Pacific Connector Pipeline and the Jordan Cove Liquified Natural Gas (LNG) project. Our active supporters drink the water, fish, crab, hunt, recreate, and have jobs that are directly tied to the health of the Rogue, Klamath, Umpqua, Coos, and Coquille watersheds and the Coos Bay estuary. Many of our active supporters live on or close to the route of the proposed Pacific Connector Pipeline, or in the blast zone radius of the LNG terminal or the LNG tankers.

**083**

5.    Rogue Climate filed a motion to intervene on October 27, 2017, submitted detailed comments on the Draft Environmental Impact Statement, and participated in FERC scoping hearings in 2017 and DEIS hearings in 2019. Rogue Climate as an organization and thousands of our active supporters have also participated in State and Local permitting processes related to this project.

6.    In January 2019, I was interviewed about the Jordan Cove project by Freehold Art Exchange.  Freehold Art Exchange, *FAEx Radio: Episode 1: Ka'ila Farrell-Smith*, available at http://freeholdartexchange.org/2019/01/faex-radio-episode-1-kaila-farrell-smith/ (last visited Dec. 23, 2020).

7.    I, Ka'ila Farrell-Smith, am an enrolled member of the Klamath, Modoc, and Yahooskin Tribes, and the daughter of Al Smith, whose case, *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990) was heard by the Supreme Court and resulted in the passage of the Religious Freedom Restoration Act in 1993. The Klamath River and our ancestral lands is of deep cultural significance to me and my people.

8.    Two years ago, I moved home to the former Klamath reservation in Chiloquin, Oregon to connect with my ancestral lands and waters, harvest traditional foods and basket materials, and focus on building my artist studio practice.

**084**

9.    The Pacific Connector pipeline would be installed on Klamath ancestral lands and under the Klamath River. The tree clearing and ground disturbance from pipeline construction would have a profound impact on my ability to harvest traditional materials, foods including elk and deer, and to enjoy the outdoors. Construction of the pipeline and the permanent clear-cut across my ancestral lands would also limit my access to traditional medicines, including elderberry, juniper berry, bolosm, Oregon grape root, and more, which have been especially important for me and my community during the covid-19 pandemic.

10.    The proposed crossing on the Klamath River would also have a profound impact on my use of the river for recreation. Construction would limit my access for recreation and gathering on the river. I am concerned a potential "frack-out" from the horizontal directional drill proposed under the Klamath River would have significant impacts to the health of the river and fish populations, which are already struggling, by releasing drilling fluids into the water. Other water quality impacts to the Klamath River basin from pipeline construction would harm my ability to harvest of traditional foods, including suckerfish and wocus, and traditional materials for basket weaving and regalia, including cattail and tule. Clean water is essential to our environmental health, for trees and vegetation, wetlands, aquatic, and human life.

**085**

11.    My whole life, I have been an advocate for Klamath Dam removal to bring salmon back to the upper Klamath River and I believe the impacts of the pipeline would harm these combined efforts to restore the health of the Klamath River because construction would increase sedimentation, temperatures of the water, and decrease fish habitat. Additionally, I am concerned that this proposal would use 15 million gallons of freshwater from the Klamath River Basin because we are increasingly experiencing drought and conflict over the use of water in the Klamath River Basin for irrigation. The State of Oregon has already denied Clean Water Act 401 Certification for this project because Jordan Cove LNG could not demonstrate that this proposal would meet Oregon's water standards.

12.    Pipeline construction in other regions in the country has shown that temporary labor for pipeline construction imposes outsized impacts on local infrastructure, public services, and public health including increases in crime, drug use, assaults, kidnapping, sex trafficking, and sexually transmitted infections. Indigenous women, girls, and two-spirit people have suffered disproportionately from these impacts. Additionally, I am concerned that out of area workers from urban areas would result in an increase spread of covid-19 in Klamath County. I am deeply concerned for my and my relatives' safety and health if pipeline construction begins and temporary workers are brought to Southern Oregon.

**086**

13.     The Malin Compressor station, which would be expanded for Jordan Cove LNG, is located in Klamath County. The proposed expansion of the compressor station to compress the gas from Klamath County to Coos Bay will result in air quality impacts, with increased pollutants of harmful air pollutants like formaldehyde, lead, benzene, and more. Air quality in Klamath County is already poor and I am concerned the expansion of the Malin compressor station would make that worse, which could affect the health of myself and my community. While visiting the Malin compressor station, I got a bloody nose and severe headache that I believe was related my proximity to the toxic air pollution. A decrease in air quality in Klamath County would have direct impacts on my respiratory health, which has become increasingly important to protect during the covid-19 pandemic. Additionally, on bad air quality days I stay inside as much as possible to protect my health, and more bad air quality days will directly impact my ability to hike, kayak, and harvest wild pigment for my art.

14.     With the changing climate and improper forest management, Oregon's wildfire seasons have become more severe. This summer, over 10,000 acres in Chiloquin burned in the Williamson Fire, thousands of structures including Rogue Climate's Jackson County office burned in the Almeda Fire, and the Obenchain Fire burned about 7 miles of the proposed pipeline route. I am concerned that this pipeline would both increase fire risk and make fighting fires

**087**

more difficult and dangerous across Southern Oregon which could threaten my and other's safety and property in the region, increase the likelihood of evacuations, and decrease the ability to recreate and harvest materials in the forests of our region.

15.    Jordan Cove LNG would exacerbate climate change which threatens my way of life and the health of future generations to come. The full emissions of the Jordan Cove LNG project would be over 32 million metric tons of $CO_2$ equivalent and the largest source of climate pollution in Oregon, according to a report from Oil Change International. Many of Rogue Climate's active supporters are directly impacted by the impacts of climate change, including the increased severity of wildfires, ocean acidification, drought, low-snowpack, and more, across Southern Oregon and the South Coast.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed on December 20, 2020.

_____
Ka'ila Farrell-Smith

6

**088**

## DECLARATION OF DOUG HEIKEN

1.      My name is Doug Heiken. I reside in Eugene, Lane County,

Oregon.

2.      I am a full-time staff and member in good standing of Oregon

Wild. I am familiar with and support Oregon Wild's mission to protect and

restore Oregon's wildlands, wildlife, and water.

3.      My job title is Conservation and Restoration Coordinator. An

important part of my job is to participate in the NEPA process (and other

agency public-involvement opportunities) on behalf of more than 20,000

members and supporters of Oregon Wild. I engage with state and federal

agencies when they make decisions affecting Oregon's public lands and

environment. My general objective is to encourage good land management

practices that conserve land, water, carbon, habitat, recreation, and our

climate, and discourage practices that are harmful to water quality; harmful

to ecosystems and habitat for fish and wildlife including threatened and

endangered species; harmful to recreation, scenic beauty, and quality of life;

harmful to mature and old-growth forests and other significant natural areas;

and harmful to the global climate.

4.      For decades Oregon Wild has been actively involved in various

proposals for industrial development the North Spit of Coos Bay, the Oregon

1

**089**

Dunes, and the public lands and waterways of southwest Oregon. Oregon Wild has an extensive record of public involvement with the numerous state and federal agencies that are reviewing and approving the Jordon Cove Energy Project (JCEP), and associated Pacific Gas Connector pipeline (PGC). Oregon Wild is an intervenor in the JCEP FERC proceeding and has commented on the application, the public interest determination, and the NEPA documents.

5.      I, and members of Oregon Wild, use and enjoy the areas that will be directly affected by the construction and operation of the Jordon Cove Energy Project for hiking, nature appreciation, wildlife viewing, photography, and personal renewal. This project is very large with impacts stretching more than 200 miles from Malin to Coos Bay, plus a concentration of significant impacts in and near Coos Bay. I have on various occasions over the last decade visited numerous specific sites that will be directly impacted by this project including: Coos Bay; Jordon Cove; the North Spit of Coos Bay; the dunes, wetlands, and lakes north of the North Spit (where ground water will be withdrawn and mitigation actions conducted); and the streams and public forests that will be impacted by the Pacific Gas Connector pipeline associated with the Jordon Cove Energy Project. I plan on going back to enjoy these places in the future. Due to the

2

**090**

COVID-19 pandemic, my plans are not yet specific, but the impacts of this project are so extensive and significant, that I am certain to revisit impacted sites in the future.

6.    My interests and those of Oregon Wild will be irreparably harmed if the Jordon Cove LNG Export Terminal and the Pacific Gas Connector pipeline are built as planned because construction and operation of the project will permanently degrade and impair my ability to enjoy and appreciate the natural amenities of southwest Oregon. JCEP/PGC will degrade terrestrial and aquatic habitat that supports fish & wildlife, so I will be less able to see and appreciate fish and wildlife. JCEP/PGC will degrade scenic values, so I will be deprived of high quality scenic experiences in southwest Oregon. JCEP/PGC will degrade water quality, water quantity, wetlands, forests, meadows, and dunes, which will impair my experience of these natural features of SW Oregon.

7.    My enjoyment of natural areas in SW Oregon will be irreparably harmed because the natural beauty (and habitat function) of the mature trees and the diverse forest understory will be irreversibly damaged by clearing the right-of-way for the pipeline that allows the JCEP to receive gas for export. The scenic quality of affected forests (including streamside areas where the pipeline crosses rivers and streams) will be severely and

**091**

permanently degraded. Various types of habitat will be degraded. Fish and wildlife that live in and around Coos Bay will be adversely affected. Wildlife that live in late successional forests along the pipeline route will move away (and may perish), so I am less likely to be able to view them (or their progeny) in the project area. All these effects will severely damage my enjoyment of the project area if the JCEP/PGC is built and if forests are cleared for the pipeline as planned.

8.     My enjoyment of the natural amenities of Oregon depends on maintaining a reasonably stable climate that supports healthy forests, oceans, and ecosystems. The Holocene climate that supports my current use and enjoyment of Oregon is being severely adversely affected by the cumulative global emissions of greenhouse gases. The JCEP/PGC project will add to the cumulative load of greenhouse gases in the atmosphere and exacerbate global climate change and ocean acidification, adversely affect the climate and my ability to use and enjoy the natural amenities of Oregon.

9.     My interests and those of Oregon Wild would be supported if FERC is required to  follow the law, because if FERC follows the law, the Commission will be better informed of the adverse environmental impacts of this project and the project's inconsistency with numerous local, state, and federal requirements, and once more fully informed, FERC is more likely to

4

**092**

draw the conclusion that the project is not in the public interest, because the alleged economic benefits of the project are clearly outweighed by all the adverse environmental effects (once those impact are all fully and accurately described and considered).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 11th day of December 2020, in Eugene, Oregon.

_____

Doug Heiken

## DECLARATION OF ROBYN JANSSEN

1.      My name is Robyn Janssen and I am the Director of Rogue

Riverkeeper, a program of the Klamath-Siskiyou Wildlands Center ("KS Wild"). I

have worked for Rogue Riverkeeper since 2012. I am also a financial supporter and

member of Rogue Riverkeeper. KS Wild is a registered non-profit corporation in

Oregon and I serve as a full-time employee.

2.      Rogue Riverkeeper has approximately 600 members and 4000 active

supporters. Our members and supporters are interested in and support Rogue

Riverkeeper's work to protect and restore clean water, native fish, and healthy

communities in the Rogue River Basin.

3.      As a river user and advocate for a healthy Rogue River, I frequently

raft, camp, hike, kayak, fish, and explore the forests, rivers, and streams in the

Upper Rogue Basin. I plan to spend time in these areas in the future enjoying

recreation on the Upper Rogue River and its surrounding public lands. The upper

Rogue River provides incredible fishing opportunities due to its cold water and

indigenous salmonid fish species. I intend to visit the Upper Rogue River in the

months of May, June, July, August, and September of 2021. I estimate that I have

visited the Upper Rogue River and surrounding areas more than 20 times in the past

8 years.

