**ORAL ARGUMENT NOT YET SCHEDULED**

No. 20-1161 (consolidated with Nos. 20-1171, 20-1172, 20-1180, 20-1198)

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

DEBORAH EVANS, *et al.*,
*Petitioners,*

v.

FEDERAL ENERGY REGULATORY
COMMISSION,
*Respondent,*

JORDAN COVE ENERGY PROJECT L.P., *et al.*,
*Respondent-Intervenors.*

On Petition for Review of Orders of the Federal Energy Regulatory
Commission

## OPENING BRIEF OF LANDOWNER PETITIONERS DEBORAH EVANS, *ET AL.* AND CONSERVATION PETITIONERS ROGUE RIVERKEEPER, *ET AL.*

David Bookbinder
Megan C. Gibson
Niskanen Center
820 First Street, NE, Suite 675
Washington, DC 20002
(202) 810-9260
dbookbinder@niskanencenter.org
mgibson@niskanencenter.org

*Attorneys for Landowner
Petitioners*

**Additional counsel listed
inside front brief cover.**

Nathan Matthews.
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5695
Nathan.Matthews@sierraclub.org

*Attorney for Rogue Riverkeeper,
Rogue Climate, Cascadia
Wildlands, Ctr. for Biological
Diversity, Citizens for
Renewables, Friends of Living
Or. Waters, Or. Physicians for
Social Responsibility, Or. Wild,
Or. Women's Land Trust, Sierra
Club, and Waterkeeper Alliance*

Gillian Giannetti
Natural Resources Defense
Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 717-8350
ggiannetti@nrdc.org

Ann Alexander
Natural Resources Defense
Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6190
aalexander@nrdc.org

*Attorneys for Natural Resources
Defense Council, Inc.*

Susan Jane M. Brown
Western Environmental Law
Center
4107 NE Couch Street
Portland, OR. 97232
(503) 914-1323
brown@westernlaw.org

*Attorney for Cascadia Wildlands,
Center for Biological Diversity,
Citizens for Renewables, Friends
of Living Oregon Waters, Oregon
Physicians for Social
Responsibility, Oregon Wild,
Oregon Women's Land Trust,
Rogue Climate, Rogue
Riverkeeper, and Waterkeeper
Alliance*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties**

1. <u>Petitioners</u>

No. 20-1161: Landowners Deborah Evans, Ronald C. Schaaf, Evans Schaaf Family LLC, Bill Gow, Sharon Gow, Wilfred E. Brown, Elizabeth A. Hyde, Barbara L. Brown, Pamela Brown Ordway, Chet N. Brown, Neal C. Brown Family LLC, Stacey McLaughlin, Craig McLaughlin, Richard Brown, Twyla Brown, Clarence Adams, Stephany Adams, Will McKinley, Wendy McKinley, Frank Adams, Lorraine Spurlock, Toni Woolsey, Gerrit Boshuizen, Cornelis Boshuizen, John Clarke, Carol Munch, Ron Munch, Mitzi Sulffridge, James Dahlman, and Joan Dahlman.

No. 20-1170: Jordan Cove Energy Project, L.P., and Pacific Connector Gas Pipeline, L.P.

No. 20-1171: Rogue Riverkeeper, Rogue Climate, Cascadia Wildlands, Center for Biological Diversity, Citizens for Renewables/Citizens Against LNG, Friends of Living Oregon Waters,
Oregon Physicians for Social Responsibility, Oregon Wild, Oregon Women's Land Trust, Sierra Club, and Waterkeeper Alliance.

No. 20-1172: Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians, and Cow Creek Band of Umpqua Tribe of Indians.

No. 20-1180: Natural Resources Defense Council, Inc.

No. 20-1198: State of Oregon, Oregon Department of Environmental Quality, Oregon Department of Land Conservation and Development, Oregon Department of Fish and Wildlife, and Oregon Department of Energy.

2. <u>Respondent</u>

　　　Federal Energy Regulatory Commission

3. <u>Respondent-Intervenors</u>

　　Jordan Cove Energy Project L.P. and Pacific Connector Gas Pipeline, LP.

4. *Amici*:

At present, no parties have moved for leave to participate as amici curiae.

## B.    Rulings Under Review

1.    Federal Energy Regulatory Commission Order Granting Authorizations Under Sections 3 and 7 of the Natural Gas Act, Jordan Cove Energy Project, L.P., Pacific Connector Gas Pipeline, L.P., 170 FERC ¶ 61,202 (March 19, 2020); and

2.     Federal Energy Regulatory Commission Order on Rehearing,

Jordan Cove Energy Project, L.P., Pacific Connector Gas Pipeline, L.P.,

171 FERC ¶ 61,136 (May 22, 2020).


## C.     Statement of Related Cases

The undersigned state that no pending cases are related within
the meaning of Circuit Rule 28(a)(1)(C).

## PETITIONERS' RULE 26.1 STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners in Cases 20-1171 and 20-1180 ("Conservation Petitioners") state that they are nonprofit associations, and that no publicly held company has a 10 percent or greater ownership in any Conservation Petitioner.

Petitioners in No. 20-1161 ("Landowner Petitioners") state that Neal C. Brown LLC Family is organized under the laws of Oregon for the purpose of maintaining the property affected by the Pacific Connector Pipeline located in Douglas County, Oregon parcel numbers R10266, R11298, and R11338, and other properties in Oregon. Neal C. Brown LLC Family has no parent company, and there are no publicly held companies that have a 10 percent or greater ownership interest in Neal C. Brown LLC Family. The Evans Schaaf Family LLC is organized under the laws of Oregon for the purpose of maintaining the property affected by the Pacific Connector Pipeline located in Klamath County, Oregon, parcel number R71040, tract KH-569.000, as well as other properties in Oregon. Evans Schaaf Family LLC has no parent

iv

company, and there are no publicly held companies that have a 10 percent or greater ownership interest in Evans Schaaf Family LLC.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES i

TABLE OF CONTENTS ........................................................................vi

TABLE OF AUTHORITIES ................................................................viii

GLOSSARY .......................................................................................xiii

JURISDICTIONAL STATEMENT ........................................................1

ISSUES FOR REVIEW .........................................................................2

STATUTES AND REGULATIONS ........................................................5

STATEMENT OF THE CASE ...............................................................5

   I.     INTRODUCTION.....................................................................5

   II.    LEGAL FRAMEWORK..........................................................9

       A.   Natural Gas Act ...............................................................9

       B.   National Environmental Policy Act ...................................11

   III.   FACTUAL BACKGROUND ...................................................12

       A.   History of The Project .....................................................12

       B.   The Approved Project.......................................................16

SUMMARY OF ARGUMENT ...............................................................18

STANDING ........................................................................................20

ARGUMENT ......................................................................................21

   I.     STANDARD OF REVIEW .....................................................21

   II.    FERC FAILED TO DEMONSTRATE THAT THE PIPELINE IS IN THE PUBLIC CONVENIENCE AND NECESSITY, AS REQUIRED BY THE NATURAL GAS ACT................................21

A.  FERC Failed To Justify Section 7 Approval Of An Export-Only Pipeline..................................................................22

B.  Pembina's Project Will Not Provide Any Public Benefits Because It Has No Market Support. ....................................38

C.  FERC Failed To Balance The Limited Or Nonexistent Benefits Of The Pipeline With Its Severe Negative Impacts On Landowners And The Environment...............................44

III.  FERC FAILED TO TAKE THE HARD LOOK AT ENVIRONMENTAL IMPACTS REQUIRED BY NEPA ...........47

A.  FERC Shrugged Off Aviation Impacts.................................48

B.  FERC Arbitrarily Rubber-Stamped Pembina's Unexplained Switch to a Less Efficient Design Alternative....................52

C.  FERC Provided No Analysis of Increased Wildfire Risks...56

D.  FERC Arbitrarily Refused to Use Oregon's Greenhouse Gas Emission Reduction Targets, or Any Other Benchmark, to Evaluate the Significance of Project Greenhouse Gas Emissions ...............................................................59

E.  FERC's "No Action" Alternative Unreasonably Assumes That A Comparably Harmful Project Is Inevitable............62

CONCLUSION ...................................................66

CERTIFICATE OF COMPLIANCE .......................................68

CERTIFICATE OF SERVICE.................................................69

vii

# TABLE OF AUTHORITIES

## Cases

*Altamont Gas Transmission Co. v. FERC,*
  92 F.3d 1239 (D.C. Cir. 1996)................................................................26

*Am. Wild Horse Preservation Campaign v. Perdue,*
  873 F.3d 914 (D.C. Cir. 2017)................................................................43

*Appalachian Voices v. FERC,*
  No. 17-1271, 2019 WL 847199 (D.C. Cir. 2019) ..................................29

*Atl. Refining Co. v. Pub. Serv. Comm'n of N.Y.,*
  360 U.S. 378 (1959)........................................................................27, 45

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,*
  462 U.S. 87 (1983)..................................................................................12

*Blue Mountains Biodiversity Project v. Blackwood,*
  161 F.3d 1208 (9th Cir. 1998)................................................................59

*Border Pipe Line Co. v. Fed. Power Comm'n,*
  171 F.2d 149 (D.C. Cir. 1948)....................................................23, 24, 25

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n,*
  449 F.2d 1109 (D.C. Cir. 1971)..............................................................51

\* *City of Oberlin, Ohio v. FERC*, ("*Oberlin*")
  937 F.3d 599 (D.C. Cir. 2019)..............................6, 7, 10, 21, 22, 23, 24,
  ........................................................................25, 26, 27, 28, 30, 45

*Consumers Energy Co. v. FERC,*
  226 F.3d 777 (6th Cir. 2000)..................................................................26

*Distrigas Corp. v. Fed. Power Comm'n,*
  495 F.2d 1057 (D.C. Cir. 1974)..............................................................23

*EarthReports, Inc. v. FERC,*
828 F.3d 949 (D.C. Cir. 2016) ............................................................. 10

*F.C.C. v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ............................................................................ 43

*Fed. Power Comm'n v. Hope Nat. Gas Co.,*
320 U.S. 591 (1944) ............................................................................ 27

*Michigan v. EPA,*
576 U.S. 743 (2015) ............................................................................ 41

*Motor Vehicle Mfrs. Ass'n  v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ........................................................................ 47, 52

*Myersville Citizens for a Rural Cmty., Inc., v. FERC,*
783 F.3d 1301 (D.C. Cir. 2015) ..................................................... 29, 41

*N.C. Wildlife Fed. v. N.C. Dep't of Transp.,*
677 F.3d 596 (4th Cir. 2012) ............................................................... 63