**094**

4.      I have visited the river for professional and recreational purposes to appreciate the natural beauty, recreate, view wildlife, fish and enjoy the solace and peace it brings me. The proposed Pacific Connector natural gas pipeline, associated with the Jordan Cove Liquified Natural Gas (LNG) export project, would negatively impact the river corridor's character and aesthetic that I rely upon both professionally and personally. If built, the Pacific Connector natural gas pipeline would negatively impact the Upper Rogue River and its tributaries as it would be placed directly into or through small tributary streams and the adjacent riparian corridor. Streams would be blasted, trenched, diverted and dammed to lay the pipeline through the channel having significant impacts on riparian vegetation, clean water, invertebrate species and the visual aesthetic of the area. If built, the pipeline would be horizontally directionally drilled underneath the Rogue River creating the potential for fractures in the bedrock and harmful impacts to clean water and sensitive fish habitat in the river. Heavy machinery, construction, and increased traffic in this region will also have a negative impact on my use and reliance on the Upper Rogue River. These activities would directly impact my use and enjoyment of the river both personally and professionally.

5.      As a 25-year professional river guide, the Upper Rogue River, from Lost Creek Lake to Shady Cove, is crucial to my enjoyment and ability to take people rafting on a scenic, mild section of river. It provides a portion of river that is

2

**095**

accessible and easy enough to teach people how to row and paddle. It is the ideal section of whitewater and scenic beauty for first time river runners.

6.     The Upper Rogue River is one of my favorite places to visit in the spring and summer months when the river is clear and full and the spring chinook salmon are in the river. The Upper Rogue River is known for its abundant fishing opportunities due to the cold, clear water and prime fish habitat.

7.     The section of river where the Pacific Connector pipeline is proposed to cross under the Rogue River is one of the last chinook spawning sites in the Upper Rogue River. I estimate that I have visited this area of the river twenty times over the past eight years. I have great concerns that the proposed horizontal directional drilling for the pipeline under the Rogue could severely impact the river if there were any frac-outs in the bedrock underneath these crucial salmon spawning sites. As previously mentioned, frac-outs are when the bedrock under the river is fractured and drilling fluids move through the cracks up into the river channel. This can be harmful for the river as the drilling fluids and chemicals can work their way into the clean river water. These fluids entering the river would harm Chinook salmon spawning sites that are located directly above the proposed drilling site by smothering gravels and any salmon eggs that are nested there.

8.     The existence of clean, cold water and iconic fish species like the Rogue River chinook salmon bring me great joy and comfort. These important

3

**096**

values are also the main focus of my profession and role as Director of Rogue Riverkeeper. Salmon species rely on cold, clean water to exist and thrive. Salmon species in the Rogue are struggling due to poor water quality from pollution and increased temperatures from decreased riparian vegetation and development. More impacts to the river and its riparian corridor are only going to further harm the Rogue's struggling salmon species. Water quality is also threatened in the Rogue. This is not only a problem for salmon and other aquatic species but also for communities in the Rogue Valley who rely on the Rogue's cold clear water for drinking, irrigating, and recreation. Ensuring the continued existence and protection of these sensitive fish species and their clean water habitat is of utmost importance to me and has directly influenced much of my personal and professional life. My love and appreciation for the Rogue River's iconic salmon species directly relies on the clean, cold water of the upper Rogue.

9.     Pursuant to my job as Rogue Riverkeeper's Program Director, I have submitted comments on several, previous permit applications that Pembina and the Jordan Cove LNG export project have applied for over the past 8 years. My comments have most specifically addressed my concerns for the harmful impacts the project would have on the Rogue River and the various uses of the River that I rely upon.

4

**097**

10.    For example, the Section 401 Clean Water Act permit required by the State of Oregon was denied because the Department of Environmental Quality determined that the proposed Jordan Cove LNG export project could not demonstrate that it would meet Oregon's clean water standards, which protect the Rogue River and its fish.

11.    The Oregon DEQ's listed beneficial uses for the main stem of the Rogue River include public and private domestic water supply, industrial water supply, irrigation, livestock watering, wildlife and hunting, fishing, boating, water contact recreation, aesthetic quality, commercial navigation and transportation and fish and aquatic life. All of these beneficial uses have the potential to be degraded by the proposed Pacific Connector natural gas pipeline as it would be built through tributaries of the Rogue River and underneath the Rogue River itself. According to the Final Environmental Impact Statement for Jordan Cove LNG, construction of the proposed Pacific Connector pipeline under the Upper Rogue River and through its tributaries would include potential blasting, drilling, trenching and diverting of waterways. These actions would have significant impacts on the cold, clean water of this area with the removal of streamside vegetation which creates shade and filtration, the introduction of sediment from construction into the streams, and the potential for frac outs, introducing drilling fluids and other pollutants into these waterways.

**098**

12.     I have a professional and personal interest in protecting and restoring clean water, fish habitat, and the overall health and natural existence of the Upper Rogue River. I will be significantly harmed both professionally and personally if the Jordan Cove LNG export project and associated Pacific Connector pipeline were built. If built, the Pacific Connector pipeline would directly impact the clean water, native fish and healthy communities of the Rogue River Basin which is my job as the Director of Rogue Riverkeeper to protect. Thus, it poses a significant threat to my work to protect the Rogue and the people that rely upon it. On a personal level, the project would harm the aesthetic and natural beauty of the river which I rely upon for my recreation and personal enjoyment.

13.     Clean water and healthy salmon species in the Rogue River basin are Rogue Riverkeeper's focus. Rogue Riverkeeper considers the Rogue's salmon a key indicator species for the health of the river and its surrounding ecosystem and we are alarmed by the species decline throughout the river system.

14.     The Rogue River and many of its tributaries are listed as "impaired" due to higher than normal temperatures. Salmon rely on cold, clear water in order to thrive. We are concerned that any more adverse impacts to the Rogue River, its tributaries, and riparian vegetation will only increase temperatures in the river causing more adverse impacts that will result in additional declines of sensitive salmon species.

6

**099**

15.    In addition to advocating for clean water and healthy native fish species in my work for Rogue Riverkeeper, I am also a professional river guide with Momentum River Expeditions. The Rogue River is Momentum's most popular rafting trip and we rely on a healthy, intact river system on which to take guests.

16.    Beyond both of my professional relationships with the river, I greatly enjoy rafting, kayaking, swimming, and fishing all sections of the Rogue River. I derive deep satisfaction from knowing that wild salmon still live in its waters and contribute to the ecosystem functions that make this region so unique. This knowledge contributes to my appreciation for the important water resources of this area.

17.    I intend to continue to spend as much time as possible on and around the Upper Rogue River for both personal and professional reasons, including recreation and professional study. Reduced habitat and impacts to cold water in the Rogue River are threatening what has historically been the largest wild salmon run in Oregon, second to the Columbia River. The Pacific Connector natural gas pipeline has the potential to directly impact the Rogue River, its tributaries and some of the last remaining Chinook spawning habitat in the Upper reaches of the Rogue River. Potential impacts to these resources include but are not limited to drilling fluids making their way into the river from frac outs which fracture the bedrock under the river during the horizontal directional drilling process. This kind

7

**100**

of impact would have dire consequences to the Chinook spawning habitat, located directly above the proposed drilling site, by polluting the water and smothering spawning gravels and eggs.

18.    I intend to spend 10 days in this area over the next 12 months. I next intend to visit the River in May, June, July, August and September, 2021.

19.    I have written about Rogue River salmon and their habitat requirements in the Rogue Riverkeeper and KS Wild newsletters and in the Rogue Riverkeeper blog. I have also given public presentations on the health of the Rogue River, emphasizing the importance of salmon habitat and cold water conditions for their vitality and survival. Both personally and professionally, the health of the Rogue River's salmon populations and their habitat is of the utmost importance to me.

20.    I am deeply troubled by the decline of sensitive salmon species on the west coast, and I fear that the continued and increased impacts to their habitat may soon lead to their drastic decline and extinction. Any further decline in Rogue River salmon populations will directly impede my professional duties to protect this species and its habitat. Because the Jordan Cove project threatens the Rogue River and its salmon, the project represents an existential threat to the mission of Rogue Riverkeeper.

**101**

21.     I am also discouraged to see that the Federal Energy Regulatory Commission (FERC) continues to move "forward" with this project proposal when the company has yet to receive any of the required permits from the state of Oregon. FERC has denied this project a Certificate of Public Convenience and Necessity once before because the impacts of the associated Pacific Connector pipeline would have had on adjacent landowners outweighed the so called "benefits" of the project. The project has changed very little in the eight years that I have worked for Rogue Riverkeeper, and Pembina has not yet been able to prove that it can build this project without dramatically impacting southern Oregon's clean water, communities, and climate. A court order holding that FERC violated the law in permitting the project would foreclose the project once and for all.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: December 21, 2020. Respectfully submitted,

Robyn Janssen

9

**102**

## DECLARATION OF JOSH LAUGHLIN

1.      The facts set forth in this declaration are based on my personal

knowledge, and if called as a witness, I could and would competently testify

thereto under oath. As to those matters which reflect a matter of opinion, they

reflect my personal opinion and judgment upon the matter.

2.      My name is Josh Laughlin.  I am over the age of eighteen, and I reside

in Eugene, Oregon.

3.      I am a full-time staff member and Executive Director at Cascadia

Wildlands. I have been involved with Cascadia Wildlands as an employee or

volunteer since its inception in 1998.  I am also a dues-paying member in good

standing of Cascadia Wildlands. I am intimately familiar with and support

Cascadia Wildlands' mission to protect and restore Oregon's wildlands, wildlife,

and waters.

4.      I routinely use and enjoy the forests, rivers and estuaries that would be

affected by the proposed Jordan Jove LNG Project and associated 229-mile Pacific

Connector Pipeline, including those found on the Rogue-Siskiyou and Umpqua

National Forests and in Coos Bay. If built, the pipeline would cross and threaten

imperiled salmon and steelhead strongholds, like the Klamath, Rogue, South

Umpqua and Coos Rivers.  I visit these natural areas for hiking, solitude, fish and

wildlife viewing, scenic enjoyment, photography, fishing and other recreational

1

**103**

pursuits, and have worked to safeguard the wildlands and waterways threatened by this proposal for over 10 years.

5.    I was last in the area threatened by the proposal in March 2020, when I went fishing and crabbing in Coos Bay with friends and my son. We boated up from Charleston past the spit at Coos Bay where the LNG terminal would be built and was shocked by how the wild character of Coos Bay would be forever transformed should this proposal proceed. I intend to return to Coos Bay to fish and crab in the same area in March 2021 and would be impacted greatly should the energy facility be built in this sensitive area.

6.    Cascadia Wildlands has approximately 12,000 supporters and members across the country who are interested in and support Cascadia Wildlands' work to protect and restore the ecosystems and species of the Cascadia Bioregion. The formation of Cascadia Wildlands in 1998 was catalyzed by the rampant logging of older forests and the destruction of natural habitats in the region. As a result of this, we devote much of our efforts towards protecting threatened landscapes and species. Analyzing and confronting the impacts of proposed timber sales and fossil fuel infrastructure on our public lands is a central tenant to our work.

7.    Some of Cascadia Wildlands' members own property and homes that are threatened with eminent domain should this fossil fuel export proposal proceed.

2

**104**

We regularly receive calls from and have conversations with affected land owners about impacts this proposal will have on their lives. Many of them have been fighting this threat for over a decade.

8.      One of the greatest threats to the ecosystems of our region is climate change, thus safeguarding our climate is a primary goal of Cascadia Wildlands. As part of our mission, we work to protect threatened mature and old-growth forests, which sequester incredible amounts of dangerous carbon dioxide from the atmosphere, thereby mitigating climate change. We also confront new fossil fuel infrastructure, as extracting and burning fracked gas is greatly exacerbating climate change.

9.      Over half of the 229-mile route of the fracked gas pipeline crosses wildlands in southwest Oregon that are mapped by the U.S. Forest Service as having moderate to very high wildfire risk. I am aware and concerned about the wildfire hazard posed by this project, and in the event of an accidental explosion of the proposed pipeline, this could ignite a major wildfire, threatening the forests, waterways, and rural communities. A wildfire in this area could also have devastating effects on imperiled species like the marbled murrelet, northern spotted owl, and Pacific fisher, and also puts rural communities and homeowners near or in the path of the pipeline in harm's way.

3

**105**

10.    For these reasons, we have been staunchly opposed to the Jordan Cove LNG Project and 229-mile Pacific Connector Pipeline for years, through grassroots organizing, education, coalition building, and litigation.