*Nat'l Assoc. of Colored People v. Fed. Power Comm'n,*
425 U.S. 662 (1976) ............................................................................ 45

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
137 F.3d 1372 (9th Cir. 1998) ....................................................... 56, 58

*New Mexico ex rel. Richardson v. BLM,*
565 F.3d 683 (10th Cir. 2009) ............................................................ 63

*Office of Consumers' Council v. FERC,*
655 F.2d 1132 (D.C. Cir. 1980) .......................................................... 45

*Puntenney v. Iowa Utils. Bd.,*
928 N.W.2d 829 (Iowa 2019) .............................................................. 37

*Sierra Club v. Costle,*
657 F.2d 298 (D.C. Cir. 1981) ............................................................ 45

\* *Sierra Club v. FERC*, ("*Sabal Trail*")
 867 F.3d 1357 (D.C. Cir. 2017) ........................................ 21, 29, 47, 51, 59

*Sierra Club v. U.S. Dep't of Energy*,
 867 F.3d 189 (D.C. Cir. 2017) ............................................................ 10

*Southwest Airlines Co. v. FERC*,
 926 F.3d 851 (D.C. Cir. 2019) ............................................................ 44

*Theodore Roosevelt Conservation P'ship v. Salazar*,
 661 F.3d 66 (D.C. Cir. 2011) .............................................................. 63

*Twp. of Bordentown v. FERC*,
 903 F.3d 234 (3d Cir. 2018) ............................................................... 29

*W. Watersheds Project v. Kraayenbrink*,
 632 F.3d 472 (9th Cir. 2011) .............................................................. 59

*Wildearth Guardians v. BLM*,
 870 F.3d 1222 (10th Cir. 2017) ................................................ 63, 64, 65

## Statutes

15 U.S.C. § 717 ............................................................................ 25, 26

15 U.S.C. § 717a .............................................................................. 23

\* 15 U.S.C. § 717b ................................................................ 2, 9, 10, 28

\* 15 U.S.C. § 717f .............................................................. 2, 6, 9, 18, 23

15 U.S.C. § 717r ....................................................................... 1, 43, 52

42 U.S.C. § 4332 ........................................................................... 3, 11

5 U.S.C. § 706 ............................................................................. 2, 43

OR. REV. STAT. § 468A.205 ................................................................. 60

# Other Authorities

*Alaska Gasline Dev. Corp.*,
    171 FERC ¶ 61,134 (May 21, 2020) .....................................................61

*Cameron LNG,*
    147 FERC ¶ 61,230 (June 19, 2014) ....................................................31

**\*** *Certification of New Interstate Natural Gas Pipeline Facilities,*
    ("*Certificate Policy Statement*")
    88 FERC ¶ 61,227 (Sept. 15, 1999) ...........................9, 10, 39, 40, 41, 45

*Certification of New Interstate Natural Gas Pipeline Facilities,*
    90 FERC ¶ 61,128 (Feb. 9, 2000) ..........................................................9

*Certification of New Interstate Natural Gas Pipeline Facilities,*
    92 FERC ¶ 61,094 (July 28, 2000) .........................................................9

*Fla. Se. Connection,*
    162 FERC ¶ 61,233 (Mar. 14, 2018).....................................................61

*Freeport LNG Development,*
    148 FERC ¶ 61,076 (Jul. 30, 2014) ......................................................31

*Independence Pipeline Co.*,
    89 FERC ¶61,283 (Dec. 17, 1999). ................................................40, 41

**\*** *Jordan Cove Energy Project*,
    154 FERC ¶ 61,190 (2016)........................................................13, 43, 44

*Jordan Cove Energy Project,*
    157 FERC ¶ 61,194 (2016)...................................................................13

*Magnolia LNG,*
    155 FERC ¶ 61,033 (Apr. 15, 2016) .....................................................31

*NEXUS Gas Transmission,*
    160 FERC ¶61,022 (Aug. 25, 2017).......................................................31

*NEXUS Gas Transmission*,
  172 FERC ¶ 61,199 (Sept. 3, 2020) ................................................29, 32

*Pac. Connector Gas Pipeline*,
  129 FERC ¶ 61,234 (2009)....................................................................12

*Pac. Connector Gas Pipeline*,
  139 FERC ¶ 61,040 (2012)....................................................................12

*Rio Grande LNG*,
  169 FERC ¶ 61,131, P108 (Nov. 22, 2019)..........................................61

*Rockies Express Pipeline,*
  150 FERC ¶61,161 (Feb. 27, 2015) ......................................................31

*Trunkline Gas Co.*,
  153 FERC ¶ 61,300 (Dec. 17, 2015), ....................................................31

**Rules**

Fed. R. Evid. 201........................................................................................14

**Regulations**

40 C.F.R. § 1502.14 (2019) ..........................................................11, 52, 63

40 C.F.R. § 1502.16 (2019) ......................................................................61

40 C.F.R. § 1502.22 (2019) ......................................................................62

40 C.F.R. § 1506.2 (2019) ........................................................................60

40 C.F.R. § 1508.8 (2019) ........................................................................54

*Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

The following acronyms and abbreviations are used in this brief:

| | |
|---|---|
| Act | The Natural Gas Act, 15 U.S.C. §§ 717-717z |
| Certificate Order | Order Granting Authorizations Under Sections 3 and 7 of the Natural Gas Act, Jordan Cove Energy Project, L.P., Pacific Connector Gas Pipeline, L.P., 170 FERC ¶ 61,202 (March 19, 2020) |
| DOE | Department of Energy |
| EIS | Environmental Impact Statement. In this Brief, used to refer to the Final EIS issued Nov. 15, 2019, record item 3619, unless otherwise specified. |
| FAA | Federal Aviation Administration |
| FERC | Federal Energy Regulatory Commission |
| LNG | Liquefied Natural Gas |
| NEPA | National Environmental Policy Act |
| Pembina | Pembina Pipeline Corporation |
| Pipeline | Pacific Connector Gas Pipeline |
| Rehearing Order | Order on Rehearing, Jordan Cove Energy Project, L.P., Pacific Connector Gas Pipeline, L.P., 171 FERC ¶ 61,136 (May 22, 2020) |
| Terminal | Jordan Cove Energy Project |

xiii

## JURISDICTIONAL STATEMENT

Petitioners seek review of the Federal Energy Regulatory Commission's ("FERC") "Certificate Order", R3737 [JA001] and "Rehearing Order," R3761 [JA205]. This Court has jurisdiction under 15 U.S.C. § 717r(b), because Petitioners intervened in proceedings before FERC, filed timely requests for rehearing of the Certificate Order under § 717r(a) R3747 [JA717], R3749 [JA718], R3750 [JA733], which the Rehearing Order denied on the merits, and timely filed a petition for review in this court.

## ISSUES FOR REVIEW

In approving the Jordan Cove Energy Project ("Terminal") and Pacific Connector Gas Pipeline ("Pipeline") (together, the "Project"):

1. Did FERC violate sections 3 and 7 of the Natural Gas Act (the "Act"), 15 U.S.C. §§ 717b and 717f, and the Administrative Procedure Act, 5 U.S.C. § 706, by:

   a. Determining that the Pipeline was an "interstate" pipeline under section 717f, despite the fact that the Pipeline's sole purpose is to deliver gas for export?

   b. Determining that the Project would provide pertinent public benefits, where the Project would not serve American consumers, where the record does not support the assertion that the Project would receive gas from American suppliers or support American jobs, where the record contains no evidence of end-user customers for the Project, and where

2

FERC previously determined that the lack of customers

rendered the Pipeline contrary to the public interest?

c.  Determining that the Project's public benefits outweighed

public harms, without explaining how harms were identified

or balanced against purported benefits?

2.  Did FERC violate the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4332 *et seq*., by:

a.  Failing to provide any analysis of whether, as the Federal

Aviation Administration ("FAA") has cautioned, the

Terminal's hot exhaust renders it "incompatible" with

operation of the neighboring Southwest Oregon Regional

Airport?

b.  Asserting, without support, that the initially proposed

Terminal design was in fact infeasible, and approving an

3

alternative design that made less use of waste heat and increased indirect environmental impacts?

c.  Conceding that the Pipeline will increase likelihood and consequences of wildfire, without providing any quantitative or qualitative discussion of this risk?

d.  Concluding that FERC could not determine whether the Project's greenhouse gas emissions were significant, despite the fact that Oregon has adopted greenhouse gas emission reduction goals that Project emissions could be measured against?

e.  Concluding that the "no action alternative" would merely shift demand to another project and thereby fail to reduce environmental impacts, where no comparable substitute project has been proposed, and where any substitute would also require FERC approval?

4

**STATUTES AND REGULATIONS**

Pertinent statutes and regulations are reproduced in an addendum.

**STATEMENT OF THE CASE**

I.    **INTRODUCTION**

Petitioners challenge FERC's approval of the Jordan Cove Energy Project, a liquefied natural gas ("LNG") export terminal located in Coos Bay, southwest Oregon (the "Terminal"), and the Pacific Connector Gas Pipeline, a 229-mile pipeline that would connect the terminal to an existing pipeline hub in Malin, Oregon (the "Pipeline") (together, the "Project"). Certificate Order P2 [JA001]. The Project is wholly owned by Pembina Pipeline Corporation ("Pembina"), a Canadian energy company. *Id.* P4 [JA002].

This may be the most ludicrous project that FERC has ever approved under the guise of its Section 7 authority: a pipeline to carry Canadian gas solely for export from an LNG terminal that, after seven years of searching, still has not found a single customer. FERC does

5

not—and could never—explain why Landowner Petitioners should have their property taken, and environmental resources be destroyed, for this purpose. To say that the Project serves "the public convenience and necessity" rates with, "War is peace," or "We bombed the village in order to save it."

FERC approved the Project despite what this Court has told it on more than one occasion. Most recently, in *City of Oberlin, Ohio v. FERC*, 937 F.3d 599 (D.C. Cir. 2019) ("*Oberlin*"), this Court reminded FERC that "Section 7 states that the Commission may issue a certificate of public convenience and necessity for 'the transportation in *interstate commerce*,' § 717f(c)(2) (emphasis added), and we have explicitly refused to interpret 'interstate commerce' within the context of the Act 'so as to include foreign commerce,'" *id*. at 606–07 (citations omitted; emphasis in original), and remanded a Section 7 pipeline certificate for an explanation "why—under the Act, the Takings Clause, and the precedent of this Court and the Supreme Court—it is lawful to credit precedent agreements with foreign shippers serving foreign customers toward a finding that an interstate pipeline is required by

6

the public convenience and necessity under Section 7 of the Act." *Id*. at 607–08.