11.    The construction of this fossil fuel export project and clearcutting the forest for the proposed pipeline will harm our interest in responsible public land management.  It will also harm our interests in the recovery of imperiled species present in the project area, including marbled murrelet, northern spotted owl, Pacific fisher, coho salmon and others. This project will have a direct negative effect on these species, which continue to face the threat of extinction.

12.    For years, Cascadia Wildlands has communicated with various state and federal agencies and policy makers about our concerns and interests surrounding older forest logging, the construction of the energy facility, and burning fossil fuels associated with this project. We regularly feature the impacts the Jordan Cove LNG Project will have in our biannual newsletter, *Cascadia Review*, and through our monthly electronic bulletins and action alerts to our supporters and members. Our membership remains deeply concerned about the impacts this project will have on their livelihoods the natural environment, and future generations.

13.    Cascadia Wildlands has regularly lead excursions and fieldchecks for our membership to the natural areas threatened by the project, including a kayak

**106**

trip in Coos Bay and hikes through threatened old-growth forests along the proposed pipeline route. We intend to continue these kinds of outings when it is safe to do so given the social distancing requirements associated with the COVID-19 pandemic.

14.    My interests will be harmed if the construction of the Jordan Cove LNG Project and Pacific Connector Pipeline proceeds as planned. The extensive logging of mature forests, drilling under and crossing iconic rivers, construction of the LNG facility and burning of fossil fuels associated with this project will diminish my enjoyment of hiking, fishing, wildlife watching and other outdoor pursuits, and detract from the aesthetic appeal of this region. I will suffer irreparable injury from the construction of this project because affected areas will likely not recover in my lifetime.

15.    Cascadia Wildlands' members' and supporters' interests will also be harmed for the aforementioned reasons.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of January, 2021 in Eugene, Oregon.

_____
Josh Laughlin

**107**

## DECLARATION OF SYLVIA MANGAN

1.      I, Sylvia Mangan, set forth that I am over the age of 18 years and am competent to attest to the facts contained in this Declaration.

2.      I am a member in good standing of Oregon Physicians for Social Responsibility (Oregon PSR), A non-profit organization of over 2,800 health professionals and public health advocates through the state of Oregon dedicated to protecting and improving environmental and public health. Guided by the values and expertise of medicine and public health, Oregon PSR works collaboratively with community partners on public education, community advocacy, and civic engagement to protect human health from the gravest threats to survival and wellbeing.

3.      Physicians for Social Responsibility shared in the 1985 Nobel Peace Prize given to our international affiliate for work documenting the impacts of nuclear weapons, and our membership includes doctors, nurses, scientists, public health professionals, and more.

4.      My husband, Larry, and I have lived in the North Bend area for 32 years, the last 20 of which have been spent on our 100-acre ranch about five miles north of the town of North Bend along Haynes Inlet, one of the northern reaches of the Coos Bay estuary. Immediately surrounding our home is a five-acre fenced area where we have about 250 blueberry plants, 10 mixed fruit trees, and about 200

**108**

wine grape plants, mostly cultivars from the cooler areas of Europe. When we built our home in 1999, we purchased all our lumber and goods locally and have contributed an enormous amount of time, energy, and money in the local community over the decades since.

5.     I graduated from college in 1972 with my Bachelor of Science in Nursing (BSN). After I obtained my degree, my career spanned 40 years of work in hospitals, school nursing, and public health. Before retiring, I was a public health nurse for approximately 20 years at the Coos County Public Health Department during which time I developed and supervised a parent education program, supervised the Maternal Child Health Program, and acquired my Masters in Public Health focusing on Health Education and Promotion. I supervised the Maternity Case Management program for high risk pregnant moms and ran the parenting program for at-risk and high-risk children from birth to age 5. We provided home visits to these high-risk families.

6.     As a result of being a public health nurse, I worked closely with multiple agencies that served these types of families, including local hospitals, social services, law enforcement, probation and parole, child protective services, schools, and Tribes.

7.     My husband Larry was also a public servant for his entire career, serving as a wildlife biologist with the Bureau of Land Management in the

**109**

Department of the Interior, where he cared for public lands throughout the West including the Oregon Coast range. We both have been involved with the community in Cub and Boy Scouts, Zonta (a women's service group) and Friends of Public Health, to name a few.

8.      We are surrounded by Douglas fir forests on our property on two sides. The forests are of varying ages ranging from young stands about 30 years old, some middle age stands around 60 years old, and a few scattered older trees 150 years and older that survived the catastrophic 1868 coast range fire that burned much of the Elliott State Forest and nearly all of the timberland from Scottsburg, inland about 30 miles on the Umpqua River from Reedsport, south to the edge of the Coos Bay estuary, where it ran out of fuel as it reached open water.

9.      On the other two sides of our home and below the house are about 35 acres of pastureland that before the 1930's were part of the estuary, and then beyond the pasture, about 30 acres of estuarine mud flats, either flooded or not, depending on the stage of the tide.  In the center of our pasture lands, immediately below our home, is a small U-shaped bay, my husband calls "the Bay of Sylvia," which is a 17-acre salt marsh and coho salmon restoration project we completed in 2009 in cooperation with the North Bend airport. The Southwest Oregon Airport district needed to enlarge its runway to allow larger planes to serve the community,

3

**110**

and in the process, some wetlands had to be filled. They asked us to work with them to recreate some of the salt marsh habitat on our pastures.

10.    The diverse habitats on our property (salt marsh, tidal flats, streams, pastures, and forests) attract a diverse array of wildlife: black tailed deer, Roosevelt elk, black bears, bobcats, pine martens, weasels, raccoons, nutria (bad), and others. We have tallied over 150 species of birds including bald eagles that nest on our property, flocks of hundreds of ducks that migrate through and over-winter here, hundreds of migrating shorebirds, and an occasional sighting of marbled murrelet flying to and from the Elliott State Forest to feed in the ocean.

11.    The area on and around our property was used ancestrally by the Hanis Indians (one of the two tribes of the Coos, the other being the Miluk) and there are many cultural remains. Noteworthy are the remnants of Indian fishing weirs on our property visible from our home.  A noted archaeologist has claimed that the remnant Native American fishing weirs in Haynes Inlet may be the greatest array of these structures in the Pacific Northwest.  Even more notably, there are remains of a 10,000+ year-old Hanis village on a prominent point of our property, likely directly associated with these fishing weirs. We've been told by a knowledgeable tribal individual that the Hanis name of the village could be translated into English as "you go around it," very descriptive of where it once was in relation to canoes going up and down the inlet.

4

**111**

12.    On our property title, looking back through all those that once owned it, I have noted that on May 8, 1869 the land was originally granted to a Jas. T. Jordan. Jordan was a white man, said to originally be a hunter and trapper who migrated here from Kentucky. He married a Hanis woman named Mary, and because of this marriage, Mary was allowed to stay here in her ancestral homeland rather than being moved (via forced march) to the US government Indian reservation in Yachats, which was the fate of many others of her tribe, not "lucky enough" to marry a white man. James and Mary Jordan ended up owning a sizable acreage on the outside perimeter of the "north bend" of the Coos Bay estuary, including our small ranch and a Cove, to our west, that was to be named after the family. My family has friends among the Confederated Tribes of the Coos, Lower Umpqua, and Siuslaw.  One of them is our dear friend Doc Slyter, Tribal Chief for the Tribe. His great grandmother was Mary.

13.    All of this is meant to give a picture, still just one part of a picture, of what our land is, and how important it is to us. We are legal owners of this priceless treasure, but we see ourselves more as caretakers of the land, doing our best to both honor its past and protect its future. Along that thinking, we've built a small cabin, at the opposite end of our property from the Hanis village site, that we call "our shack" as a tribute to Aldo Leopold, the well-known conservationist, who had the iconic "Shack" on his property in Wisconsin and whose land ethic we try

5

**112**

to emulate. We love our land; it has become a part of us and we are part of it; inseparable.

14.    When we received the first letter from the company promoting the Jordan Cove Liquified Natural Gas (LNG) project saying they wanted our land for the Pacific Connector pipeline, my husband Larry described opening the letter as a "drop to the ground" feeling as he began to understand the implications to us. Our home is about 2.5 miles from the site of the proposed Jordan Cove LNG plant, and just outside of the blast zone if a tragic accident were to occur at the facility. The current Federal Energy Regulatory Commission (FERC)-approved pipeline route does not cross our property, but rather goes under the big North Bend Bridge. We were on two of the Environmental Impact Statement pipeline route alternatives, but neither of those were selected for the proposed action. The closest alternative was about 500 feet from our home and would have crossed wetlands, impacted our coho restoration work, and disrupted our ranch management including the animals we graze on our lands: we own two llamas and a goat for blackberry control, and lease some of our pasture to a local rancher who grazes 20 calves here for 5 months of the year.

15.    Even though we were not on the "approved routing" pipeline right-of-way for the project, if Jordan Cove LNG were to encounter engineering difficulties with the record 9,000-foot section of the deep drilling under the bay closer to town,

6

**113**

they would be expected to come back north to likely build across our property to complete the project. Knowing that multiple proposed alternate routes for the pipeline could cross our property means that we feel forced to keep our guards raised since any variation from the current conditionally-approved route would put us in the direct path of the pipeline.

16.    The constant stress and unrelenting worry of this pipeline and LNG terminal being built in our community has been, at times, almost too much to bear. Initially, we were in a state of shock: fearful and devastated at the thought of losing our life's dream. In the overnight letter we received from Pacific Gas Connector Pipeline, it stated that they were interested in our property and wanted access to our land to conduct a survey. This felt invasive and presumptuous from the start.

17.    Both the pipeline and LNG terminal sites are in a well-known earthquake area, the Cascadia subduction zone, where science suggests that an earthquake over 9.2 on the Richter scale is overdue. The earthquake itself could cause up to 10-15 feet of ground subsidence, and the resulting tsunami from the quake could arrive within 15 minutes. This would mean that tankers moored at the facility or in transit down the channel would not have time to exit the bay, with disastrous implications for explosions, leaks, and fires in the estuary.

18.    As a Public Health Nurse, I am very aware of the many risk factors that exist in our community, from extreme poverty to significant psycho-social

**114**

issues, such as a high rate of substance abuse, lack of education, mental health problems, and high unemployment. I have worked with these families and have seen the increased morbidity among children and their parents due to many of these issues. These issues mean that this community is vulnerable already, and the proposed Jordan Cove LNG export terminal and Pacific Connector pipeline would pose a myriad of health risks to myself, my husband, and our neighbors.

19.    LNG terminals emit airborne particulate matter, volatile organic compounds, ozone, nitrous oxide, carbon monoxide, and other hazardous air pollutants. With many of these pollutants, there is no safe level of exposure, meaning that my family and our neighbors will be subjected to increased risk of respiratory disorders, heart attacks, exacerbation of asthma, and early death. As a nurse, I cared for many clients who smoked, had asthma, lived in unhealthy environments, and thus their children grew up with many ear infections, allergies, and asthma, and other respiratory disorders. These impacts also mean that people must take more sick days at school and work.

20.    The construction of a major LNG export terminal would disrupt existing jobs and cause many people to move away, further exacerbating our problems of high unemployment since terminal workers would have a large number of temporary and out-of-state workers. Stable employment and steady

8

**115**

school attendance are major social determinants of health that would be degraded by the Jordan Cove LNG export terminal.

21.    The main hazards of handling LNG are fire and explosion, cryogenic freeze burns, embrittlement of metals and plastics, and confined spaces hazards. Emissions of methane and toxic gases can occur when fracked gas is transported via pipelines, which are subject to leaks and explosions. To be liquified, the fracked gas must undergo a process that removes $CO_2$, mercury, and some heavy hydrocarbons to create an end product that is primarily methane, which is then supercooled into a liquid. Little public research has been conducted as to where the byproducts of the concentration or "purification" process go. These chemicals may cause serious harm. Mercury is a well-known neurotoxin; exposure in utero can result in lifelong impairments in cognitive thinking, memory, language, and attention.