Nevertheless, both of FERC's orders at issue here rely—virtually word-for-word—on the exact same arguments that *Oberlin* rejected. That the Pipeline is not carrying gas in interstate commerce is a given, and FERC manages only a half-hearted attempt to explain why it is. Nor does FERC explain how a pipeline serves "the public convenience and necessity" when it does not in any way serve U.S. consumers (for whose benefit Congress enacted the Act) or even U.S. producers (because it will carry only Canadian gas). Nor can FERC coherently explain how it justifies this Project on the basis of "market demand" when the Terminal has searched vainly for even a single customer for its LNG, and FERC previously denied this very Project due to a lack of market demand.

FERC has thus authorized the Pipeline to bulldoze environmental resources and, at its convenience, seize Landowner Petitioners' property by eminent domain, all to build a pipeline to transport Canadian gas for reexport to non-existent buyers.

7

FERC similarly shirked its NEPA obligation to take a hard look at environmental impacts. FERC offered implausible arguments for dismissing or downplaying impacts, such as asserting, apparently on FERC's own initiative, that the less-impactful Terminal design initially proposed by Pembina was in fact infeasible, or that a FERC decision to reject the Project would inevitably lead to some other, equally harmful project being proposed and approved. FERC refused to use available tools to address impacts, including using a model freely provided by the Federal Aviation Administration for use in addressing impacts on the neighboring Southwest Oregon Regional Airport, or using Oregon's greenhouse gas emission reduction targets as a benchmark against which to measure the Project's emissions. And FERC simply shrugged off impacts, such as by conceding that the Pipeline could increase the likelihood and severity of wildfires, while providing no analysis whatsoever of the consequences of this effect.

## II.  **LEGAL FRAMEWORK**

### A.  <u>Natural Gas Act</u>

The Project here implicates FERC's authority under Natural Gas Act Sections 3 and 7. 15 U.S.C. §§ 717b, 717f.

Under Section 7 of the Act, any company seeking to construct a pipeline that will transport gas in interstate commerce must first obtain approval from FERC. 15 U.S.C. § 717f(c). FERC may only authorize a pipeline if it determines that it is "required by the present or future public convenience and necessity." § 717f(e). Authorization under this Section provides authority to acquire land through eminent domain. § 717f(h).

FERC's "Certificate Policy Statement" interprets the Section 7 public convenience and necessity standard. *Certification of New Interstate Natural Gas Pipeline Facilities,* 88 FERC ¶ 61,227 (Sept. 15, 1999), *clarified,* 90 FERC ¶ 61,128 (Feb. 9, 2000), *further clarified,* 92 FERC ¶ 61,094 (July 28, 2000) ("Certificate Policy Statement"). Under this statement, "the Commission will issue a certificate … only if a project's public benefits (such as meeting unserved market demand)

9

outweigh its adverse effects (such as a deleterious environmental impact on the surrounding community)." *Oberlin*, 937 F.3d at 602. In this balancing test, the Certificate Policy Statement puts particular emphasis on impacts to landowners, especially potential use of eminent domain. *E.g.,* 88 FERC ¶ 61,227, 61,748.

Section 3 of the Act separately regulates LNG exports. FERC regulates "the siting, construction, expansion, or operation" of LNG infrastructure, whereas the Department of Energy ("DOE") must approve exports themselves, *i.e.*, transfer and sale of LNG to a foreign buyer. 15 U.S.C. § 717b(a), (e)(1); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016). Section 3 differs from Section 7 in that it does not provide eminent domain authority, and it does not require an affirmative public interest finding; instead, FERC and DOE will approve a project unless it is inconsistent with the "public interest." *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 203 (D.C. Cir. 2017). As with Section 7, the "public interest" includes consideration of "environmental" impacts. *Id.* at 202.

10

### B.  **National Environmental Policy Act**

NEPA aims to protect the environment by requiring agencies to look before they leap. Before taking action significantly affecting the environment, an agency must prepare an "Environmental Impact Statement" ("EIS"), which includes considerations such as "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. § 4332(C). The alternatives analysis, including "the alternative of no action," is the "heart" of this analysis. 40 C.F.R. § 1502.14 (2019).[1]

NEPA's procedural requirements have "twin aims:" to ensure that the agency's decisions are fully informed, and to facilitate public participation by ensuring "that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking."

---

[1] The FERC actions at issue here were governed by the NEPA regulations in effect prior to the September 14, 2020 revision.

11

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983) (citation omitted).

## III.  **FACTUAL BACKGROUND**

### A. <u>History of The Project</u>

This is the third try for the Pipeline and Terminal, which have hung over Landowners' and Conservation Petitioners' heads for fourteen years.

Pembina's corporate predecessor, Veresen, first proposed the Pipeline and Terminal in 2007 as an LNG *import* project that would deliver gas *to* the Malin, Oregon hub. *Pac. Connector Gas Pipeline*, 129 FERC ¶ 61,234, P1 (2009). FERC approved the import project in 2009, *id.* but the development of hydraulic fracturing eliminated the U.S. market for LNG imports. *Pac. Connector Gas Pipeline*, 139 FERC ¶ 61,040, P22 (2012). Accordingly, in 2012, and before any construction had occurred, Veresen abandoned the import proposal, leading FERC to vacate the 2009 authorizations. *Id.*

12

Veresen tried again in 2012, now proposing an export facility. *Jordan Cove Energy Project*, 154 FERC ¶ 61,190, PP1, 27 (2016). In 2016, FERC rejected this second attempt, as Veresen had failed to provide *any* evidence of market support for the Pipeline, despite FERC's repeated warnings, over more than two years, that the Pipeline would be denied without such evidence. *Id.* PP14-18, 39-40. FERC refused to treat Veresen's "generalized allegations of need," including DOE's export approval under Section 3, as demonstrating need for the Pipeline under Section 7. *Id.* P40. Because the Terminal could not operate without the Pipeline, as the Pipeline and Terminal form "two segments of a single, integrated project," FERC rejected the Terminal as well. *Id.* P46. FERC then denied rehearing. *Jordan Cove Energy Project*, 157 FERC ¶ 61,194 (2016).

The third applications, at issue here, were filed in 2017, and Pembina acquired Veresen thereafter. Certificate Order, P4, n.5 [JA002]. To date, no customer has signed a contract for the LNG

13

Pembina hopes to produce.[2] Nor does the record contain contracts for sale of gas to the Project. FERC speculates that the Project "cannot meet [its] gas supply needs … and … purpose" without U.S. gas, Certificate Order, P85 [JA037-038], but as FERC later conceded:

> The proportion of natural gas exported through the project that would originate from the U.S. Rocky Mountains as opposed to Western Canada is unknown. The Commission does not require this information from project sponsors and does not expect to receive such information.[3]

---

[2] R3163 Ex.17 [JA442] (Jordan Cove Energy Project DOE/FE Semi-Annual Report (April 1, 2019)). Pembina's most recent report, filed October 1, 2020, confirms that no contracts have been signed. https://www.energy.gov/sites/prod/files/2020/11/f80/Jordan Cove Energy Project LP Semi-Annual Report 3413.pdf. Petitioners request that the Court take judicial notice of this more recent document, and of other documents available online in the FERC and DOE dockets for this Project. The facts contained therein "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts "must take judicial notice if a party requests it and the court is supplied with the necessary information," Fed. R. Evid. 201(c)(2), and "may take judicial notice at any stage in the proceeding." Fed. R. Evid. 201(d).

[3] FERC Ltr. to Nat'l Oceanic and Atmospheric Admin. (Aug. 12, 2020) https://elibrary.ferc.gov/eLibrary/filelist?accession_num=20200812-3024 at 3. Petitioners request judicial notice of this letter. *See supra* n.2.

14

On the other hand, Pembina has received authorization to import gas from Canada "sufficient to meet the entire supply needs of the" Project. Certificate Order P85 [JA037]. Petitioners submitted extensive evidence indicating that if the Project operate at all, market conditions will lead to sourcing all gas from Canada. *See, e.g.,* R1552, 13-14 [JA386-387], R3163 Ex.18 at 3-8, Ex.26 [JA445-450, 469-478].

Nonetheless, FERC approved this third proposal. FERC's basis for this approval, and its sole ground for distinguishing its prior rejection, is that this time, Pembina had its Terminal and Pipeline subsidiaries sign precedent agreements with each other for the Terminal to purchase almost the entire Pipeline capacity. Certificate Order PP17, 35 [JA007, 014]. The Terminal is the Pipeline's only customer, as the Pipeline's open season failed to receive any other creditworthy bids. *Id.* P17 [JA007]. FERC determined that this demonstrated that the Pipeline had market support and would provide public benefits sufficient to outweigh its adverse impacts on landowners, surrounding communities, and the environment. *Id.* P294 [JA125]. FERC did this despite the fact that the Terminal itself has not found a single customer

15

for its gas despite seven years of effort. FERC also approved the

Terminal, finding that it was "not inconsistent with the public interest."

*Id.*

## B.  <u>The Approved Project</u>

The Pipeline will be 229 miles long, with capacity to transport

1,200,000 dekatherms per day. Certificate Order P15 [JA006]. The

route crosses 155.1 miles of private land[4] with an estimated 268 total

private landowners,[5] including the 31 Landowner Petitioners here, all

of whom imminently face eminent domain proceedings if the Certificate

Order is not vacated. It crosses 78 miles of federal land, including four

national forests. Certificate Order P232 [JA100]. Pipeline construction

---

[4] The route originally crossed 147.8 miles of private land. EIS, Table 4.7.2.1 [JA627]. The inclusion of the Blue Ridge Variation route adds 7.3 miles of private land to the route. EIS 3-24 [JA554].

[5] The route originally crossed the lands of 252 private landowners. R1842 at 5 [JA393]. The Blue Ridge Variation route added an additional estimated 16 private landowners. R3683, at 15 [JA675]. The exact numbers of private landowners the Blue Ridge Variation adds to the route is not found in any document provided by the Pembina to FERC.

16

will require clearing a 75-to-95 foot right-of-way along the entire route; after construction, a 50 foot right-of-way will be kept permanently clear. EIS 2-44 – 2-46 [JA528-530]. The route crosses 337 waterbodies. *Id.* 4-95 [JA595]. The entire route crosses land with high fire risk, *id.* 4-814 [JA663], and both Pipeline construction and permanent maintenance of the right-of-way will increase the risk of wildfires. *Id.* 4-178 [JA625].