22.    Safety to myself and other area residents is a huge concern, both in and around the LNG plant itself but also along the route of the ocean-going tankers as they motor up and back along the Coos Bay channel. In the event of a terminal or tanker explosion, people within 500 yards would be instantly cremated. Within one mile, individuals could receive second and third degree burns if they do not take cover immediately. Within 2.2 miles, people could still be burned depending on terrain and exposure. We have personally calculated from aerial photos that

**116**

there are 17,000 people residing in those three zones that would be exposed either near the facility or along the ingress and egress route of the tankers. Our home would likely also be affected, sitting just 2.5 miles away from the proposed LNG terminal site.

23.     The construction of the Jordan Cove LNG terminal and Pacific Connector gas pipeline would cause myself, my family, and our neighbors immense stress and anxiety due to noise and pollution during the building phase and the catastrophic consequences of a leak or explosion. Pollutants from the facility would place me and my family at higher risk of respiratory diseases and other ailments. And these environmental impacts would interfere with our right to use and enjoy our property.

24.     A court decision holding that FERC violated the law when authorizing this project would address my concerns, because it would be very likely that the project would never be built.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed on this 19th day of January, 2021.

_Sylvia Mangan_

———————————————
Sylvia Mangan

**117**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATURAL RESOURCES DEFENSE )
COUNCIL, INC., )
 )
       *Petitioner,* )        Case No. 20-1180
 )        Consolidated with
   v. )        Nos. 20-1161, 20-1170
 )        20-1171, 20-1172,
FEDERAL ENERGY REGULATORY )        20-1198
COMMISSION, )
 )        **DECLARATION OF**
       *Respondent.* )        **ROBERT POLLOCK**
 )

**ROBERT POLLOCK** states as follows:

1.      I have personal knowledge of each of the facts set forth below, and if

called upon to do so, could and would testify regarding the following.  This

declaration is filed in support of the Petition filed in the captioned matter,

concerning the proposed Jordan Cove Energy Project.

2.      I live at 385 Oakview Drive in Roseburg, Oregon, and have lived

there for about 25 years. I am 81 years old and am a retired scientist, with

both a bachelor's and master's degree in zoology and a doctorate in genetics.

I live with my wife, Jean, who is also a retired scientist, having earned both

a bachelor's and master's degree in biology. I have been an NRDC member

since 2002.  My last donation was in December 2019.

1

**118**

3.    I've been familiar with the Jordan Cove project for over 15 years. In 2015, I filed a comment with the Federal Energy Regulatory Commission addressing the previous version of the project, which I've attached to this declaration. In that comment, I raised my concerns about the project's wildlife and climate change impacts. These impacts are still present in the current version of the project at issue today.

4.    The Jordan Cove project could, if built, threaten many of my favorite activities. I have been a lifelong birder—since I was 14 or 15 years old. I belong to the National Audubon Society and to our local Umpqua Valley Audubon Society. While we haven't been getting out as much currently due to COVID, my wife and I regularly go hiking to watch birds and to enjoy the overall environment.

5.    We go hiking and birding on the Oregon coast about once every other month, and go to the area around Coos Bay every 3-4 months. We've visited the South Slough National Estuarine Research Reserve in Charleston, Oregon, which I understand is just south of where the LNG tankers are supposed to enter Coos Bay, and intend to do so again. We also often hike just off Trans Pacific Trail Road, northwest of the BLM Boat Launch on the North Spit of Coos Bay. This area is just west of the proposed path for

**119**

tankers going to the Jordan Cove terminal. And to get to this area, we drive immediately north of where the terminal is proposed to be built.

6.    The area around the BLM Boat Launch is a really good place for birding, and we like to go there several times a year. When we visit these places in and around Coos Bay, we tend to move very slowly to enjoy the scenery, moseying along to see what we can find. Both my wife and I are interested in photography and natural history, and like to spend our free time enjoying the local area's birds and ecology.

7.    I am worried that the Jordan Cove terminal, and the increased ship traffic to and from it, could diminish our enjoyment of Coos Bay. The part of the Bay where my wife and I like to walk and watch birds is a very narrow body of water, so any large tank vessel coming through there is going to be quite obvious, and detrimental to the peaceful scenic beauty of the Bay. I also fear that both the increased ship traffic and the terminal are going to harm or drive away bird populations. Certainly, our enjoyment of the experience of hiking and birding at Coos Bay would be diminished; and if the impacts of the proposed industrial activity are severe enough, we might simply choose not to go there anymore.

8.    I am also concerned about the increased incidence of forest fires in our area, which are made worse and more frequent by climate change. I am

3

**120**

seeing more smoke in the summer now, which we can smell in our home coming from 30 to 50 miles away. I have to be particularly careful when it comes to air quality, because I have heart issues and certain allergies. As such, I check the air quality before I go out, and will change or cancel my planned activities based on that. I am aware that Jordan Cove will emit greenhouse gases that will make climate change worse, and hence potentially increase the risk of fire in the region. This puts me at greater risk of smoke inhalation, and could affect my ability to partake in hiking and birding.

9.    I DECLARE, under penalty of perjury, that the foregoing is true and correct.

August 24, 2020

Robert Pollock

**121**

ORIGINAL

ROBERT and JEAN POLLOCK    385 Oakview Drive    Roseburg, Oregon 97471    541.672.8794    rjpollock@riousa.com

2015 FEB -9  A II: 38

CP13-483
CP13-492

February 2, 2015

Kimberly Bose, Secretary
Federal Energy Regulatory Commission
888 First St. N.E.
Washington, D. C. 20246

Dear Ms. Bose:

We are opposed to the Pacific Connector pipeline. It is irresponsible to place a 230-mile natural gas pipeline across an area where a major earthquake from the Cascadia Subduction Zone is overdue and anticipated. It would jeopardize wildlife and streams with a 100-foot wide strip that will have to be maintained by pesticide applications and further endanger aquatic life already compromised by poor water quality in many of the almost 400 waterways the pipeline would cross.

It is unacceptable to allow a foreign company to take our land by eminent domain to export natural gas to a foreign country; there must be a public benefit to allow the right of eminent domain, and there is none as shown by 90% of private landowners who object. A few jobs in Coos Bay are not sufficient to justify the destructive potential of the pipeline.

The liquified natural gas will be produced by fracking which is one of the most environmentally destructive methods of fossil fuel extraction. Apparently, FERC failed to consider the impacts of fracking in contributing to climate change.

The Jordan Cove terminal will emit 2.166 million tons of $CO_2$ per year. Our ocean fisheries are already struggling, and increasing the acidity of the water by addition of more $CO_2$ will only make it worse. The pipeline, terminal, and shipping, will affect 32 species protected under the Endangered Species Act.

Can you give us one good reason to approve this pipeline? We think not!

Sincerely,

Robert Pollock

Jean Pollock

122

## DECLARATION OF NATALIE RANKER

1.    I, Natalie Ranker, set forth that I am over the age of 18 years and am competent to attest to the facts contained in this Declaration.

2.    I am a member in good standing and currently serve as president of Citizens for Renewables (CFR), a non-profit organization based in southwestern Oregon dedicated to improving the quality of air and water in our state and promoting the expansion of renewable energy  utilizing non-polluting technologies to benefit the world.

3.    Citizens Against LNG, Inc. (CALNG) is a project of CFR and also a non-profit that has been fighting for social and economic justice in Oregon since 2006.

4.    Citizens for Renewables/Citizens Against LNG, Inc. has fully participated in the Federal Energy Regulatory Commission (FERC) Prefiling (PF-17-04) and Application (CP17-495-000 & CP17-494-000) process of the Jordan Cove Energy Project, LP, L.P. and the Pacific Connector Gas Pipeline, L.P., LNG Export (Jordan Cove or JCEP). We represent over 5,000 citizens who live, work, operate businesses, recreate, and socialize in areas that would be negatively impacted by the Jordan Cove LNG terminal, storage tanks, natural gas liquefaction facility, and the Pacific Connector Gas Pipeline.

**123**

5.    The main aspect of this fight has been to stop the construction of a 230 mile pipeline across southern Oregon and a liquid natural gas production facility on the coast at North Bend, Oregon. This project has been proposed by Canadian companies for the transport Canadian gas to the Oregon coast for liquefaction and transport to Japan, China, and other far eastern countries. Many Oregon landowners along the pipeline route have refused  to sell their properties, some of which have been in their families for generations, and the current proposal is to take their land by eminent domain. CFR and CALNG have fought alongside landowners on the pipeline route and residents in affected towns at the local, state, and federal level. We have challenged and/or appealed every land use application put forth by the several Canadian companies, currently Pembina, working on the project, and we will continue to do so.

6.    My husband and I moved to Coos Bay from Houston, Texas, fifteen years ago. My husband had breathing difficulties that were being exacerbated by the pollution of the surrounding petrochemical industries and the life styles of 5 million people. Coos Bay seemed the perfect place for clean air and a quiet retirement. We had been coming here to visit since the 1980's and had friends and grandkids here. Our first home was a rental in the country, and then in 2012, we found our perfect house in a perfect neighborhood. We were close to the bay as

**124**

well as the scenic McCullough Bridge with lots of huge firs, redwoods, and deciduous trees surrounding us.

7.    What we didn't know at the time was that our location, being one mile from Jordan Cove, was far from perfect. We spent a year renovating, painting, and planting, and we came to love our new home. However, we then learned that the city and county had plans for our location in North Bend. There was to be built a natural gas liquefaction plant a mile from our house, a natural gas pipeline less than a half mile from our house, and a 2,000-man work camp housing project one quarter mile away. We could not allow this to happen. We decided that it was our right and also right for us to fight for the home and neighborhood and the retirement that means so much to us.

8.    It would not be possible for us to remain living in our Simpson Heights home if the Jordan Cove Energy Project (JCEP) and pipeline is built. Natural gas is primarily made up of methane, and it is the main emission from liquefaction. Methane is 20 times more potent than carbon dioxide and holds a great deal more heat close to the earth. It is also much more flammable. The pipeline to JCEP will run along the northern border of Simpson Heights approximately 50 yards from a heavily used park and close to numerous homes. There has never been a pipeline that does not leak, so this would be one more source of pollution right next to where our children and families play and live.

**125**

Also, there is constant venting and flaring of storage tanks and other apparatus, so there will be a constant addition of methane to the already potent industrial pollution of the facility.

9.    My husband's breathing problems have worsened since we have been here and he has developed cardiac problems as well. Therefore, continuing to live here if the project is built, which will worsen existing pollution, will make life far more difficult for him and hasten his death. If we feel it necessary to move from this area, another problem that is arising from JCEP is that local real estate agents now feel it appropriate to mention the plans for the plant/pipeline to clients, which is resulting in declining interest in this area and declining property values. If we ever wanted to sell, there would be little hope of making any profit to put towards another home. So we can't afford to stay and can't afford to move.

10.    We feel exploited and abused by a foreign corporation coming here and so drastically changing the lives of so many by proposing this project in our community. However, we are luckier than many. We at least have a home to live in, whereas many other lower income, disabled, minority, and elderly residents on fixed incomes will be forced out of their homes when the much higher rents of oil boom wages are imposed. There will NOT be the thousands of jobs and high wages that have been promised. Many locals do not have the skills necessary to build the terminal so workers from outside the community will be brought in, and

**126**

once it is built, the workers will be gone and local residents will be left with broken homes, broken streets and other services, and a broken society that has been used and abused by thousands of nonlocal workers who feel entitled because they have money to spend.

11.     The construction of the Jordan Cove facility and pipeline will also create numerous other problems for residents and visitors. For over a year there will be thousands of piles being driven into the bedrock of the bay for the docking facility for the LNG tankers. This will create a massive amount of sound all across the bay in the decibel range that is harmful to humans, fish, and bi-valves, and will drive people away from that area. Some of the main attractions of this part of the estuary are fishing, clamming, and digging sand shrimp as well as surfing. These will not be nearly as popular when there is the constant clamor of pile driving, liquefaction trains, and finally LNG tankers in transit.