The Terminal will occupy a 200-acre site directly across Coos Bay from the Southwest Oregon Regional Airport. *Id.* 2-2 – 2-3, 2-43 [JA522-523, 527]. The Terminal includes five liquefaction "trains," each driven by its own gas-fired turbine. *Id.* 2-1, 4-687 [JA521-657]. Operation of these turbines, together with other Terminal components, will emit hundreds of tons of criteria pollutants annually; the Terminal and Pipeline together will emit more than two million tons of carbon dioxide equivalent per year. *Id.* 4-701, 4-706 [JA660, 662]. Although the Terminal includes three, 30-megawatt-each waste heat recovery steam generators, Pembina only proposes to generate a combined 24.4 megawatts of electricity on-site, and to import the remaining electricity

17

needed, 15 to 25 megawatts, from the electric grid. Rehearing Order P119 [JA265-266].

Ultimately, FERC concluded that the Project would cause significant, long-term or permanent harm to multiple environmental resources. EIS 5-1 [JA669].

## SUMMARY OF ARGUMENT

FERC's approval of the Project violated the Natural Gas Act. Part II.

First, FERC failed to justify use of Section 7 for an export-only Pipeline. Part II.A. Because all gas transported by the Pipeline will supply exports, rather than domestic consumers, the Pipeline is not an "interstate" pipeline for purposes of Section 7. Part II.A.1. Even if the gas to be transported could be said to be in "interstate commerce," FERC failed to show that a pipeline that solely serves to supply exports can provide public benefits such that it is required by the public convenience and necessity. Part II.A.2. DOE's conclusion, under Section 3, that the proposed exports had not been shown to be inconsistent with

18

the public interest does not justify a Section 7 finding that the Pipeline is required by the public convenience and necessity. Part II.A.2.i. Nor has FERC provided any additional evidence of the Pipeline's "domestic benefit." Part II.A.2.ii. Notably, nothing in the record establishes that the Pipeline will draw on gas produced in the United States; to the contrary, all available evidence indicates that any exported gas would be produced in Canada. *Id.*

Even if *some* export Pipeline could provide pertinent public benefits, *this* Pipeline and Terminal will not: there is no credible evidence of market support for the Project, and unused infrastructure benefits no-one. Part II.B. FERC failed to balance the limited or nonexistent benefits of the Project against the severe negative impacts on landowners and the environment. Part I.C

FERC also violated NEPA. Part III. FERC acknowledged that the Terminal might impact operation of the neighboring airport, but FERC arbitrarily concluded that analysis and management of this was someone else's problem. Part III.A. FERC failed to take a hard look at a Terminal design alternative that would produce all needed electricity

19

from on-site waste heat, despite the fact that Pembina itself initially proposed that design. Part III.B. FERC similarly admitted, but refused to analyze, the Pipeline's impact on wildfire. Part III.C. FERC once again refused to address whether the Project's greenhouse gas emissions were significant, despite the fact that here, Oregon's emission reduction targets provide a benchmark. Part III.D. And FERC arbitrarily concluded that the no-action alternative would not actually reduce environmental impacts. Part III.E.

## STANDING

Petitioners in Case 20-1161 are individual landowners who face the permanent taking of their property by the Pipeline. R3163, p.1 [JA409].

Petitioners in Cases 20-1171 and 20-1180 are non-profit organizations with members who live, work, and recreate in areas that will be affected by the construction and operation of the Project. Addendum 38-154. This Court can redress the harm to these

20

organizations and their members by vacating the Certificate Order and remanding to FERC. *See Sierra Club v. FERC*, 867 F.3d 1357, 1335 (D.C. Cir. 2017) ("*Sabal Trail*").

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews FERC's Natural Gas Act decisions for whether they are arbitrary and capricious or otherwise contrary to law. *Oberlin*, 937 F.3d at 605.

### II.    FERC FAILED TO DEMONSTRATE THAT THE PIPELINE IS IN THE PUBLIC CONVENIENCE AND NECESSITY, AS REQUIRED BY THE NATURAL GAS ACT.

FERC violated the Natural Gas Act, the Administrative Procedure Act, and the Takings Clause of the U.S. Constitution in concluding that an export-only pipeline and terminal were in the public interest for purposes of Natural Gas Act Section 7, by, *inter alia*, failing to

21

demonstrate that there was a market need for the Pipeline or that the Pipeline would provide public benefits, and failing to explain how such benefits outweighed evidence of adverse impacts.

## A. FERC Failed To Justify Section 7 Approval Of An Export-Only Pipeline.

In *Oberlin*, 937 F.3d at 606-08, this Court held that FERC failed to justify a Section 7 certificate for the Nexus Pipeline that would, in part, carry gas for export to Canada, because FERC failed to demonstrate that exporting was "interstate commerce" or an activity "required by the public convenience and necessity." *Id.* FERC repeats and compounds these errors here, where the Pipeline's *sole* purpose is to deliver gas to its affiliate for export.

### 1. Gas for export is not interstate commerce under the Act.

Exports simply are outside the scope of Section 7:

> Section 7 states that the Commission may issue a certificate of public convenience and necessity for 'the transportation in *interstate commerce*,'

22

§ 717f(c)(2) (emphasis added), and we have
explicitly refused to interpret 'interstate
commerce' within the context of the Act 'so as to
include foreign commerce.'

*Oberlin*, 937 F.3d at 606-07 (citing *Border Pipe Line Co. v. Fed. Power*

*Comm'n*, 171 F.2d 149, 152 (D.C. Cir. 1948), and *Distrigas Corp. v. Fed.*

*Power Comm'n*, 495 F.2d 1057, 1063 (D.C. Cir. 1974)); 15 U.S.C. §

717a(7) (defining interstate commerce as commerce taking place within

the United States). FERC erred in *Oberlin* in part because it failed to

explain why the exported gas was in interstate—and not foreign—

commerce, even though the Nexus Pipeline was entirely within the U.S.

and shipped gas from Ohio to Michigan (where some was then exported

to Canada via a different pipeline).

Following *Oberlin*, FERC has had four opportunities to explain

*why* exports can serve as a basis for a Section 7 finding of public

convenience and necessity.[6] FERC has failed each time, simply

---

[6] (1) The remand order in *Oberlin* itself; (2) the Certificate Order,
(3) the Rehearing Order, and (4) FERC's brief in opposition to
Landowner-Petitioners' Motion for Summary Vacatur ("FERC Vac.
Opp'n.") in this case, Doc. #1856037.

23

restating identical arguments—often word-for-word—that *Oberlin* rejected. FERC's failure evinces that no such basis exists.

In trying to distinguish this case from *Oberlin*, FERC first claimed that the Pipeline is interstate because its sole customer, the Terminal, is "a domestic shipper," whereas the Nexus Pipeline had precedent agreements with "foreign shippers serving foreign customers." Rehearing Order P37 [JA223-224]. FERC's argument elevates form over substance: FERC is arguing that it is not the gas's *destination* that determines whether it is in foreign commerce, but rather the shipper's place of incorporation. Not only does that ignore this Court's reasoning in *Oberlin*, where the Court made clear its concern was with contracts that serve "demand for export capacity," 937 F.3d at 606, but here both the Terminal and Pipeline are wholly-owned subsidiaries of Pembina, a Canadian company, and the Project's sole purpose is to export gas to foreign customers. Certificate Order PP1-2, 4, 7 [JA001-003]; Rehearing Order P4 [JA206].

Alternatively, FERC suggests that *Border Pipe Line,* upon which *Oberlin* partially relied, is distinguishable because the pipeline in that

24

case only carried gas produced in Texas, and thus was not in interstate commerce, while here the Pipeline is "not delivering gas solely produced in Oregon," so all of the gas must be in interstate commerce. Certificate Order PP47-48 [JA228-229]. FERC's characterization of *Border Pipe Line* is disingenuous—the opinion turned on the separation of interstate and foreign commerce in the Act, noting that "[i]nterstate commerce and foreign commerce have been distinct ideas ever since they appeared as two concepts in the Constitution." 171 F.2d at 150. Moreover, FERC again fails to distinguish *Oberlin,* as the gas for export at issue there also traveled across state lines. 937 F.3d at 603.

Further, as FERC knows, pipelines that transport gas that has crossed state lines are not necessarily within FERC's Section 7 jurisdiction, *contra* Certificate Order PP47-48 [JA228-229]. For instance, the Act excludes from FERC's Section 7 jurisdiction "Hinshaw pipelines" that receive interstate gas "at the boundary of a State if all the natural gas so received is ultimately consumed within such State" and are subject to that State's regulation. 15 U.S.C. § 717(c). Thus, a pipeline located wholly within Virginia that carries gas that came from

25

Oklahoma is not necessarily regulated under Section 7 if all its gas is consumed in Virginia. *Altamont Gas Transmission Co. v. FERC,* 92 F.3d 1239, 1246 (D.C. Cir. 1996); *Consumers Energy Co. v. FERC*, 226 F.3d 777, 779 (6th Cir. 2000) (Congress concluded that Hinshaw pipelines are "matters primarily of local concern" and more appropriately regulated by state agencies).

### 2. Exporting gas is not required by the public convenience and necessity.

*Oberlin*'s second concern was "why—under the Act, the Takings Clause, and the precedent of this Court and the Supreme Court," a pipeline's facilitation of exports could be "required by the public convenience and necessity under Section 7 of the Act." 937 F.3d at 607-08. The Act declares that it is the "transporting and selling [of] natural gas *for ultimate distribution to the public*" that is "affected with a public interest." 15 U.S.C. § 717(a) (emphasis added). "The primary aim of this legislation was to protect consumers against exploitation at the hands of natural gas companies." *Fed. Power Comm'n v. Hope Nat. Gas Co.*,

26

320 U.S. 591, 610 (1944). "The Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." *Atl. Refining Co. v. Pub. Serv. Comm'n of N.Y.,* 360 U.S. 378, 388 (1959). By definition, exporting gas serves none of these public interests. Ignoring this, FERC merely repeated the two justifications that *Oberlin* rejected; both should be rejected here as well.

### i.   DOE's Section 3 determination does not satisfy the "public convenience and necessity" under Section 7.

FERC's first justification for crediting exports under Section 7 was that, under Section 3, exports to countries with whom the U.S. has a free trade agreement are, by law, "consistent with the public interest," and DOE shall approve exports to non-free-trade-agreement countries unless they are "not consistent with the public interest." Rehearing Order P39 [JA224]. But *Oberlin* already rejected the idea that a Section 3 authorization automatically supports a Section 7 finding: "It is insufficient, however, to simply assume that such a finding under Section 3, which does not authorize the exercise of eminent domain, is

27

somehow equivalent to a finding that a given export constitutes a public use within the meaning of the Takings Clause." 937 F.3d at 607 n.2.