12.     There is also the matter of dredging, and how it will affect the people who live, work, and recreate here.  In June of 2019, the City of North Bend approved an application, FP 4-19/CBE 5-19, submitted by Pembina. In part, this approval granted the placement of a dredge line and a temporary dredge offloading facility in zones 48-CA and 51-CA respectively. Citizens for  Renewables appealed this decision to LUBA as an Intervenor-Petitioner.  On July 17, 2020, LUBA granted the appeal and reversed the City's decision, stating that neither of

**127**

these two key components are allowed in the zones designated. This ruling denied JCEP their designated area for depositing their massive pile of dredge spoils. The LUBA reversal of this land use application is certainly appropriate since the described uses are not allowed in the respective estuary zones. However, it remains possible for Pembina to resubmit yet another application for this permit, meaning that it will take a federal court order overturning FERC's Certificate of Public Convenience and Necessity before the JCEP project is dead once and for all.

13.     Many of the citizens that my organization represents live in the hazardous burn zones of the proposed LNG terminal and transiting LNG tankers, and would be at risk of receiving second degree burns within 30 seconds should there be a mishap and resulting pool fire.

14.     The Coos Bay estuary is an invaluable area serving as a nursery for our ocean dependent industries. JCEP would cause irreparable harm to fishing, crabbing, oyster farming, clamming, and other industries and pastimes.

15.     Another major problem would be the harm inflicted on our tourist industry. Tourism added $275.8 million to our local economy in 2018 and accounted for 3,330 jobs in Coos County. (See FERC Accession No 20200220-5034, exhibit 8, p. 83). Our residents and our local economy will suffer greatly with the damages that will be done to these industries in return for the promise of so few future jobs.

**128**

16.    For these and numerous other reasons, JCEP will significantly impact our life as we know it. The influx of thousands of outside workers will also greatly affect the lives of so many who now call Coos County their home. It is not right that all of this should be done for the profit of a Canadian company with so little benefit and in many instances great harm to local residents.

17.    A court order finding that FERC violated the law when authorizing this project would address my concerns, because then the project would not be built and its attendant harms would not occur.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on August 2, 2020

_____
Natalie Ranker

**129**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATURAL RESOURCES DEFENSE        )
COUNCIL, INC.,                   )
                                 )
    *Petitioner,*            )          Case No. 20-1180
                                 )          Consolidated with
    v.                       )          Nos. 20-1161, 20-1170
                                 )          20-1171, 20-1172,
FEDERAL ENERGY REGULATORY        )          20-1198
COMMISSION,                      )
                                 )          **DECLARATION OF**
    *Respondent.*            )          **DARLYNE REISING**
_____  )

**DARLYNE REISING** states as follows:

1.    I have personal knowledge of each of the facts set forth below, and if called upon to do so, could and would testify regarding the following. This declaration is filed in support of the Petition filed in the captioned matter, concerning the proposed Jordan Cove Energy Project.

2.    I live at 2116 Quail Point Circle in Medford, Oregon, and have lived there for eight years. I am 72 years old, and a retired information technology manager. I am a member of NRDC, having first donated in 1992 and most recently donated in June 2020. I am also a member of the Rogue Riverkeeper.

3.    The Jordan Cove terminal and associated pipeline would, if built, affect me in multiple ways, all of them bad. Since learning of the project shortly after moving to Oregon, I signed up to receive information about the project,

**130**

attended a meeting at our local fairgrounds to learn about it, and registered my

opposition with the Federal Energy Regulatory Commission. I have learned that

the project is a threat to the whales that I love to watch, to my health, to my

outdoor recreation, and even to the retirement community where my house is.

4.    My wife and I are somewhat obsessed with whale watching—we love

it and can hardly get enough of it. In a non-COVID world, we go a couple times a

year to Lincoln City and Depoe Bay on the Oregon coast to see both the resident

pod of gray whales there as well as the whales that migrate. We've been doing that

for about six years, and intend to continue as long as possible. We often camp in

Lincoln City, right across from the Nelscott Reef. About 15 minutes from there,

we can get so close that it feels like we are practically on top of the whales – we

can see their eyes, and get a good look at their babies. Usually, we will camp there

anywhere from two to four weeks when the whales are around. Additionally,

sometimes in wintertime, we go camping near Reedsport to watch the whales. We

have sometimes met up with friends at our whale watching sites and exposed new

people to whale watching.

5.    As I've learned from the whaling center in Depoe Bay and other

sources, the migrating whales that we like to watch travel to the Sea of Cortez off

Baja California to have their babies, and then migrate north again to where we can

see them at Depoe Bay and elsewhere along the coast. To make that trip, they

**131**

have to go past the coast near Coos Bay – it's the only route available for them to bring their babies back. I am very concerned that if the project is built, whales—the mothers and babies—are going to be hit and killed in that area by the increased tanker traffic going to and from the terminal. Such events would be a horrifying and tragic loss for me. And if the population were to decline significantly as a result of the ship strikes, my wife and I would no longer be able to enjoy watching them in the same way we do now, and would go less frequently, if at all.

6.     On our whale watching trips, I also enjoy bird watching—particularly sea birds—and am a member of the Audubon Society. I am concerned that if Jordan Cove starts to impact the whales and diminish their population, the sea birds will be negatively impacted as well, since the food chain those birds depend upon would be disrupted. A diminished bird population would be one more reason we would have to make the sad choice to limit or end our regular trips to the coast.

7.     In addition to our trips to see the whales, my wife and I also like to go hiking near Shady Cove on the Rogue River. There is a beautiful deep gorge with an easy hiking trail about 20 minutes from there. We usually go about twice a year, and would have been there already this summer were it not for the pandemic. The proposed pipeline would cross the River not far from that location, and would require cutting down a large number of trees in the right of way. Once that

**132**

happens, the area will be much less appealing for us to visit, as the view and the wilderness feel of it will be diminished, and we probably would not go there anymore.

8.      Finally, I am worried about how the project will affect my health, due to the climate change to which it will contribute. The Jordan Cove project would make climate change worse due to its anticipated methane emissions, and climate change has been linked to increased frequency and severity of forest fires. Additionally, there is the risk that an accident on the proposed pipeline or a pipeline leak will spark fires. I have had asthma for at least 20 years—I take daily medication, and have an emergency inhaler I use to keep my lungs open. Forest fires are thus a huge problem for me, since my asthma makes the smoke more difficult for my body to handle. When the fires came through our area a couple years ago, we had to put different air filters on our furnace to protect my health. If the Jordan Cove project is built, it would contribute to the climate change problem—and, very likely, the associated fires—getting even worse. My health would suffer accordingly.

9.      Increased fire danger threatens even the very existence of my retirement community. Approximately 10 to 20 percent of our community's population passes away each year, which means we have to have people continually moving into the community to maintain our economic and social

**133**

stability. Increased forest fires of the sort we had a couple of years ago, which

raised air pollution to hazardous levels, will keep people from moving here. The

community we love so much would likely cease to be sustainable.

10.    The project and its climate change impacts additionally threaten the

bird populations where I live. I enjoy bird watching closer around my home when

I'm not on my whale watching trips - there are about 60 species of birds that come

through and make their homes on our retirement community campus. But a change

or reduction in the local bird population would diminish that enjoyment. Hence, I

am concerned that the tree clearing for the pipeline will make it hotter by the river,

which will negatively impact the ecosystem and drive away birds. For example, if

the water becomes too warm for the salmon, then the eagles will leave; and if small

mammals leave the area because they have no cover, the birds who prey on them

will leave with them. Climate change also drives bird populations farther north, so

we would likely lose the birds we have here now that I enjoy watching. The same

is true for the sea birds I like to watch on the coast.

I DECLARE, under penalty of perjury, that the foregoing is true and correct.

August 25, 2020

Darlyne J. Reising
Darlyne Reising

**134**

## DECLARATION OF JOE SERRES

1.      The following facts are personally known to me, and if called as a witness I would and could truthfully testify thereto.

2.      My name is Joe Serres, and I reside in Medford, Oregon, with my two daughters. I moved to southern Oregon in 2000 after completing my law degree at the University of Oregon. I am employed at Options for Southern Oregon, a large nonprofit healthcare organization that focuses on mental health, housing, and competitive employment services for low-income individuals and families in southern Oregon.  I have provided development and legal services to Options for Southern Oregon since 2003.

3.      I am an avid outdoor recreationalist: I enjoy hiking, fishing, swimming, nature photography, geologic and ecological study, documenting wildlife and plants, and spending family recreational time in the lands and waters that would be affected by the Jordan Cove-Pacific Connector project.

4.      I am the President of the Board of Directors of Friends of Living Oregon Waters ("FLOW). I co-founded FLOW in 2002 to help protect Oregon's waters from the impacts of pollution and development. I have served as the volunteer Conservation Director of FLOW since 2002 and have been directly involved in monitoring and advocating for protection of Oregon's waters.

1

**135**

5.    FLOW is an all-volunteer organization and works with our members and local communities to serve the interests of protecting Oregon's waters. FLOW's mission is to use legal oversight and public education to help protect Oregon waters from the impacts of pollution and development.  FLOW's office is based in Grants Pass, Oregon, and we have statewide membership, including members whose interest is the protection and restoration of streams, rivers, wetlands, Wild & Scenic Rivers, and watersheds of southern Oregon.

6.    FLOW has been involved in the permitting process for local, state and federal permits regarding for Jordan Cove and the Pacific Connector since the beginning of the project.  We have been active regarding this issue - LNG terminal and pipeline development in Oregon - since 2003, and provided comments to local, state and federal agencies throughout the process since that time.

7.    FLOW's interests in the watersheds of southern Oregon serve our members' interests of protecting waterways from pollution and development. FLOW also monitors all Wild and Scenic Rivers in Oregon, which include various rivers that would be impacted by the proposed project. FLOW's members and I, in my personal capacity and as Board President, visit these areas for various reasons including recreation, aesthetic beauty, spiritual purposes and to research plants and wildlife utilizing these lands and waters.

**136**

8.      I have personally visited various areas that would be impacted by the proposed Jordan Cove/Pacific Connector project at least 120 times over the last 18 years. During visits to the affected watersheds, walking woodland areas, meadows, and river and stream corridors, I have visited areas that would be directly degraded by proposed project development. My daughter, Bela Serres, completed her high school senior volunteer project in 2018 with FLOW by accompanying our monitors documenting areas associated with the Jordan Cove-Pacific Connector project and since then she and I have led small groups on hikes in oak woodland/savannah areas that would be impacted by the Pacific Connector pipeline.  Many of these areas we visit recently burned during the 30,000 acre South Obenchain fire during the late summer of 2020 and we are continuing to visit and photo-document these areas.

9.      I am very concerned about the status of threatened and endangered species and the effects of LNG pipeline development. One of my duties as a FLOW Board member is to ensure that development activities in watersheds are in compliance with various federal environmental laws, including the Endangered Species Act.

10.      FLOW protects Oregon's vulnerable water systems through legal oversight, monitoring, and community education. FLOW has three conservation programs: the Oregon Wild and Scenic Rivers program, the Oregon Waters

3

**137**

program, and our field monitoring network. Our field monitoring program has enabled participants to document the impacts of development on lands and waters throughout Oregon and have led to significant improvements in the condition of these monitored areas.

11.      We will be visiting the affected area that is impacted by the proposed Jordan Cove/Pacific Connector project over the coming months and years.  We have field monitors that are monitoring the affected area and I will be taking multiple trips to monitor conditions in areas directly affected by the proposed Jordan Cove/Pacific Connector project. Preventing the Jordan Cove/Pacific Connector project activities in the affected watersheds would greatly improve my personal experience while visiting these lands and waterways for recreational, spiritual, aesthetic, and research purposes.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of January, 2020.

Joe Serres

**138**

## DECLARATION OF DOUGLAS SMITH

1.     My name is Douglas Smith, and I am a current Individual Supporting Member in good standing of Petitioner organization Waterkeeper Alliance. I have been a member continuously since at least 2008. I rely on Waterkeeper Alliance and other environmental advocacy groups of which I am a member to represent my environmental, health, recreational, aesthetic, and other interests.

2.     I am a retired professor who moved to Ashland, Oregon in 1977, attracted by the beauty and recreational opportunities in the region. In earlier careers, I was Photography Coordinator and Curator for the Southern Oregon Historical Society and was self-employed as a professional photographer. My wife and I raised a family here, often taking hikes and rafting rivers in the areas where the proposed Pacific Connector natural gas pipeline is proposed to be constructed through the Rogue River and its tributaries and forests nearby.