FERC was forced to repackage this argument here, stating that while Section 3 authorizations are not dispositive, "they do inform our determination that the proposed pipeline is in the public convenience and necessity because it will support the public interest of exporting natural gas to [free trade agreement] countries." Rehearing Order P39 [JA224-225].[7] FERC further stated in its order on remand in *Oberlin* that DOE's Section 3 approval makes it appropriate "to give precedent agreements for the transportation of gas destined for export the same

---

[7] Although DOE was required to automatically approve Pembina's application for exports to free trade agreement countries, 15 U.S.C. § 717b(c), no evidence indicates that the Project will in fact export to such countries. Pembina has sought and received authorization to export the full Terminal capacity to non-free-trade-agreement countries. R3163, Ex.16 [JA431] (*Jordan Cove Energy Project, L.P.*, Order No. 3413 (Mar. 24, 2014) (conditional DOE authorization)); DOE/FE Order No. 3413-A at 122 (July 6, 2020) (final authorization), https://www.energy.gov/sites/prod/files/2020/07/f76/3143a.pdf, (last accessed Jan. 21, 2021). Petitioners request judicial notice of this order. *See supra* n.2.

weight in determining need that it gives to other precedent agreements for transportation." *NEXUS Gas Transmission*, 172 FERC ¶ 61,199, P15 (Sept. 3, 2020); *see also* Rehearing Order P41 [JA225]. But this is disingenuous, since FERC unswervingly treats domestic precedent agreements as dispositive.[8] FERC's argument is thus that while a Section 3 export authorization is not dispositive on its own, it allows FERC to give export agreements "the same weight" as domestic ones, which *are* dispositive.

_____

[8] *E.g.*, "FERC's conclusion that there is a market need for the Project was reasonable and supported by substantial evidence, in the form of long-term precedent agreements for 100 percent of the Project's capacity." *Appalachian Voices v. FERC,* No. 17-1271, 2019 WL 847199, at *1 (D.C. Cir. 2019); "The criterion is 'market need'—whether the pipelines will be self-supporting—which the applicants here satisfied by showing that 93% of their capacity has already been contracted for." *Sabal Trail*, 867 F.3d at 1379; "In keeping with its policy, the Commission concluded that the evidence that the Project was fully subscribed was adequate to support the finding of market need." *Myersville Citizens for a Rural Cmty., Inc., v. FERC*, 783 F.3d 1301, 1311 (D.C. Cir. 2015); "In this case, FERC reasonably relied on NJNG's binding contract to utilize all of the Project's capacity . . . as evidence of the market need and proof that the Project will be self-supporting." *Twp. of Bordentown v. FERC*, 903 F.3d 234, 262-63 (3d Cir. 2018) (footnote omitted).

Congress deliberately gave pipelines benefitting U.S. consumers eminent domain authority, which it did not give to export projects, and FERC cannot launder an export project through Section 7 to provide authority that Congress did not see fit to grant in Section 3. *See Oberlin*, 937 F.3d at 607 n.2.

### ii.    The Pipeline Provides No "Domestic Benefits."

FERC's second justification is the Pipeline's alleged "domestic benefits," which FERC lists as transporting, producing, and distributing gas, which in turn would allegedly support jobs in sectors and industries that rely on that gas. Rehearing Order P40 [JA225]. Each of these alleged benefits is either imaginary or is not a "public benefit" for purposes of the Act or the Takings Clause.

First, by definition, the Pipeline will not result in *any* distribution of gas to the public, because all of it will be exported. Second, there is no evidence that, even if the project transports U.S. gas, rather than Canadian gas, that the Pipeline will result in additional U.S. gas production. To the contrary, FERC has consistently stated that building

30

new gas infrastructure does not inherently increase gas production. *See*
*NEXUS Gas Transmission*, 160 FERC ¶ 61,022, P170 (Aug. 25,
2017),(FERC approval will not "induce further shale gas production,"
because "a number of factors, such as domestic natural gas prices and
production costs drive new drilling"); *Rockies Express Pipeline,* 150
FERC ¶ 61,161, P39 (Feb. 27, 2015) ("[A] number of factors—including
gas prices, production costs, and transportation alternatives—drive new
drilling.").

FERC has been especially emphatic that its approvals of new LNG
terminals do not lead to any additional gas production. *E.g.*, *Freeport*
*LNG Development*, 148 FERC ¶ 61,076, P33 (Jul. 30, 2014) ("[T]here is
no connection between the projects before us and any specific,
quantifiable induced production."); *Trunkline Gas Co.*, 153 FERC ¶
61,300, P137 (Dec. 17, 2015), ("There is no showing that there is a
sufficient causal link between authorization of this LNG project and
any additional production."); *Cameron LNG,* 147 FERC ¶ 61,230, P68
(June 19, 2014) ("induced production is not caused by the Liquefaction
Project"); *Magnolia LNG*, 155 FERC ¶ 61,033, P116 (Apr. 15, 2016) (no

31

"sufficient causal link" to "any additional production"). FERC made no contrary finding in this case.

That leaves only the Pipeline's benefits in transporting gas. As an initial matter, as Commissioner Glick has noted, "If the benefit of new pipeline capacity is that it will provide new pipeline capacity, then the Commission's assessment of need is little more than a circular 'check-the-box' exercise." *NEXUS Gas Transmission*, 172 FERC ¶ 61,199, Comm'r Glick, dissenting, P7 (Sept. 3, 2020). But the situation is even more absurd here, as the record establishes that all of the gas that the Pipeline would carry, and that the Terminal would export, will come from Canada. Transporting gas produced and processed in Canada for re-export does not provide any "public benefits" under either the Act or the Takings Clause.

Landowner-Petitioners submitted three expert reports pointing out that while FERC keeps saying—without a shred of evidence—that the exported gas would come from both Canada and the U.S., the economics say otherwise. The Project will export Canadian gas because it has been, is now, and for the foreseeable future will be, considerably

32

cheaper than U.S. gas. R3163, Ex.18 at 5-6, Ex.24 at 2-4 [JA447-448, 464-466]; R3749, Exhibit: "McCullough Research April 20, 2020," at 2 [JA730]). Moreover, most gas in the Pacific Northwest *already* comes from Canada. R3163, Ex.24, Fig. 3 [JA465]. And Pembina will profit more from exporting Canadian gas because it is a Canadian company, whose business is to process and transport Canadian gas. R3749, McCullough Exhibit, at 3 [JA731]). FERC never said a word about any of this in Certificate Order or Rehearing Order.

That the Project will export only Canadian gas is not speculative. Pembina has secured the necessary authorizations from both DOE and the Canadian National Energy Board to import Canadian gas into the U.S. for the express purpose of meeting all of the Project's needs. R3163, Ex.19 at 2 [JA453]("[t]he quantity of gas requested for export under the License is necessary to support" the Jordan Cove LNG facility); R3163, Ex.23, *DOE Order 3412*, at 2 [JA458] (Pembina will "import the natural gas from Canada by pipeline . . . to a proposed liquefied natural gas (LNG) export facility to be located at the Port of Coos Bay, Oregon.").

33

Pembina emphasized this point in a subsequent Canadian

National Energy Board filing:

> Jordan Cove LNG is in the same position as LNG
> Canada and other applicants . . . *who seek the
> ability to supply 100 per cent of their project
> requirements from Canada.* The requested
> tolerance would allow Jordan Cove LNG to
> maximize its use of Canadian gas despite
> variations in plant requirements from year to
> year.

R3163, Ex.21 at 2 [JA455] (emphasis added).

Similarly, in its DOE import application, Pembina emphasized

that its DOE and National Energy Board applications together "request

the necessary export and import authorizations *for the maximum

volume* that would be needed at the Project's maximum expanded

capacity." R3163, Ex.23 at 6 [JA461] (emphasis added). Thus, if the

Terminal were ever to find any customers, all of the gas transported via

the Pipeline would come from Canada.

The best FERC could muster to counter this evidence came *after*

the Certificate and Rehearing Orders, in its opposition to Landowner-

Petitioners' vacatur motion. FERC asserted for the first time that "the

34

Pipeline has said that it 'cannot meet the gas supply needs of the [LNG] Terminal and the purpose of the overall Project without accessing U.S. Rocky Mountain supplies.'" FERC Vac. Opp. 10. This *post hoc* argument rests on sleight-of-hand, with the conjunction "and" doing all of the work. Pembina *can* (and plans to) meet all of the Project's needs with Canadian gas, and neither FERC nor Pembina ever dispute this. But Pembina cannot satisfy "the purpose of the overall Project" without U.S. gas, because Pembina has defined the Project's "purpose" as "to export natural gas supplies derived from existing natural gas transmission systems (linked to the Rocky Mountain region and Western Canada) to overseas markets." EIS, 1-6 [JA512]. Having speciously defined the "purpose" of the Project to include U.S. gas, by definition that "purpose" can only be met by doing so. But Pembina is not obligated to satisfy this purpose, and there is no evidence that it will.

In fact, in the proceeding appealing Oregon's "certification denial" of the Project under the Coastal Zone Management Act to the Secretary of Commerce, FERC conceded that it has no idea whether the Project would use *any* U.S. gas and, if it did, how much it would use:

35

> *The proportion of natural gas exported through the project that would originate from the U.S. Rocky Mountains as opposed to Western Canada is unknown.* The Commission does not require this information from project sponsors and does not expect to receive such information.

FERC Ltr. to Nat'l Oceanic and Atmospheric Admin., *supra* n.3, at 3-4 (emphasis added). Pembina, for its part, conceded that there is not a scrap of evidence that any gas will come from the U.S.: "*The record does not indicate the portion of exported gas that is expected to originate from the U.S. Rocky Mountain region as opposed to Western Canada,*" and that "*such information is unavailable.*" Pembina Response to Nat'l Oceanic and Atmospheric Admin. at 4 (Aug. 12, 2020) (emphasis added).[9]

No matter how often FERC says that the Pipeline will transport U.S. gas, there is *zero* record evidence to support that conclusion. To the contrary, *all* of the record evidence is that the Pipeline will transport

---

[9] Available at https://beta.regulations.gov/document/NOAA-HQ-2020-0058-0049 (last accessed Jan. 21, 2021). Petitioners request judicial notice of this document for the reasons stated *supra* n.2.

only Canadian gas, thus making a mockery of the Project's alleged

domestic benefit of transporting U.S. gas.