3.     As a river user and advocate for a healthy Rogue River, I frequently raft, camp, hike, kayak, fish, and explore the forests, rivers, and streams in the Upper Rogue Basin.  I plan to spend time in these areas in the future enjoying recreation on the Upper Rogue River and its surrounding public lands.  I estimate that my wife and I have visited the Upper Rogue River and surrounding areas more than 120 times in the past 20 years and plan to continue at that pace or greater in the future.  I intend to visit the Upper Rogue River and the forests in almost all the

1

**139**

months of the year 2021, as we have done in the past, whether it be cross-country skiing, camping, river-rafting, hiking, or just photographing the natural magic of the region.  My wife and I do these activities many times with other families from our neighborhood and will do so every year we are able in the future.

4.      I am very familiar with the specific area where the Pacific Connector pipeline is proposed to cross under the Rogue River.  This corridor of the river, which I have visited many times, is one of the last chinook spawning sites in the Upper Rogue. I have great concerns that the proposed horizontal directional drilling for the pipeline under the Rogue could severely impact the river if there were any frac-outs in the bedrock underneath these crucial salmon spawning sites.

5.      Frac-outs are when the bedrock under the river is fractured and drilling fluids move through the cracks up into the river channel. This can be extremely harmful for the river as the drilling fluids and chemicals leak into the clean river water.  The Chinook salmon spawning sites that are located directly above the proposed drilling site would be harmed especially by smothering gravels and any salmon eggs that are nested there.

6.      If built, the Pacific Connector LNG pipeline would negatively impact not only the Upper Rogue River, but also its tributaries as it would be placed directly into or through small tributary streams and the adjacent riparian corridor. Streams would be blasted, trenched, diverted and dammed to lay the pipeline

**140**

through the hundreds of miles-long corridor having significant impacts on riparian vegetation, clean water, invertebrate species and the visual aesthetic of the areas. Heavy machinery, construction, and increased traffic in these regions will also have a negative impact on my use and enjoyment of Upper Rogue River and areas through which the pipeline would be built.

7.      In addition to river experience directly related to the region and the site of the proposed LNG pipeline crossing, I have hiked the Pacific Crest Trail (PCT) and seen the site where the 36" pipeline and the 50-foot wide, permanent swath of cleared land around it will cross that almost sacred American pathway - the PCT.  The visual statement of an almost 300-mile-long bare strip of unnatural land with a giant pipeline of dangerous flammable gas flowing through it - complete with noise pollution and its effect on wildlife - is very concerning and disturbing to me.

8.      As a citizen of Oregon and as an American, I have actively advocated for managing our lands and waters for all people and animals and for far-reaching decisions to preserve our resources for all, even when some of those resources will be used for commercial ends.  I have submitted comments on several previous permit applications that Pembina and the Jordan Cove LNG export project have applied for over the past five years. My comments have most specifically addressed my concerns about the harmful impacts the project would have on the

**141**

Rogue River and the lands where I have frequently visited, rafted, hiked, fished, photographed and camped, and where I plan to continue to do so in the future.

9.     The existence of clean, cold water and iconic fish species like the Rogue River Chinook salmon bring me great joy and comfort. The salmon are a rare example of the rich wildlife that, while certainly adversely impacted by human activities, has managed to survive many human-caused obstacles.  Salmon species rely on cold, clean water to exist and thrive. Salmon species in the Rogue are struggling due to poor water quality from pollution and increased temperatures from decreased riparian vegetation and development. More adverse impacts to the river and its riparian corridor are only going to further harm the Rogue's struggling salmon species.

10.     I am also very concerned about the threat of impacts to water quality in the Rogue that are likely to result from this project.  This is not only a problem for salmon and other aquatic species, but also for communities in the Rogue Valley who rely on the Rogue's cold clear water for drinking, irrigating, and recreation. Ensuring the continued existence and protection of these sensitive fish species and their clean water habitat is of utmost importance to me and has directly influenced much of my personal and professional life.  My love and appreciation for the Rogue River's iconic salmon species directly relies on the clean, cold water of the upper Rogue.  I am very concerned that the impacts from the proposed pipeline

**142**

construction and operation will lower the quality of life for me, my family, and my community by lessening the health, environmental, recreational and aesthetic values of this unique and incredible natural area.

11.    I am very concerned about the hazards of a LNG pipeline crossing forest lands with the realistic possibility of leakage, earthquake damage, environmental and other political sabotage, and a myriad of causes, both natural and human, that may occur. Additionally, I am very concerned about the forest clear-cutting to create the 95 foot wide right of way necessary for pipeline construction activities (only 45 feet of which is proposed to be re-seeded after the pipeline is built) and how this will segment ecosystems, cause sedimentation and temperature and other water quality changes in the Rogue and its tributaries, industrialize the area, cause grave aesthetic harm, and allow for introduction and spread of invasive species.

12.    In my written and oral comments and correspondence that I have submitted during notice-and-comment opportunities and in hearings before FERC, the Jackson County Commissioners, and in correspondence to Members of Congress, I have specifically communicated my concerns about the harmful impacts that the proposed Pacific Connector Pipeline to Jordan Cove would have on the Rogue River and the various uses of the River that I, my family, and our broader community have relied on for generations.  I am also very concerned about

**143**

the hazards of a LNG pipeline crossing forest lands with the realistic possibility of

leakage, explosions, fires, earthquake damage, environmental political sabotage,

and other causes, both natural and human, that may occur.

13.    All of the treasured land and waterways in the Rogue River basin that

I now use and will continue to use and share in the future are a symbol to me and

others of what we value and must conserve and protect as a legacy for future

generations.  In addition, for me, approval of the Jordan Cove project would be a

failure to address climate change, which would violate my commitment to making

as little environmental "footprint" as possible.  I will be truly saddened if this

project is allowed to adversely impact Oregon, our nation, and our world.

14.    I fully support Waterkeeper Alliance's petition for review challenging

FERC's decisions to allow construction and operation of the Pacific Connector

Pipeline project and associated LNG export facilities. As a private citizen, I do not

have the resources or wherewithal to bring such legal challenges in my personal

capacity and rely upon Waterkeeper Alliance to assert and protect my and my

family's environmental, health-related, recreational, aesthetic, and other interests.

15.    Further, the environmental, health-related, recreational, aesthetic and

other injuries about which I am gravely concerned would be redressed by a

favorable decision, as the injuries to the Rogue River and its surrounding

**144**

ecosystem that would affect my experience of the Rogue Basin and forests forever would be prevented or mitigated.

I declare under penalty of perjury that the foregoing facts are true and correct. Respectfully executed this 12th day of January, 2021.

_Douglas R. Smith_
_____
Douglas Smith

**145**

## DECLARATION OF BARBARA TAYLOR

I, Barbara Taylor, declare as follows:

1.      I have personal knowledge of the matters stated herein, and if called as a witness, could and would competently testify thereto.

2.      I currently live in North Bend, Oregon. My husband and I have lived here for over 34 years.

3.      I give this declaration for use by the Center for Biological Diversity (the "Center") regarding the proposed Jordan Cove LNG terminal and Pacific Connector pipeline (the "Jordan Cove" project). I am a member of the Center, a national, nonprofit conservation organization with more than 1.7 million members and online activists dedicated to the protection of endangered species and wild places.

4.      I joined the Center in 2011, and I support its mission to secure a future for all species, great and small, hovering on the brink of extinction and to protect the lands, waters and climate that people and species need to survive. I became a member of the Center because it is working to protect people and places that will be harmed by fossil fuel projects like Jordan Cove. Public interest environmental organizations such as the Center serve an important role in ensuring that environmental laws are followed and in protecting our environmental resources

**146**

and public safety. I trust the Center to take actions that defend and promote my interests in this matter.

5.      The Jordan Cove project proposed for Coos Bay would be in close proximity to our home and in an area that I frequently use for recreation. Our home is in the "blast zone" mapped by the Federal Energy Regulatory Commission ("FERC") should there be an incident at the proposed LNG facility.

6.      I am very concerned about the risks this project poses to our community and to the areas that I enjoy. Coos Bay and the surrounding land is an integral part of my life, and the Jordan Cove project would have a significant impact on my daily life and the Coos Bay area that I use and enjoy every day.

7.      The area where the project would be located is a prime destination for me, the local community, and visitors for recreational opportunities. I frequently visit Coos Bay, in particular the area where the proposed Jordan Cove project would be located. My husband and I walk our dog nearly every day on the North Spit, which is only a few minutes from our house. I visit the project area often to hike, birdwatch, kayak and to enjoy nature. I often meet up with friends and local hiking groups on the North Spit and other areas in the vicinity of the project, where I enjoy the natural surroundings and wildlife.

8.      My visits to the proposed Jordan Cove project area have benefited my life in many ways – physically, spiritually, and emotionally. Taking walks with my

**147**

family and friends on the North Spit and other natural areas in the vicinity of the project is an integral part of the experience that makes living in North Bend so special to me.

9.      I am very concerned about how the project will affect my quality of life, as I often visit the project area to enjoy the relaxing and restorative power of being in a natural outdoor setting. The project will drastically alter the character of Coos Bay and the surrounding area, changing it from a natural area into an industrial fossil fuel shipping center. This will adversely affect my ability to use and enjoy the project area, negatively affecting my life.

10.     The Jordan Cove project would limit access to areas I currently enjoy for recreation and make other uses undesirable or even dangerous. For example, I often enjoy kayaking in Coos Bay near the North Spit and in the area where the project would be located. I usually put in at the BLM boat launch that is located very close to the proposed location for the Jordan Cove LNG facility. In good weather, I try to kayak there several times per month and expect to continue to do so in the future. However, given the increase in tanker traffic associated with the project, kayaking in these areas will no longer be safe if the project is constructed. The LNG facility would also be an eyesore, spoiling the aesthetics of this area and making it unsuitable for my kayak adventures.

**148**

11.    I have a great appreciation for the native species that inhabit this area and value spending time observing them. For example, I am an avid birdwatcher, and I often visit the North Spit and other areas around Coos Bay for bird watching. I enjoy birdwatching every time I visit the project area, and the presence of this amazing wildlife is part of what makes the area so special to me.

12.    Noise and light from the project would adversely affect wildlife in the area, including the snowy plovers and other shore birds that live on the North Spit as well as songbirds in the woods surrounding the bay, diminishing the opportunities for me to birdwatch and otherwise view and enjoy such species.

13.    I plan to continue bird watching, hiking, kayaking, exploring the bay, walking the surrounding land, and enjoying the solitude of this area, and I hope to pass on this legacy to my grandchildren. The Jordan Cove project threatens to destroy this. It would cause immediate, irreparable harm to my everyday life and the natural values I treasure. I have a young granddaughter and I have been looking forward to sharing the natural beauty of Coos Bay with her; however, the project would ruin the natural beauty of the area and I would not feel comfortable bringing her there if the Jordan Cove project is built due to the risk of an accident and potential exposure to air and water pollution.

14.    The Jordan Cove project would have an extreme impact on the life I now enjoy here, destroying the peace and quiet this land provides, disrupting our

**149**

everyday recreational opportunities, and creating a visual blight to the area I love. I am particularly concerned about the pollution associated with the project, including air, water, noise and light pollution.

15.    I am further concerned about the potential for natural gas and other spills or leaks from the project, which would have dire consequences for the fish, wildlife, and activities the bay now supports.  A leak or spill in this area would have disastrous effects on me and my family and would harm the water resources and habitat areas we rely on and enjoy.

16.    Although it is my hope and plan to be able to stay in North Bend and to continue enjoying life along Coos Bay with my family, I fear that the effects of the project would be too much to bear to continue living here – and it would have immediate, irreversible impacts on my family's future. If the project is built, I will likely need to move away from this area, as it would adversely affect the natural beauty and recreational opportunities that I rely on and for which I originally decided to settle here.

17.    My interests in protecting the character of Coos Bay and continuing to use and enjoy the Jordan Cove project area as set forth herein would be served if this Court were to find that the Federal Energy Regulatory Commission failed to adequately assess the environmental impacts of the Jordan Cove project, and that the issuance of a permit was unsupported by relevant information. If this Court

**150**

were to find in favor of Plaintiffs, significantly more information would be available to me and the public regarding the impacts of the Jordan Cove project, and additional mitigations and limitations might be implemented that would better protect my interests as stated herein. Or, the project may never be built at all, which would also serve my interests.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed this 27th day of December, 2020 in North Bend, Oregon.