Certainly, building the Pipeline will provide jobs, even if the

Pipeline never carries U.S. gas, or even any gas at all (as is likely, since

the Terminal has no customers, *infra* Part II.B). But Congress did not

enact the Act as an employment program. By definition, building any

pipeline creates jobs; if jobs were the purpose of Section 7, then this

alone would be a sufficient public benefit and there would be no need for

a public convenience and necessity finding. Indeed, there would no

reason for the Pipeline to carry any gas, since the vast majority of those

jobs would be created by building the Pipeline, not by operating it—

here, an annual average of 1,023 jobs per year during the 4.5 years of

construction and only 200 jobs during operation. EIS 4-615 – 4-616

[JA629-630]; *see Puntenney v. Iowa Utils. Bd.,* 928 N.W.2d 829, 848

(Iowa 2019) (noting that "[i]f economic development alone were a valid

public use," then the Dakota Access pipeline could have used eminent

domain to condemn land to build a palatial mansion, "which could be

defended as a valid public use so long as 3100 workers were needed to

37

build it, it employed twelve servants, and it accounted for $27 million in property taxes.").

No court has ever held that the Act's goal was to create construction jobs or, indeed, that the jobs and tax benefits that result from any government infrastructure approval *alone* satisfies the Takings Clause.

## B.    Pembina's Project Will Not Provide Any Public Benefits Because It Has No Market Support.

Even if *some* hypothetical export pipeline could be required by the public convenience for purposes of Section 7, *this* Pipeline is not it, because nobody wants to buy the Project's LNG. The Terminal is a complete dead end.

DOE requires the Terminal to report the status of its export contracts every six months, and despite seven years of effort, it has reported *no* such contracts. *See supra* n.2. In addition, Petitioners also submitted extensive evidence demonstrating that this Terminal, in

particular, is unlikely to fare any better finding customers in the future. *E.g.* R3749 at 6 [JA723].

FERC cynically and willfully ignores these facts, applying a bright-line rule that the Pipeline's precedent agreements with the Terminal are "sufficient[] evidence of demand." Rehearing Order P33 [JA222].

Section 7 requires a demonstration of market support. Certificate Policy Statement, 88 FERC ¶ 61,227, at 61,744. Here, FERC's market support finding rests solely on (1) Pembina's arrangement to sell gas to itself, by having the Terminal sign precedent agreements for the Pipeline's capacity, Rehearing Order PP25, 33 [JA217-218, 222], and (2) FERC's assertion that it need not look behind these agreements to see whether the Terminal has any chance making good on them and putting the gas to use, *id.* PP30, 35 [JA220-221, 223]:

> As the court stated in *Minisink Residents for Environmental Preservation & Safety v. FERC*, and again in *Myersville Citizens for a Rural Community, Inc. v. FERC*, nothing in the Certificate Policy Statement or in any precedent construing it suggests that the policy statement requires, rather than permits, the Commission to

39

>    assess a project's benefits by looking beyond the
>    market need reflected by the applicant's
>    precedent agreements with shippers.

*Id.* P30 (footnotes omitted). FERC's claim that it is permitted, but never

required, to second guess whether an affiliate precedent agreement

demonstrates market support, *id.*, is contrary to the Certificate Policy

Statement, the Act, and basic principles of agency decision making. As

the Certificate Policy Statement recognizes,

>    The amount of capacity under contract also is not
>    a sufficient indicator by itself of the need for a
>    project, because . . . pipeline capacity is often
>    managed by an entity that is not the actual
>    purchaser of the gas. Using contracts as the
>    primary indicator of market support for the
>    proposed pipeline project also raises additional
>    issues when the contracts are held by pipeline
>    affiliates. Thus, the test relying on the percent of
>    capacity contracted does not reflect the reality of
>    the natural gas industry's structure and presents
>    difficult issues.

88 FERC ¶ 61,227, 61,744. Thus, precedent agreements are, at best,

*evidence* that a pipeline will provide public benefits, *id.*, and this

evidence can be rebutted, *see, e.g., Independence Pipeline Co.*, 89 FERC

¶ 61,283, 61840 (Dec. 17, 1999). To refuse to even consider this

40

possibility is to "fai[l] to consider an important aspect of the problem." *Michigan v. EPA,* 576 U.S. 743, 752 (2015).

Here, the Pipeline's precedent agreements raise every red flag FERC has previously identified with treating precedent agreements as a proxy for market need, and then some. The agreements are with a single customer. Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,748, 61,749. That customer is an affiliate. *Id.* at 61,744. The affiliates entered into the agreements in order to rehabilitate a proposal facing denial. *Independence Pipeline Co.*, 89 FERC ¶ 61,283, 61,840. And most importantly, and perhaps unique to this case, FERC knows what it would find if it *did* look behind these agreements: a purported buyer with no plausible need or use for the gas.

This Court has never held that FERC may uncritically accept any and all precedent agreements; this Court has upheld reliance on precedent agreements when those agreements have been with established entities in the business of selling and transporting gas. *See, e.g., Myersville Citizens for a Rural Cmty.*, 783 F.3d at 1309 (affiliate agreements with "two local [gas] distribution companies"). In contrast,

41

the Terminal has no customers or other use for the gas. As such, whatever the merit of affiliate agreements in general, *these* agreements have literally no probative value in determining "market need" for the Pipeline.

Eventually (and without explanation), FERC went so far as to disclaim its own authority to examine the buyer's *bona fides*: "[F]urther analysis by the Commission regarding market need for liquified natural gas is neither required *nor permitted*." FERC Vac. Opp. 15 (emphasis added). If what FERC is saying is that evaluating the need for the Terminal's LNG is DOE's job, it is missing the point: DOE's Section 3 export review does not bar FERC—or relieve it of the obligation—from evaluating whether a precedent agreement being offered by the Pipeline in a FERC proceeding as evidence of need actually demonstrates need. Rehearing Order P44 [JA227]. And by asking this question, FERC would not be second-guessing any DOE determination, since DOE made no findings about market need for the Terminal's LNG; DOE, in part because its authorizations do not implicate eminent domain, adopts a laissez-faire approach and expects that the global market may not

42

support all the projects DOE approves. R3163, Ex.16 at 142-143
[JA439-440].

FERC's reliance on the agreements is also a 180-degree change of
course from the logic underpinning its 2016 denial of the Project. The
relationship signified by those agreements is not new; it has been a
fundamental assumption of the Project all along. The Natural Gas Act's
"substantial evidence" standard, like the Administrative Procedure Act,
requires FERC to offer a "reasoned explanation" for its decision to
approve the Project after rejecting it in 2016, but it did not. *See* 15
U.S.C. § 717r(b), 5 U.S.C. § 706(2)(A); *F.C.C. v. Fox Television Stations,
Inc.*, 556 U.S. 502, 515-16 (2009); *Am. Wild Horse Preservation
Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

In 2016, FERC recognized that the Pipeline's purpose was to
transport gas to the Terminal. 154 FERC ¶61,190, at P40. FERC
explicitly stated that the Pipeline and Terminal are "integrated." *Id.* at
P43. Despite the fact that the Pipeline and the Terminal were a single
project (and Veresen's protest that there was "no other proposed way"
for gas to reach the Terminal, *id.* at P40), FERC concluded that there

43

was no public need for the Pipeline, and, thus it denied both the

Pipeline *and* the Terminal applications. *Id.* at PP42, 46.

FERC's 2016 denial was sound, and the agency cannot now

"gloss[] over or swerve[] from prior precedents without discussion."

*Southwest Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)

(citation omitted). The new precedent agreements in no way undermine

FERC's 2016 finding that there is no public need for the Pipeline. Given

the prior denial, "reasoned decisionmaking requires the Commission to

do more than simply point to the agreement among affiliates and call it

day." Rehearing Order, Comm'r Glick, dissenting, at P15 n.47 [JA363].

## C. **FERC Failed To Balance The Limited Or Nonexistent Benefits Of The Pipeline With Its Severe Negative Impacts On Landowners And The Environment.**

FERC also failed to weigh the purported public benefits of the

Pipeline with the severe negative impacts on landowners and the

environment, as the Act requires. Under the Certificate Policy

Statement, "the Commission will issue a certificate . . . only if a project's

public benefits (such as meeting unserved market demand) outweigh its

44

adverse effects (such as a deleterious environmental impact on the surrounding Community)." *Oberlin*, 937 F.3d at 602 (citations omitted). FERC must determine the magnitude of both the Pipeline's benefits and harms, and weigh one side against the other. *See* Certificate Policy Statement, 88 FERC ¶61,227 at 61,749.

The "public interest" encompassed by the Act includes impacts on landowners and the environment. *Nat'l Assoc. of Colored People v. Fed. Power Comm'n*, 425 U.S. 662, 669-70 (1976). FERC must consider these factors in making a public interest determination; FERC cannot limit itself solely to considering demand or market support. *Atl. Refining Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959); *Office of Consumers' Council v. FERC*, 655 F.2d 1132, 1147 (D.C. Cir. 1980). Here, although FERC purports to have engaged in a balancing analysis, Rehearing Order P57 [JA234], it failed to "identify the stepping stones" on its path to these conclusions. *Sierra Club v. Costle*, 657 F.2d 298, 333 (D.C. Cir. 1981).

First, as noted above, the Pipeline will have only extremely limited public benefits: at most, these would be the jobs created by

45

building the Pipeline and, if the Terminal were ever to find a customer, operating it (to carry Canadian gas).

Second, even if the Pipeline does have some limited public benefit, FERC failed to explain how it balanced that against the Project's negative impacts. FERC acknowledges some adverse impact on landowners, Certificate Order P89-94 [JA039-041], and the environment, *id*. P155 [JA064-065], but then offers only the conclusory statement that "the benefits the Pacific Connector Pipeline will provide outweigh the adverse effects on economic interests," *id*. P94 [JA041], and that these adverse effects are "acceptable considering the public benefits that will be provided by the projects." *Id*. P294 [JA125].

FERC never offered *any* reasoning or methodology to support this conclusion. As Commissioner Glick stated in dissent, given "the absence of any effort in [FERC's] order to explain why the Project satisfies the relevant public interest standards despite the significant environmental impacts, the only rational conclusion is that those substantial environmental impacts do not meaningfully factor into the Commission's application of the public interest." *Id*., Comm'r Glick,

46

Dissenting, P11 [JA161]. As such, FERC's analysis "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983): whether FERC should "deny [the projects] on the ground that [they] would be too harmful to the environment." *Sabal Trail*, 867 F.3d at 1373.