B.R. Taylor

Barbara Taylor

**151**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATURAL RESOURCES DEFENSE )
COUNCIL, INC., )
)
     *Petitioner,* )
)
     v. )
)
FEDERAL ENERGY REGULATORY )
COMMISSION, )
)
     *Respondent.* )
_____ )

Case No. 20-1180
Consolidated with
Nos. 20-1161, 20-1170
20-1171, 20-1172,
20-1198

**DECLARATION OF**
**HILLARY TIEFER**

**HILLARY TIEFER** states as follows:

1.    I have personal knowledge of each of the facts set forth below, and if called upon to do so, could and would testify regarding the following. This declaration is filed in support of the Petition filed in the captioned matter, concerning the proposed Jordan Cove Energy Project.

2.    I live at 5007 SW Canterbury Lane in Portland, Oregon. I am 70 years old and a retired English professor. I have been a member of NRDC for more than 25 years. I have additionally been a member of the Sierra Club for about 20 years.

3.    I am deeply concerned about the Jordan Cove project and the impact it would have on me. If built, the Jordan Cove project would greatly diminish my enjoyment of the scenery at Coos Bay. In addition, I suffer from health conditions that make me particularly sensitive to climate change, which the project will exacerbate.

**152**

4.    My husband and I visit Coos Bay one to two times a year, as we have a son who lives in the Bay Area, and I like to stop in Coos Bay when driving to visit him. I greatly enjoy these visits because of the beauty and serenity of Coos Bay and the nearby Oregon Dunes National Recreation Area, which we also sometimes visit. I enjoy views of the Bay while eating lunch and walking around the harbor. We intentionally choose Coos Bay and avoid stopping in the larger towns along the I-5 corridor when we travel, because the greater level of noise and industrialization in those places cuts into our enjoyment of the bucolic scenery. If the Bay were further industrialized by construction of the Jordan Cove project, the beauty of the scenery would be diminished by both the terminal and the increased ship traffic, and I would not want to stop there anymore.

5.    I am also very worried about the impact that climate change has on me. Although it's already happening, Jordan Cove's pollution is going to make it worse. I have an inherited medical condition called anhidrosis that makes me unable to perspire, which means I cannot tolerate heat. My mother and brother both had this condition as well, which my brother coped with by living in Alaska. In even moderately warm weather, I have to take water with me that I can pour on myself, and if temperatures go above 80 degrees, I avoid going out at all because it's too uncomfortable. I tend to take my daily walks only in the morning to avoid the heat. If the weather gets consistently hotter, I will likely avoid walking in the area where I live and be able to spend less time outdoors during the summer.

**153**

6.      Additionally, I have respiratory allergies, and my allergic reactions are made worse by airborne irritants. That means smoke from forest fires – which climate change is making more frequent – is a recipe for misery for me. When the severe fires came through our area two years ago, I was sneezing so hard I was nearly choking. I could not even get out of the car due to the smoke. I am concerned, once again, that Jordan Cove is going to contribute to climate change – and hence to forest fires – and make this problem even worse.

7.      I have been concerned with the potential impact of the Jordan Cove project on me and my community for many years, and have been consistently registering that concern in multiple comments to the Federal Energy Regulatory Commission and other government agencies and officials. I am attaching to this Declaration my comments submitted in July 2019, May 2019, May 2015 (via Friends of the Earth), February 2015, and December 2014. In most of them, I highlight my particular concern with the climate impacts of the project.

I DECLARE, under penalty of perjury, that the foregoing is true and correct.

August $\underline{18}$, 2020

Hillary Tiefer

**154**

RECEIVED
*By Docket Room at 12:42 pm, Oct 01, 2020*

# Vinson&Elkins

John S. Decker  jdecker@velaw.com
**Tel** +1.202.639.6599  **Fax** +1.202.879.8899

October 1, 2020

Natalie Wood
Office of Natural Gas Regulatory Activities
U.S. Department of Energy
FE-34
P.O. Box 44375
Washington, DC  20026

Re:    *Jordan Cove Energy Project, L.P.*, DOE/FE Docket Nos. 12-32-LNG, 11-127-LNG
       Semi-Annual Report

Dear Ms. Wood:

Pursuant to Ordering Paragraph M of DOE/FE Order Nos. 3413 and 3413-A, and Ordering Paragraph I of DOE/FE Order No. 3041, Jordan Cove Energy Project L.P. ("JCEP") hereby submits its semi-annual report describing the progress of the proposed liquefaction facility.[1]  On March 19, 2020, the Federal Energy Regulatory Commission ("Commission") issued its order granting the authorization requested by JCEP in its Application, and on May 22, 2020, the Commission issued an order granting rehearing, in part, and denying rehearing, in part, and denying requests for a stay.[2]  JCEP continues to pursue other required federal, state, and local permits and authorizations for its facility. JCEP has also continued its negotiations with prospective customers for liquefaction services.

Please contact me if you have any questions.

Respectfully submitted,

*/s/ John S. Decker*
John S. Decker
*Attorney for Jordan Cove Energy Project L.P.*

---

[1] *Jordan Cove Energy Project, L.P.*, DOE/FE Order No. 3413-A (July 6, 2020); *Jordan Cove Energy Project, L.P.*, DOE/FE Order No. 3413 (Mar. 24, 2014); *Jordan Cove Energy Project, L.P.*, DOE/FE Order No 3041 (Dec. 7, 2011).
[2] *Jordan Cove Energy Project, L.P., et. al.*, 170 FERC ¶ 61,202 (2020), *order on reh'g and stay*, 171 FERC ¶ 61,136 (2020).

**Vinson & Elkins LLP  Attorneys at Law**
Abu Dhabi  Austin  Beijing  Dallas  Dubai  Hong Kong  Houston  London  Moscow
New York  Palo Alto  Riyadh  San Francisco  Shanghai  Tokyo  Washington

2200 Pennsylvania Avenue NW, Suite 500 West
Washington, DC 20037-1701
**Tel** +1.202.639.6500  **Fax** +1.202.639.6604  www.velaw.com

# FEDERAL ENERGY REGULATORY COMMISSION
## WASHINGTON, D.C. 20426

OFFICE OF THE GENERAL COUNSEL

August 12, 2020

VIA Electronic Mail

Adam Dilts
Chief, Oceans and Coasts Section
NOAA Office of the General Counsel
1305 East-West Highway
SSMC4, Room 6111
Silver Spring, Maryland 20910

Dear Mr. Dilts:

On July 10, 2020, your office requested the comments of the Federal Energy
Regulatory Commission (Commission) on an administrative appeal brought by Jordan
Cove Energy Project, L.P. (Jordan Cove) and Pacific Connector Gas Pipeline, LP (Pacific
Connector) (Docket Nos. CP17-494-000 and CP17-495-000) pursuant to the Coastal
Zone Management Act (CZMA).

Specifically, you posed the following questions, for which answers are provided
below.

(1) *The status of any other FERC-approved LNG export terminals in the
United States. According to Appellants' principal brief, the project "is the
only FERC-approved LNG export terminal on the West Coast of the
contiguous United States, and the first LNG export terminal authorized on
the U.S. West Coast in over 50 years." NOAA requests FERC's views on
whether: (a) FERC has approved any other LNG export terminals in the
United States; and (b) any applications for the approval of other LNG
export terminals in the United States are currently pending before FERC.*

Including the Jordan Cove Energy Project, the Commission has approved 22 LNG
export terminals in the United States. There are currently two applications for
LNG export terminals in the United States pending before the Commission.
There are currently four project sponsors preparing applications for LNG export
terminals in the United States, but those applications have not yet been filed.

**156**

(2)    *The expected proportion of the natural gas exported through Applicants'
project that would originate from the U.S. Rocky Mountains versus that
which would originate from Western Canada. FERC acknowledged that
although "an affiliate of Jordan Cove previously received authorization
from DOE to import gas from Canada (for purposes of delivering that gas
to Jordan Cove's previously proposed export terminal) sufficient to meet
the entire supply need of the pipeline, that does not mean that the Pacific
Connector Pipeline will transport only Canadian gas." NOAA requests
FERC's views on: (a) the expected proportion of natural gas exported
through Applicants' project that would originate from the U.S. Rocky
Mountains as opposed to Western Canada; (b) any materials from FERC
Docket Numbers CP17-494 and CP17-495 supporting such figures or
projections; or, (c) if such information is unavailable or unknown, an
explanation as to (i) why that information is unavailable or unknown at this
time and (ii) when FERC anticipates receiving such information.*

In the Authorization Order, the Commission noted that Jordan Cove and Pacific
Connector stated that they "cannot meet the gas supply needs of the [Jordan Cove
LNG] Terminal and the purpose of the overall [proposed projects] without
accessing U.S. Rocky Mountain supplies, which are available from the Ruby
Pipeline."[1]  The Commission also acknowledged that natural gas producers in the
U.S. Rockies had commented in the Commission's proceedings about the benefits
the Pacific Connector Pipeline would provide to producers in the Uintah/Piceance
and Green River Basins.[2]  Lastly, the Commission noted that Jordan Cove's
import authorization issued by the Department of Energy "acknowledges that
Jordan Cove will also access gas supplies in the U.S. Rockies and that the
proposed imports are 'designed to create flexibility in the Project's sourcing of
natural gas.'"[3]

---

[1] *Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202, at P 85 (2020) (quoting
Jordan Cove and Pacific Connector's July 22, 2019 Response to Comments on draft
Environmental Impact Statement at 18).

[2] *Id.*

[3] *Id.* (quoting *Jordan Cove LNG L.P.*, FE Docket No. 13-141-LNG, Order
No. 3412 at 5-6 (March 18, 2014)).

**157**

The proportion of natural gas exported through the project that would originate from the U.S. Rocky Mountains as opposed to Western Canada is unknown. The Commission does not require this information from project sponsors and does not expect to receive such information.

(3)     *The foreign markets anticipated to receive the project's LNG exports. Jordan Cove's stated purpose of this project is to export natural gas to overseas markets due to the growth of international demand, particularly in Asia. NOAA requests FERC's input on (a) which specific Asian markets the project plans to export to; (b) which of those Asian markets are PTA-countries, and which are non-PTA countries; and, (c) any materials from FERC Docket Numbers CP17-494 and CP17-495 supporting such information.*

The Commission does not authorize exportation of the commodity of natural gas. Rather, project sponsors requesting authorization to export natural gas must submit applications to the Department of Energy. This question is best directed to the Department of Energy, which authorized the export of the commodity.

(4)     *The status of any government-to-government consultations between FERC and Tribal Governments relating to the Jordan Cove Energy Project, and, specifically, impacts to tribal resources of concern.*

Consultations between Commission staff and Tribal Governments are ongoing and are occurring on an "as needed" basis. Commission staff has submitted to the Tribal Governments for their respective signatures a Programmatic Agreement to resolve adverse effects on historic properties.[4]

(5)     *The national interest of the project. During this appeal, the Administrator must evaluate whether the proposed activity furthers the national interest as articulated in section 302 or 303 of the CZMA, in a significant or substantial manner. According to Appellants, the national interests relevant to this appeal include: (a) "priority consideration being given to*

---

[4] Commission Staff's Memo Providing Final Programmatic Agreement, Docket Nos. CP17-494-000 and CP17-495-000 (filed June 26, 2020).

**158**

> *coastal-dependent uses and orderly processes for siting major facilities related to ... energy;" and (b) "developing the resources of the Nation's coastal zone." NOAA requests that FERC provide its view on how its responses to the specific topics noted above influences its assessment of whether the project is in the national interest, as defined in the CZMA.*

When reviewing applications proposed pursuant to section 3 of the Natural Gas Act (NGA),[5] the Commission is required to grant requested authorizations unless it finds that they will not be consistent with the public interest, while under NGA section 7,[6] the Commission determines whether projects are required by the public convenience and necessity. The CZMA does not require or authorize the Commission to determine whether proposed projects are in the national interest as defined in that act.

If I can be of any further assistance with this or any other Commission matter, please let me know.