## III. FERC FAILED TO TAKE THE HARD LOOK AT ENVIRONMENTAL IMPACTS REQUIRED BY NEPA

FERC violated NEPA by not assessing impacts with the potential to significantly harm surrounding communities, including impacts on aviation and wildfire risk. FERC uncritically accepted design choices with no apparent justification, failing to rigorously explore alternatives that would reduce environmental impacts. And FERC undermined its entire NEPA analysis by asserting that denying the application would not reduce impacts, based on the unsupported assertion that if this project is not built, a hypothetical alternative would be approved and built instead.

47

### A. __FERC Shrugged Off Aviation Impacts__

Directly across Coos Bay from the Terminal site, less than a mile away, is the Southwest Oregon Regional Airport, the only commercial passenger airport in the region. EIS 4-656 [JA631]. Although the Federal Aviation Administration ("FAA") has stated that facilities like the Terminal are "incompatible" with nearby airport operations, FAA 2015 Memo at 2 [JA739], FERC failed to take a hard look at impacts on aviation.

The Terminal's liquefaction process is driven by five turbines that combust gas, rated for a combined 2620.5 million British thermal units per hour. EIS 4-687 [JA657]. Other components will also generate heat. The hot exhaust from this combustion creates a thermal plume that generates turbulence, potentially impacting aviation. FAA 2015 Memo at 1-2 [JA738-739]. Proposed facilities with lower heat output, farther removed from airports, have been rejected due to aviation impacts. R2996, 39 [JA402].

FERC did not meaningfully assess this risk. FERC concluded that "thermal plumes emanating from the terminal could adversely affect

48

takeoffs and landings," EIS 4-657 [JA632], but FERC dismissed this impact by repeating the FAA's statement that "the overall risk associated with thermal exhaust plumes in causing a disruption of flight is low." Rehearing Order, P196 [JA303] (quoting FAA 2015 Memo). FERC takes this FAA statement sorely out of context. The risk of thermal plumes *in general* is low, but most thermal plumes are not near airports. As the following sentence of the quoted FAA document states, "[h]owever, … thermal exhaust plumes *in the vicinity of airports* may pose a unique hazard to aircraft in critical phases of flight (particularly takeoff, landing and within the pattern) and *therefore are incompatible with airport operations*." FAA 2015 Memo at 2, [JA739] (emphases added). To assist in evaluating this important risk, the FAA provides a free modeling tool that can be used to assess specific sites, which FERC did not employ. *Id.*[10] Absent any specific analysis, FERC

---

[10] Although Pembina offered a "thermal plume analysis" that predicted "no impacts" to aviation, R3756, 200 [JA736], FERC did not and could not adopt this flawed conclusion. Pembina relies on a study

provides no reason to doubt the FAA's general statement that thermal plumes preclude nearby airport operation.

Instead of analyzing the thermal impacts, FERC improperly sought to punt to other agencies. The Certificate Order relies on "determinations made by the FAA" to conclude that "the project [would not] significantly impact the airport." Certificate Order P155 n.268 [JA065]; *id.* PP244-248 [JA106-107]. But the FAA explicitly excluded thermal, steam, or gas flare plumes from its Terminal analysis, disclaiming authority over these issues, and only considered lighting and structures' physical intrusion into airspace. FAA Letter 425976912, at 5 [JA742]; FAA 2015 Memo at 1 [JA738] ("There are no FAA regulations protecting for plumes and other emissions from exhaust stacks.").

-----

prepared for the design proposed in 2013, in which the thermal plume would be twice as far away from the primary flight path. R1657, 102 [JA391]. Proximity to flight path is a key determinant of a thermal plume's impact. FAA 2015 Memo, at 2 [JA739]. Pembina offered no explanation of how the old study's conclusion remained valid despite halving this distance.

50

The Rehearing Order then erroneously punts to the airport itself. R3761, P197 [JA303-304]. FERC mistakenly suggests that the FAA assigned airport operators sole responsibility for addressing thermal impacts, *id.*, ignoring the FAA's plain request that "permitting agencies" themselves address aviation impacts when they review projects that would produce thermal plumes near airports. FAA 2015 Memo, at 2 [JA739]. FERC is plainly such an agency, and it, not the FAA, must address these impacts. On the other hand, FERC identifies no authority the airport *could* exercise to address this risk—to the contrary, FERC's summary of permits, approvals, and consultations does not identify any role for the airport. EIS 1-28 [JA520].

Even if FERC had demonstrated that another agency had evaluated thermal impacts on aviation, or had authority to address them, NEPA would still require that *FERC* take a hard look at this issue. *Sabal Trail,* 867 F.3d at 1357 (citing *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n,* 449 F.2d 1109, 1122-23 (D.C. Cir. 1971)).

51

FERC admits that the Terminal may impact aviation, but FERC
provides no analysis of the severity of this impact, including whether, as
the FAA warns, the Terminal will be "incompatible" with use of the
region's only passenger airport. This was not a hard look.

## B. FERC Arbitrarily Rubber-Stamped Pembina's Unexplained Switch to a Less Efficient Design Alternative

In the course of NEPA review, FERC described—at different
times—two alternative designs for providing electricity to the Terminal.
FERC violated NEPA by failing to rigorously compare these
alternatives, and FERC violated both NEPA and the Act by offering an
entirely unsupported explanation for FERC's choice between the two.
40 C.F.R. § 1502.14(a) (2019); 15 U.S.C. § 717r(b); *State Farm,* 463 U.S.
at 52.

The Application and draft EIS discuss a design in which three, 30-
megawatt-each generators would produce electricity using waste heat
captured from turbine exhaust. R1886, 2-7 [JA395]; R1055, at 9
[JA382]. These documents stated that two of these generators would

52

more than satisfy the Terminal's needs, which range from 39.2 to 49.5 megawatts, with the third generator installed as a spare. *Id.*; R1055, RR1-32 [JA384]. Under this design, the Terminal would "not be connected to the local grid, and will not import … power." R1055, RR1-32 [JA384].

The EIS substitutes an alternative design *sub silentio*, violating NEPA by failing to compare the new design with the original or to justify excluding the original from analysis. The new alternative still includes three, 30-megawatt generators, but states, implausibly and without any justification, that they will only be "capable of generating a total maximum of 24.4 [megawatts]." EIS 2-8 [JA525]; Rehearing Order P119 [JA266]. The new alternative then adds a newly proposed connection to the electric grid that will supply the balance of power needed, 15 to 26 megawatts.[11] EIS 2-8 [JA525]. Although the EIS did not address the issue, getting electricity from the grid rather than

---

[11] Constant demand of 15 megawatts is the electricity used by 12,500 American homes, which draw on average 1.2 kilowatts per hour. https://www.eia.gov/tools/faqs/faq.php?id=97&t=3.

waste heat increases environmental impacts: producing electricity offsite emits greenhouse gases and other air pollutants, whereas using waste heat has no apparent impacts. *See id.* 3-18 [JA548] (discussing how a separate alternative of replacing all on-site gas turbines with grid-supplied electric power would have indirect effects caused by off-site electric generation); 40 C.F.R. § 1508.8(b) (2019). FERC ultimately adopted the EIS's grid-tied design. Rehearing Order P119 [JA266].

FERC violated NEPA by failing to rigorously explore the direct and indirect impacts of the grid-tied design. More importantly, FERC utterly failed to justify rejection of the environmentally preferable waste-heat-only alternative. FERC has not identified any mistake that Pembina or FERC made, in the Application or draft EIS, in initially concluding that a waste-heat-only alternative was feasible. After the draft EIS was published, Pembina simply filed an unexplained request to limit on-site electricity generation and add an electrical connection to

54

the grid. R1952, at 5 [JA397].[12] Pembina's change in preference, without

more does not justify FERC's exclusion of the previously proposed

waste-heat-only alternative from the EIS. But FERC not only rubber-

stamped Pembina's request for a design change: FERC sought to lock it

in by claiming that any other design, including the one Pembina

originally proposed, would be infeasible—a claim Pembina itself did not

make. *Compare* R1952, at 5 [JA397] *with* Rehearing Order P119

[JA266] (asserting without citation that "Commission staff determined,

and we agree, that supplying all facility power through waste heat is

not feasible."). FERC's *sua sponte* claim of infeasibility is implausible on

its face, constitutes an unexplained reversal of positions taken by FERC

and Pembina in this very proceeding, and is not supported by *any*

---

[12] While neither Pembina nor FERC have explained the decision
to limit on-site electricity generation to 24.4-megawatts, Oregon's
Energy Facility Siting Commission asserts jurisdiction over facilities
capable of generating 25 megawatts or more, and this agency told
FERC that absent further evidence to the contrary, it considers the
generators here to qualify. R3647, at 3 [JA673].

citation or analysis. FERC's rejection of the environmentally preferable waste-heat-only alternative was arbitrary.

### C. **FERC Provided No Analysis of Increased Wildfire Risks**

Southwest Oregon features extremely rugged terrain and frequent wildfires; fires regularly burn near and across the Pipeline route. EIS 4-177 – 4-178 [JA624-625], R3590, App'x K Figs. 2.1 – 2.8 [JA483-490] (maps of recent fires). Construction and operation of the Pipeline and right-of-way will increase the likelihood and potential severity of fire. EIS 4-178 [JA625]; Rehearing Order P210 [JA310]. The potential for a wildland fire stemming from the construction or operation of the Pipeline to threaten nearby private property is real, *e.g.*, Addendum p.72 (Eatherington Decl. ¶10), and yet FERC failed to provide any discussion of the severity or consequences of this additional fire risk, falling fall short of the hard look NEPA requires. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

First, FERC agrees that construction of the Pipeline may itself start a wildfire, but provides no discussion of the likelihood or

56

consequences of such an occurrence. Ignition may result from
"prescribed burning of slash, mowing, welding, refueling with
flammable liquids, and parking vehicles with hot mufflers or tailpipes
on tall dry grass." EIS 4-178 [JA625]. These activities are riskiest
during "fire season," but that is when pipeline construction would
primarily occur; FERC declined to impose fire season restrictions. *Id.*;
R3720, 31 [JA714]; Rehearing Order P216 & n.683 [JA312].
Nonetheless, FERC does nothing more than acknowledge that this is a
risk, without, for example, addressing how often these activities start
fires, how effectively such fires are controlled, or, if they escape control,
their consequences on the environment and private property scattered
across the forested land crossed by the Pipeline.