Sincerely,

DAVID MORENOFF

Digitally signed by DAVID MORENOFF
Date: 2020.08.12 10:18:27 -04'00'

David L. Morenoff
Acting General Counsel

---

[5] 15 U.S.C. § 717b (2018).

[6] 15 U.S.C. § 717f (2018).

**159**

Document Content(s)

Jordan Cove Energy Project - FERC Response.PDF ...........................1

**160**

UNITED STATES OF AMERICA

DEPARTMENT OF ENERGY

OFFICE OF FOSSIL ENERGY

_____ )
JORDAN COVE ENERGY PROJECT L.P.          )     FE DOCKET NO. 12-32-LNG
_____ )

FINAL OPINION AND ORDER GRANTING LONG-TERM
AUTHORIZATION TO EXPORT LIQUEFIED NATURAL GAS
TO NON-FREE TRADE AGREEMENT NATIONS

DOE/FE ORDER NO. 3413-A

JULY 6, 2020

**161**

either unredacted contracts, or in the alternative (A) Jordan Cove may file, or cause to be filed, long-term contracts under seal, but it also will file either:  (i) a copy of each long-term contract with commercially sensitive information redacted, or (ii) a summary of all major provisions of the contract(s) including, but not limited to, the parties to each contract, contract term, quantity, any take or pay or equivalent provisions/conditions, destinations, re-sale provisions, and other relevant provisions; and (B) the filing must demonstrate why the redacted information should be exempted from public disclosure.[623]

To ensure that DOE/FE destination and reporting requirements included in this Order are conveyed to subsequent title holders, DOE/FE will include as a condition of this authorization that future contracts for the sale or transfer of LNG exported pursuant to this Order shall include an acknowledgement of these requirements.

### H. Export Quantity

This Order grants Jordan Cove's Application, as modified by the 2018 Amendment, in the full volume of LNG requested for export to non-FTA countries, up to the equivalent of 395 Bcf/yr of natural gas.

### I. Combined FTA and Non-FTA Export Authorization Volumes

The volumes of LNG authorized for export in Jordan Cove's FTA authorization (DOE/FE Order No. 3041-A) and this Order each reflect the planned liquefaction capacity of the Jordan Cove LNG Terminal, as approved by FERC.  Accordingly, Jordan Cove may not treat the FTA and non-FTA export volumes as additive to one another.

---

[623] *Id*. § 590.202(e) (allowing confidential treatment of information in accordance with 10 C.F.R. § 1004.11).

BEFORE THE UNITED STATES
SECRETARY OF COMMERCE

Appeal from the Oregon Department of Land Conservation and Development's
Consistency Objection under the Coastal Zone Management Act

**SUPPLEMENTAL BRIEF OF APPELLANTS JORDAN COVE ENERGY
PROJECT L.P. AND PACIFIC CONNECTOR GAS PIPELINE, LP**

Ariel H. Stavitsky
Stoel Rives LLP
760 SW Ninth Avenue
Suite 3000
Portland, OR  97205
Phone: 503.294.9354
Email: ariel.stavitsky@stoel.com

Michael B. Wigmore
Corinne Snow
Matthew X. Etchemendy
Abby M. Meredith
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone: 202.639.6778
Email: mwigmore@velaw.com
Email: csnow@velaw.com
Email: metchemendy@velaw.com
Email: ameredith@velaw.com

*Counsel for Appellants*

August 12, 2020

**163**

3413-A (July 6, 2020), ASA409.[2]  More generally, because the "authority to approve or disapprove the import or export of [natural gas] . . . is within DOE's exclusive jurisdiction," *Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202, P 32 (2020) (FERC Accession No. 20200319-3077) ("Authorization Order"), A144-45, DOE has addressed the import- and export-related subjects raised in the supplemental briefing order more directly than FERC.  Appellants therefore discuss DOE's Project-related findings in more detail below.  Finally, in light of DOE's conclusions and consistent with prior Secretarial decisions, Appellants submit that the sources and destinations of the exported LNG are not relevant to the Secretary's determinations here.  DOE has authoritatively addressed the public interest as it pertains to imports and exports (as has Congress itself with regard to FTA imports and exports, *see* 15 U.S.C. § 717b(b)-(c)), and confirmed that the Project's public benefits do not depend on where the gas is sourced or where it is ultimately consumed.

A.     Further Information On Upstream Sources Is Neither Available Nor Necessary.

The record does not indicate the portion of exported gas that is expected to originate from the U.S. Rocky Mountain region as opposed to Western Canada.  As discussed in DOE's July order, such information is unavailable and will almost certainly change over the multi-decade life of the Project, due to the nature of the service that JCEP will provide to customers.  Under JCEP's intended liquefaction tolling service (a common business model for LNG exports), individual customers will source and deliver their own gas to the LNG Terminal.  *See* DOE/FE Order 3413-A at 32, 75, 97, ASA445, ASA488, ASA510.  JCEP will then provide a bundled service to receive, pre-treat, liquify, store, and load the natural gas onto ships for export.  *Id.* at 32, 97, ASA445, ASA510.  At all times the customers will own and control the sourcing and mixing of the gas.  *Id.*

---

[2] "ASA___" citations refer to Appellants' Supplemental Appendix filed with this brief.  Consistent with prior briefs, "A___" citations refer to the Appendix filed with Appellants' opening brief, and "RA___" citations refer to the Reply Appendix filed with Appellants' reply brief.

**164**

at 32, ASA445.  Customers are likely to begin to source their gas much closer in time to the start-up of the LNG Terminal (which is not anticipated to occur before 2025 under current expectations, *see infra* Part IV), and are likely to have a mix of long-term, medium-term, and short-term supply agreements, likely reflecting varying portions of gas sourced from the United States and Canada.

In light of this business model, JCEP does not "plan[] to export" (NOAA Order at 1) any particular mix of natural gas from domestic and Canadian sources, nor does it anticipate ever having such plans.  Rather, such decisions will lie with its customers.  *See* DOE/FE Order 3413-A at 75, 97, ASA488, ASA510.[3]  In deciding where to source their gas, customers will likely respond to "prevailing market conditions," *id.* at 75, ASA488, such as the price and availability of gas from different sources, *id.* at 97, ASA510.  However, attempting to predict energy markets years and decades in advance is highly speculative, as such "market factors" are highly "dynamic" and "will vary over time." *Id.*  Appellants are aware of no record materials that support reliable projections on these topics, nor do they expect such materials to become available in the foreseeable future.[4]

Oregon has noted that "[a]n affiliate of [JCEP] has obtained a US [DOE] license to import gas from Canada for use on the . . . Pipeline." Oregon Br. 11.  However, this import authorization

---

[3] While JCEP may supply small amounts of gas to the LNG Terminal during the start-up, testing, and commissioning process, and expects to retain a small amount of liquefaction capacity for its own use (for which it will need to source its own feed gas), *see* DOE/FE Order 3413-A at 75, ASA488, such gas will be sourced much closer in time to those events, which are still years away.

[4] When JCEP applied to DOE for non-FTA export authorizations in 2012, it appended a study by Navigant Consulting that analyzed gas supply and demand outlooks and modeled potential price effects of the proposed exports for the North American natural gas market through 2045.  *See* JCEP Application, DOE/FE Docket No. 12-32-LNG, Appendix A (Mar. 23, 2012), ASA33.  Navigant's modeling predicted that the gas would initially be 70% Canadian and 30% from the U.S. Rockies, shifting to 35% Canadian and 65% from the U.S. Rockies by 2045, for an overall ratio across the study period of about 50/50.  *Id.*, Appendix A at 3, 29, ASA42, ASA68.  For completeness' sake, and to be responsive to the supplemental briefing order, Appellants have included their DOE application (with the aforementioned study appended) in the appendix to this supplemental brief, and move below for its inclusion in the record.  However, that study was prepared in 2012, and a similar study prepared today would not necessarily arrive at the same projections.

**165**

simply provides *flexibility* in exporting Canadian-sourced natural gas, and does not reflect either the intent or the likelihood that gas exported from the LNG Terminal will primarily (let alone exclusively) originate in Canada. Simply stated, JCEP has sought the necessary authorizations for the LNG Terminal to handle any potential mix of Canadian and U.S.-sourced natural gas, depending on customer choices.[5] Both DOE and FERC thus correctly rejected project opponents' efforts to rely on that import authorization to question the Project's benefits or draw inferences about where the exported gas will come from. DOE/FE Order 3413-A at 96-97, ASA509-10; Authorization Order P 85, A169-70. Congress has entrusted exclusive regulatory authority over the import/export of natural gas and interstate natural gas transportation to DOE and FERC, respectively, and these determinations are entitled to deference. *See* 15 C.F.R. § 930.127(e)(1); *cf.* 15 U.S.C. § 717b; *Sierra Club v. FERC*, 827 F.3d 36, 40-41 (D.C. Cir. 2016).

Although the portion of exported gas that will be produced in the U.S. Rocky Mountain region is not known, it is also not relevant to the national interest inquiry. Indeed, DOE's July order addressed at length—and rejected—precisely the argument regarding Canadian-sourced gas that Oregon has raised in this proceeding. *See* DOE/FE Order 3413-A at 93-99, ASA506-12. In rejecting that argument, DOE properly recognized and gave weight to the fact that "under NGA section 3(c), imports of natural gas from and exports to Canada are 'deemed to be consistent with the public interest.'" *Id.* at 95, ASA508 (quoting 15 U.S.C. § 717b(c)). DOE accordingly "observe[d] that importing natural gas from Canada for liquefaction at a U.S. LNG terminal is far from a strike against Jordan Cove, as some intervenors suggest." *Id.* As DOE explained,

> To the contrary, [JCEP] has provided compelling evidence of the economic benefits associated with the construction and operation of the proposed Terminal in Oregon.

---

[5] Although JCEP's customers will generally be responsible for sourcing their own gas, JCEP or Jordan Cove LNG L.P. may import and export customer-owned gas as their agent. *See* DOE/FE Order 3412 at 6-7 (Mar. 18, 2014), ASA232-33; DOE/FE Order 3413-A at 32-33, ASA445-46.

**166**

> Most recently, [JCEP] and [PCGP] have stated that they will invest a total of $9.8 billion to construct the Jordan Cove Energy Project in Oregon, with $2.88 billion of that total spent on local Oregon businesses.  As [the DOE Office of Fossil Energy] found in granting the Conditional Order in 2014, the economic benefits associated with the Project will accrue locally, regionally, and nationally, even if some or all of the feed gas is imported from Canada.

*Id.* (footnotes omitted); *cf.* DOE/FE Order 3413, ASA241 (referenced Conditional Order).  Thus, DOE noted that while it "cannot predict the ultimate allocation between U.S.-sourced and Canadian-sourced natural gas," exported LNG is likely to be sourced from both countries, and DOE's determinations regarding domestic benefits were not based on "any prescribed allocation" of U.S. and Canadian gas.  DOE/FE Order 3413-A at 95-96, 99, ASA508-09, ASA512.

DOE's July order also appropriately gave weight to the fact that "[t]he United States and Canada are part of a thriving, integrated North American natural gas market, as evidenced by the recently-signed United States-Mexico-Canada Agreement (USMCA) and ongoing high levels of trade."  DOE/FE Order 3413-A at 94, ASA507.  The USMCA embraces national treatment for natural gas (among other goods), *see* USMCA, art. 2.3.1 (Dec. 13, 2019), https://bit.ly/2ZZmZSg; DOE/FE Order 3413-A at 1 n.5, ASA414 (Canada among nations for which "current[] . . . FTAs requir[e] national treatment for trade in natural gas"), as have prior trade agreements, *see La. Ass'n of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d 1101, 1124 (D.C. Cir. 1992) (per curiam).  A separate annex between the United States and Canada also explicitly "recognize[s] the importance of enhancing the integration of North American energy markets based on market principles, including open trade and investment."  USMCA, CA-US Side Letter on Energy, art. 3 (Nov. 30, 2018), https://bit.ly/3jYhn2h.  Thus, as DOE recognized, U.S. law and trade policy provides no support for—and, in fact, precludes—any effort to use the Canadian origin of some of the exported gas as "a strike against Jordan Cove."  DOE/FE Order 3413-A at 95, ASA508.

7

**167**