Second, Petitioners explained that the Pipeline right-of-way—
which FERC requires to be maintained in an early-successional
condition (*i.e.*, comprised of flammable shrubs, grasses, and small
diameter trees)—will act as a "wick" if a wildfire occurs. R2996, 175-76
[JA403-404]. FERC did not analyze the risk and effects of *lateral* spread
of fire along and out from the right-of-way. While FERC did observe

57

that ground fires can climb vertically into the forest canopy through

"ladder" fuels, EIS 4-178 [JA625], it did not analyze the qualitative

changes to vegetation resulting from canopy fires, whether firefighters

would be able to access and successfully suppress a crown fire should it

occur, and if suppression was unlikely, what the potential

environmental consequences would be of such a wildfire.

Third, FERC did not address the potential for, and effects of, a

rupture of the Pipeline that results in a wildland fire. Instead, FERC

merely referenced data regarding pipelines constructed in urban

environments and concluded that pipeline ruptures were rare,

explaining that most fatalities from pipeline ruptures come from feeder

lines in urban environments. EIS 4-819 [JA664]. It did not analyze the

risk and effects of wildfire from a pipeline rupture in a nonurban,

rugged, forested environment, which is already predisposed to fire.

FERC's "general statements about 'possible' effects and 'some risk' do

not constitute a 'hard look' absent a justification regarding why more

definitive information could not be provided." *Neighbors of Cuddy*

*Mountain*, 137 F.3d at 1380 (holding that merely acknowledging that

58

there would be cumulative effects on old growth habitat, without any quantitative analysis of "number or percentage" of old growth trees impacted, violated NEPA); *accord Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998). The EIS provides nothing to inform decisionmakers or the public about whether the increase in fire risk is significant enough to warrant modifying or denying the Pipeline. FERC has not contended that further analysis is impossible. NEPA requires more than simply acknowledging that the Pipeline would increase wildfire potential. FERC must actually disclose to the public the potential direct, indirect, and cumulative *effects* of a Pipeline-related wildfire on people and the environment. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011).

**D. <u>FERC Arbitrarily Refused to Use Oregon's Greenhouse Gas Emission Reduction Targets, or Any Other Benchmark, to Evaluate the Significance of Project Greenhouse Gas Emissions</u>**

Both NEPA and the Act require FERC to take a hard look at the impact of greenhouse gas emissions. *Sabal Trail*, 867 F.3d at 1376.

Here, the Project will emit 2,145,387 metric tons of carbon dioxide equivalent per year within the State of Oregon. Certificate Order P259 [JA112]. Nonetheless, FERC asserted that it was incapable of discussing the consequences, severity, or significance of these impacts, *id.* P262 [JA113-114], as FERC has done in *every* other proceeding Landowner and Conservation Petitioners are aware of.

Climate impacts are not as intractable as FERC claims. Oregon has adopted greenhouse gas reduction goals that provide a benchmark for the significance of these impacts. *See* OR. REV. STAT. § 468A.205; R3749, Ex. "Ore. Exec. Order 20-04" at 5 [JA728]. NEPA specifically requires FERC to address "any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned)." 40 C.F.R. § 1506.2(d) (2019); *see also* 40 C.F.R. § 1502.16 (2019). Here, FERC acknowledges that the Project emissions will consume 4.2 and 15.3 percent of Oregon's 2020 and 2050 emission budgets, respectively. Certificate Order P261 [JA113]. But FERC refuses to address whether these emissions represent a conflict with— or will outright preclude achievement of—those goals. Nor does FERC

60

address whether consuming such a large portion of the emission budget demonstrates that the emissions are significant.

FERC's stated reason for disregarding Oregon's targets is that Oregon has not "create[d] any additional regulatory authority to meet" them. Rehearing Order P252 [JA327-328]. This is a shocking and arbitrary move of the goalposts. FERC has frequently complained that it lacked state "goals,"[13] "thresholds,"[14] "targets[,] or benchmarks"[15] against which to measure greenhouse gas emissions, without any suggestion that those "goals," *etc.*, would only be informative if they were enforceable. Nor has FERC explained *why* a legislatively adopted goal does not provide a useful benchmark unless it is backed by "additional regulatory authority." Certificate Order P260 [JA113].

Nor can FERC reasonably complain that the problem is a lack of specificity. Again, FERC has never previously suggested that a

---

[13] *Alaska Gasline Dev. Corp.*, 171 FERC ¶ 61,134 P215 (May 21, 2020).

[14] *Fla. Se. Connection*, 162 FERC ¶ 61,233 P26 (Mar. 14, 2018).

[15] *Rio Grande LNG*, 169 FERC ¶ 61,131, P108 (Nov. 22, 2019).

61

statewide benchmark would be inadequate. FERC now argues that Oregon has not specifically set standards applicable to "natural gas or LNG facilities." *Id.* But it does not take sector-specific analysis to see that Oregon is unlikely to meet its 2050 goal if a full seventh of the target is allocated to this Project, or that a 2 million ton per year emissions *increase* will undermine Oregon's ambitious goals for emission *reductions*.

Comparison with state emission targets is not the only way to evaluate the significance of greenhouse gas emissions; FERC could have used some other "method[] generally accepted in the scientific community" to do so. 40 C.F.R. § 1502.22(b)(4) (2019). However, given FERC's conceded failure to use any other method, FERC's refusal to measure significance against Oregon's statewide emission reduction targets was arbitrary.

**E.  FERC's "No Action" Alternative Unreasonably Assumes That A Comparably Harmful Project Is Inevitable**

FERC's analysis of the "no action alternative" relies on blanket assertions that are not only unreasonable but unsupported by the

62

evidence. A reasoned no action alternative is a required element of NEPA. 40 C.F.R. § 1502.14(c) (2019); *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011); *see also N.C. Wildlife Fed. v. N.C. Dep't of Transp.*, 677 F.3d 596, 602 (4th Cir. 2012). The no action alternative "serves as a baseline against which the impacts of the proposed action are compared and contrasted." EIS 3-4 [JA534]. An agency acts arbitrarily and capriciously when it bases its NEPA analysis on a no action alternative so illogical as to "'defeat NEPA's goals of decisionmaking and informed public comment.'" *Wildearth Guardians v. BLM*, 870 F.3d 1222, 1237 (10th Cir. 2017) (quoting *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009)). Such is the case here.

FERC states in the EIS that the no action alternative would "not likely provide a significant environmental advantage" because the Project "is market-driven" and "it is reasonable to expect that in the absence of a change in market demand, if the Jordan Cove LNG Project is not constructed (the No Action Alternative), exports of LNG from one or more other LNG export facilities may occur." EIS 3-5 [JA535].

63

Although FERC admits that no alternative to the Project has been
proposed (and why would one be, given the complete lack of demand for
the Terminal), FERC argues that a hypothetical substitute project
"would require a similar footprint," "could occur … in the region," and
would have similar environmental consequences to the proposed action.
*Id.*

Other courts have rejected similar unsupported agency assertions
of powerlessness over alleged market forces. In *Wildearth Guardians*,
the Bureau of Land Management asserted that denying coal leases on
federal land would make "no appreciable difference" because "even if it
did not approve the proposed leases, the same amount of coal would be
sourced from elsewhere." 870 F.3d at 1228. The Tenth Circuit held that
this "blanket assertion" was "unsupported by hard data" and simply
"irrational." *Id.* at 1235-36; *see also id.* at 1237-38 (agency abused its
discretion when it relied "on an economic assumption, which
contradicted basic economic principles, as the basis for distinguishing
between the no action alternative and the preferred alternative.")

64

Here, as in *WildEarth Guardians*, nothing supports FERC's assumption that the market's appetite for a facility comparable to the Terminal is inevitable. Moreover, this case is even more extreme, because any substitute facility would *also* require FERC approval. *Cf. WildEarth Guardians*, 870 F.3d at 1228 (BLM asserted that denying federal coal leases would merely shift coal production to other "national and international suppliers"). Thus, *even if* selecting the no-action alternative here would assuredly lead to a substitute proposal—which, the evidence and project's history indicate is unlikely—and *even if* that proposal would have comparable environmental impacts, this does not mean that FERC's no action alternative would result in the same impacts: FERC could (and should) deny the substitute as well. Moreover, the actual impacts of the hypothetical substitute LNG terminal, perhaps located in a different part of the country, would depend on a series of separate approvals by multiple federal and state agencies.

65

# CONCLUSION

For these reasons, the Court should vacate the Certificate Order and remand to FERC.

Dated: July 6th, 2021

Respectfully submitted:

*/s/ David Bookbinder*
David Bookbinder
Megan C. Gibson
NISKANEN CENTER
820 First Street, NE, Suite 675
Washington, DC 20002
301-751-0611
dbookbinder@niskanencenter.org
mgibson@niskanencenter.org
*Attorneys for Landowner Petitioners*

*/s/ Nathan Matthews*
Nathan Mathews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5695
nathan.matthews@sierraclub.org

*Attorney for Rogue Riverkeeper, Rogue Climate, Cascadia Wildlands, Center for Biological Diversity, Citizens for Renewables, Friends of Living Oregon Waters, Oregon Physicians for Social Responsibility, Oregon Wild, Oregon Women's Land Trust, Sierra Club, and Waterkeeper Alliance*

66

*/s/ Susan Jane M. Brown*
Susan Jane M. Brown
Western Environmental Law Center
4107 NE Couch Street
Portland, OR. 97232
(503) 914-1323
brown@westernlaw.org
*Attorney for Rogue Riverkeeper, Rogue Climate, Cascadia Wildlands,*
*Center for Biological Diversity, Citizens for Renewables, Friends of*
*Living Oregon Waters, Oregon Physicians for Social Responsibility,*
*Oregon Wild, Oregon Women's Land Trust, and Waterkeeper Alliance*


*/s/ Gillian Giannetti*
Gillian Giannetti
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 717-8350
ggiannetti@nrdc.org

Ann Alexander
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6190
aalexander@nrdc.org

*Attorneys for Natural Resources Defense Council, Inc.*

67

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32, I certify that: this brief complies with:

1. the type-volume limitations set by the December 18, 2020 briefing order issued in this case, because this brief contains 11,169 words, excluding the parts of the brief exempted by Rule 32(f); and Petitioners' combined briefs less than the 23,850 limit set by the Court, and

2. the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

*/s/ Nathan Matthews*
Nathan Matthews

## CERTIFICATE OF SERVICE

I hereby certify that on 6th day of July, 2021, I electronically filed the foregoing Landowner and Conservation Petitioners' Proof Joint Opening Brief with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

*/s/ Nathan Matthews*
Nathan Matthews